Maryam Fatouh, Esq.
111 Town Square Place, Ste. 1238
Jersey City, NJ 07310
P: (856) 296-1877
E: Maryam.Fatouh@gmail.com

Theodore Bohn, Esq.
90 Montgomery Street
Bloomfield, NJ 07003
P: (631) 512-2412
E: Ted1091@gmail.com
*Attorneys for Plaintiffs*

Jonathan Wallace, Esq.
P.O. Box 728
Amagansett, NY 11930
P: (917) 359-6234
E: Jonathan.Wallace80@gmail.com
*\* Admitted pro hac vice*

**FAWZIA AFZAL-KHAN** and **ADAM RZEPKA**,

*Plaintiffs*,

vs.

**JONATHAN G.S. KOPPELL,** President of Montclair State University, in his official and individual capacities; **MARGAREE COLEMAN-CARTER**, Associate Vice President and Dean of Students of Montclair State University, in her official and individual capacities; **ASHANTE S. CONNOR**, Associate Vice President of Inclusive Excellence and Special Advisor to the President of Montclair State University and Former Director of Equity and Title IX Coordinator of Montclair State University, in her official and individual capacities; **JULIA DELBAGNO**, Assistant Dean of Student Engagement of Montclair State University, in her official and individual capacities; **DAWN MEZA SOUFLERIS**, Vice President for Student Development of Montclair State University, in her official and individual capacities; and **KENNETH E. SUMNER**, Former Associate Provost for Academic Affairs of Montclair State University, in his official and individual capacities;

*Defendants.*

Civil Case No.:
2:25−CV−13793−MEF−MAH

Hon. Michael E. Farbiarz, U.S.D.J. Hon. Michael A. Hammer, U.S.M.J.

**SECOND AMENDED COMPLAINT**

JURY TRIAL DEMANDED

Plaintiffs Fawzia Afzal-Khan ("Afzal-Khan") and Adam Rzepka ("Rzepka") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this Complaint against all Defendants and allege as follows:

**PRELIMINARY STATEMENT**

1. Montclair State University's ("MSU") website presents a strong commitment to freedom of expression on its public campus: "Freedom of speech is at the core of the mission of higher education. The First Amendment to the Constitution of the United States protects freedom of speech, a fundamental and human right of all American citizens. The right protects all speech regardless of its content. Any attempt to restrict speech at public colleges and universities is a direct violation of the United States Constitution. The restrictions set forth by the First Amendment establish that students, faculty and administrators do not have the right to silence any individual or group of individuals." [1]

2. Beginning in late 2023, the senior administration at MSU violated the letter and spirit of this affirmation in every respect, in a concerted effort to silence calls on its campus for Palestinian human rights. In doing so, it joined a widespread effort at universities nationally: on campuses across the country, academics and students of every kind have been and continue to be stifled, censored, and intimidated— both professionally and

---

[1] https://www.montclair.edu/civic-and-voter-engagement/on-campus-expressive-activity/

personally—simply for speaking out against the ongoing U.S.-funded genocide of the Palestinian people. Entire futures have been jeopardized by the very colleagues these academics once called friends, and by universities they have long regarded as sanctuaries for truth, dialogue, and dissent.

3. This action arises from the deliberate and coordinated effort by the Defendants to suppress the constitutionally protected speech of faculty and students advocating for Palestinian human rights beginning in November 2023.

4. From November 2023 forward, Defendants engaged in a pattern of intimidation including, but not limited to, misusing police presence to threaten and break up small, peaceful protests; hobbling all means of mass communication between its faculty and staff; imposing punitive disciplinary measures; misrepresenting speech policies; imposing reputational harm and ostracism; enforcing prior restraint, and inviting others to harm Plaintiffs based on their exercise of Constitutionally protected rights-- all in order to silence a single "disfavored" viewpoint.

5. The backdrop for this case is the powerful international mass movement of people of conscience who have spoken out in solidarity with the people of Palestine and against Israel's genocide. United States support for this genocide has forced widespread discussion of important questions of public interest, namely (1) the prolonged moral and legal injury to the Palestinian people in denying them their collective right to self-determination and sovereignty, as well as each of their individual basic human rights, including but not limited to the right to life, the rights to freedom of movement, assembly,

3

and expression, the right to a healthy natural environment, the right to education, and many other rights that are (or have until recently been) taken for granted in the United States; and (2) the active participation or complicity in these wrongs by higher education institutions and other actors.

6. The Palestine solidarity movement on campuses belongs to a tradition of students and faculty rising up to reject policies and official actions that violate our stated values and/or legal norms. Campus movements in opposition to the American war in Vietnam, other American military interventions around the globe, Apartheid in South Africa, and dependence on fossil fuels have forced important public reckonings and policy changes over the years.

7. Indeed, vibrant campus movements, and their faculty supporters, have proved essential to the healthy functioning of democracies.

8. In contrast to the salutary function of dissenting student voices, there is an international trend to suppress speech in support of Palestinians through such means as imposing limitations on Constitutionally protected speech intended to diminish its reach or impact; impermissibly retaliating against speakers for their speech; and intimidating people who hold disfavored views, whether directly or indirectly, by knowingly exposing them to harm or intimidation by others.

**JURISDICTION AND VENUE**

4

9. This is a civil rights action that raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

10. This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has the authority to award the requested damages pursuant to 28 U.S.C. 1343; the requested declaratory relief pursuant to 28 U.S.C. §§ 2201-02; the requested injunctive relief pursuant to 28 U.S.C. §1343 and Fed. R. Civ. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

11. Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because the Defendants reside in this district and because all of the acts described in this Complaint occurred in this district.

## **PARTIES**

12. Plaintiff Professor Fawzia Afzal-Khan ("Afzal-Khan,") is and was a tenured professor of English and University Distinguished Scholar at MSU, where she has taught since 1987, and is currently a visiting professor at Princeton University. She is a renowned interdisciplinary scholar, playwright, poet, and public intellectual whose academic and creative work spans postcolonial studies, feminism, performance, and Muslim cultural identity. She has also published widely in academic journals and major media outlets and is known internationally as a scholar-activist and advocate for academic freedom.

13. Plaintiff Professor Adam Rzepka ("Rzepka") is and was tenured professor in the Department of English at MSU, and the author of internationally recognized academic

5

publications on Shakespeare and early modern studies. He has been a highly successful, well-respected, and popular professor at MSU for twelve years, and an elected member of the University Senate for the past year. He has served on numerous university committees and is a respected voice on issues of policy transparency and faculty rights.

14. Defendant Jonathan G.S. Koppell ("Koppell"), is and was the President of Montclair State University. He is sued in both his individual and official capacities. As the chief executive officer of the University, Defendant Koppell exercised and implemented final decision-making authority over campus policy, enforcement, and disciplinary measures. He personally approved, directed, or ratified the discriminatory treatment of Plaintiffs and others engaging in constitutionally protected speech related to Palestine, including the forceful removal of student demonstrators, the suppression of faculty expression, and the disparate application of university rules. His actions resulted in clear violations of Plaintiffs' rights under the First and Fourteenth Amendments.

15. Defendant Margaree Coleman-Carter ("Coleman-Carter") is and was the Associate Vice President and Dean of Students of Montclair State University. She violated Plaintiffs' rights as set forth herein by ordering and/or participating in their discriminatory treatment due to their engagement in constitutionally protected speech related to Palestine, including directing and participating in the forcible dispersal of peaceful pro-Palestinian campus vigils and threatening Plaintiffs and other faculty participants with investigation for "insubordination." She is sued in both her individual and official capacities.

16. Defendant Ashante S. Connor ("Connor") is and was Associate Vice President of Inclusive Excellence and Special Advisor to the President of Montclair State University and Former Director of Equity and Title IX Coordinator of Montclair State University. She violated Plaintiffs' rights as set forth herein by initiating and administering a baseless "hostile environment" investigation against Rzepka in retaliation for his protected speech on Palestine, imposing restrictions on his campus communications, and recording unfounded disciplinary findings in his EEOC file, thereby contributing to the discriminatory suppression of pro-Palestinian expression on campus. She is sued in both her individual and official capacities.

17. Defendant Julia DelBagno ("DelBagno") is and was Assistant Dean of Student Engagement of Montclair State University. She violated Plaintiffs' rights as set forth herein by, inter alia, ordering and/or participating in their discriminatory treatment due to their engagement in constitutionally protected speech related to Palestine, including directing the relocation and dispersal of peaceful pro-Palestinian vigils without lawful basis and misrepresenting university policies to justify such actions. She is sued in both her individual and official capacities.

18. Defendant Dawn Meza Soufleris ("Soufleris"), is and was the Vice President for Student Development of Montclair State University. She violated Plaintiffs' rights as set forth herein by ordering and/or participating in their discriminatory treatment due to their engagement in constitutionally protected speech related to Palestine, including directing campus police to disperse peaceful pro-Palestinian vigils, personally confronting and harassing faculty participants, and permitting hostile counter-protesters to threaten and

7

intimidate students and faculty without intervention. She is sued in both her individual and official capacities.

19. Defendant Kenneth E. Sumner ("Sumner"), is and was the Associate Provost for Academic Affairs of Montclair State University. He violated Plaintiffs' rights as set forth herein by ordering and/or participating in their discriminatory treatment due to their engagement in constitutionally protected speech related to Palestine, including falsely representing that restrictive protest policies were in effect, threatening Plaintiffs and other faculty participants with investigation for "insubordination," and obstructing their ability to engage in peaceful, protected expressive activity. He is sued in both his individual and official capacities.

## STATEMENT OF FACTS

### I. Defendants' Policy on First Amendment-Protected Campus Activities

20. Defendants have undertaken a clear, sustained and coordinated campaign of suppression, with the objective of chilling Plaintiffs' speech, through administrative overreach, false accusations, and targeted disruption and suppression of university speech forums.

21. Defendants' violation of their own binding university policies demonstrates the extent of their retaliatory objectives.

### A. The YAL Case

22. On September 10, 2019, three students affiliated with Young Americans for Liberty ("YAL") engaged in an on-campus protest challenging MSU's "gun-free zone" policies.

23. The students were ordered to leave by campus police under a then-existing policy requiring prior permission from an MSU Dean at least two weeks in advance of any protest.

8

24. This policy granted MSU officials unbridled discretion to deny permission indefinitely and seemingly without reason.

25. On January 15, 2020, a federal lawsuit, *Young Americans for Liberty at Montclair State University v. Trustees of Montclair State University* et al. (case number 2:20-cv-00508-BRM-JSA) (Exhibit A), was filed on behalf of YAL asserting that the policy constituted an unconstitutional prior restraint on student speech, and further challenging MSU'S delegation of discretionary powers to the Student Government Association and the Bias Education Response Taskforce, authorized to investigate (and hence punish) "bias incidents" including political expression.[2]

26. MSU was subsequently found to have impermissibly restricted the First Amendment rights of pro-gun protesters on campus. To remedy this constitutional violation, a settlement agreement was reached by the parties that explicitly required MSU to adopt a specific Expressive Activity Policy verbatim ("2021 Policy") (Exhibit B).

27. The Settlement Agreement and Release, dated June 15, 2021 (Exhibit C), required MSU to formally adopt the 2021 Policy to ensure that its rules governing expressive activity on campus did not infringe upon the First Amendment rights of students and faculty.

28. The 2021 Policy was expressly intended to prohibit viewpoint discrimination and to safeguard disfavored or controversial speech from administrative suppression, while allowing free engagement in expressive activity in all indoor and outdoor locations of the university at any time, provided that such activity did not directly disrupt or impede the

---

[2] https://adflegal.org/press-release/pro-liberty-student-groups-lawsuit-prompts-nj-university-abolish-bias-response-team/

essential functions of the university. The 2021 Policy was in effect from June 2021 throughout the period at issue in this complaint.

## II. Defendants' Violation of Content-Neutral Expression Policies in November 2023

29. On November 6, 2023 (one month after the events of October 7th), Koppell issued a campus-wide email titled "Respecting and Caring for Each Other During Challenging Times," addressing the tensions seen in relationships across the campus over the preceding weeks (Exhibit D).

30. Discretely buried within Koppell's email was a previously unannounced directive restricting all "rallies and vigils" to the university's Amphitheater, which Koppell claimed would "lessen the impact on instruction, especially during this critical time in the semester." The email stated:

> "Please keep that in mind that as we continue to follow our Expressive Activity Policy (One specific update: recent rallies and vigils have been conducted in the Quad near the Student Center. But the volume has become disruptive to teaching and learning. Beginning the week of November 6, 2023, all such events will be located at the University's Amphitheater, to allow safe expression in an area that is accessible but lessens the impact on instruction, especially during this critical time in the semester.")

31. Koppell's statement both seemingly affirmed that the 2021 Policy was still operative, while introducing a new condition on rallies and vigils (clearly referring to demonstrations advocating for Palestinian human rights over the month of October 2023).

32. This eviscerated the 2021 Policy's essential requirement to respect the First Amendment protections.

33. Rather, the purported change—never actually implemented or even referenced thereafter—served only to create confusion, and was subsequently invoked, along with a

range of other spurious rationales (detailed below), to threaten Afzal-Khan and Rzepka with investigation for engaging in expressive activity elsewhere.

34. Further, the claim that the "volume [of rallies and vigils] has become disruptive to teaching and learning" was not supported by facts.

35. Koppell, bound by the mandate of the 2021 settlement agreement, nonetheless impermissibly and arbitrarily attempted to impose a substantial new condition restricting expressive activity to the Amphitheater without altering the officially posted 2021 Policy.

36. In addition to rallies, vigils, and other physical demonstrations, Defendants read a good deal of discussion and debate occurring among members of the community, including written exchanges on existing campus listservs.

37. The listservs named "Campus" and "Discuss" were two online forums for MSU faculty and staff that were heavily used for exchange of information and views on Palestine and Israel in the period from October 2023 to December 2023.

38. By December 2023, the "Discuss" listserv and the "Campus" listserv each had over 3,000 subscribers. These forums were the primary vehicles for open dialogue and event coordination, including around the Gaza conflict.

39. Both Afzal-Khan and Rzepka had shared anti-war and pro-ceasefire viewpoints on these listservs, as they had previously done for the month preceding Koppell's statement.

40. December 7, 2023, began a shocking and alarming turn of events by which Defendants escalated censorship of Rzepka's Palestine-related speech.

41. That day, Rzepka received an email from Defendant Connor stating that her office had received "a formal complaint(s)…alleging you [Rzepka] may have violated provisions of the New Jersey State Policy Prohibiting Discrimination in the Workplace. The University

11

has initiated a preliminary inquiry into the allegations and imposed interim measures." (Exhibit E).

42. These "measures" forbade Rzepka from engaging "in any form of communication on the Montclair State University 'Discuss' listserv OR discuss@lists.montclair.edu."

43. Connor further required that Rzepka appear for an intake meeting on December 14, 2023, the purpose of which would be to review the applicable policies, procedures, and the complaint.

44. As a result, Professor Rzepka's access to the "Discuss" listserv was suspended "until further notice."

45. The above-mentioned "intake meeting" ultimately convened on December 19, 2023.

46. At that meeting, Connor indicated that they had "received complaints against [Rzepka] alleging inappropriate conduct that constitutes a hostile work environment under the New Jersey State Policy Prohibiting Discrimination in the Workplace," on or about November 13, 2023. (Exhibit F).

47. Rzepka was specifically accused of creating this "hostile environment" for [a] "protected class" on the Discuss listserv, a truly unfounded allegation with no specific evidence offered other than that he had peacefully and appropriately expressed his support for an end to the genocide in Gaza.

48. Indeed, Rzepka was afforded only a single "intake" hearing, with no opportunity to hear from his accuser(s) as to whom he allegedly created a hostile work environment or how, much less the composition of the alleged protected class.

49. After recording this baseless and defamatory allegation in Rzepka's file, Defendants began sending Rzepka weekly emails demanding that he complete "optional" Human Resources ("HR") training.

50. These emails were originally scheduled to continue until 2034, but were discontinued after January 23, 2025, after Rzepka made multiple requests for clarifying details around the purported harassment, all of which were met with refusal.

51. Inexplicably, Connor's December 12, 2023 email invoked "religion" and "national origin" as the relevant protected classes, yet it failed to identify any of his actions that alleged to have created a "hostile work environment," and further failed to offer an example of the specific protected class at issue.

52. In fact, it would have been impossible to identify any examples of Rzepka targeting a protected class, not only because Defendants failed to identify one but also because Rzepka did not do so.

53. Defendants targeted Rzepka with this false accusation simply because he replied to emails which defended and justified the bombing of Gaza posted by other MSU faculty and staff, advocated for a ceasefire, and decried the mass slaughter of innocent Palestinians, particularly children, in Gaza.

54. Then, on December 21, 2023, in yet another campus-wide email, Koppell abruptly and arbitrarily dissolved the "Discuss" and "Campus" listservs, unsubscribing all users, including Rzepka and Afzal-Khan (Exhibit G).

55. The elimination of these essential campus communication channels substantially chilled Rzepka's (as well as Afzal-Khan's) protected speech and damaged their professional and reputational standing.

56. In this December 21, 2023, email, Koppell stated "Effective today, December 21, we will no longer automatically subscribe employees to the Campus, For Sale, and Discuss lists. To provide you with the choice to participate in Campus, For Sale or Discuss, we will unsubscribe all current members of these lists today, so from now on, if you want to participate you will need to re-subscribe."

57. Koppell admitted that he was taking this repressive action in response to "concerns about recent posts"—an obvious reference to Professor Rzepka's ceasefire posts and anti-war speech on those listservs.

58. On December 22, 2023, Rzepka received a follow-up email from Connor confirming that, at their November 30, 2023, meeting, she had reviewed the New Jersey State Policy Prohibiting Discrimination in the Workplace as it related to the conduct attributed to Rzepka (see Exhibit E, attached hereto).

59. Connor further ordered Rzepka to complete a mandatory online training course entitled "Preventing Harassment & Discrimination — Gateway" (alternatively titled the Code of Conduct course)."

60. This demand was patently unreasonable: Connor supplied no specific evidence whatsoever for the alleged violation of the aforementioned policy, depriving Rzepka of any meaningful opportunity to rebut Defendants' unfounded and unarticulated allegation.

61. As a direct consequence of that finding, Connor sanctioned Rzepka by (1) ordering him to complete additional anti-harassment training and (2) permanently flagging his record such that any future complaints about him relative to any State or University policy must be referred to Employee and Labor Relations for further action—a clear threat to his employment.

62. Connor not only silenced and sanctioned Rzepka without justification but also bypassed the very process set forth in MSU's own policy on Reporting Discrimination or Harassment, which states that any disciplinary action against faculty must first receive the university President's approval.[3]

63. As a direct result of this serious procedural defect, Rzepka was forced to ask the Union to file a formal grievance to cure the violation (Exhibit I).

64. Koppell then subsequently reviewed and confirmed the finding against Rzepka, still without even identifying which religious class he had allegedly harassed—let alone providing evidence that he had harassed its members (Exhibit J).

### III. Defendant's Clear and Consistent Pattern of Viewpoint-Based Discrimination Against Pro-Palestine Expression Throughout 2024

65. Defendants deliberately targeted and suppressed a specific viewpoint: that the Israeli assault on Gaza constitutes a grave violation of Palestinian human rights and must end immediately.

66. No other viewpoint on campus was met with anything remotely approaching the same sustained, coordinated, and disproportionate repression between November 2023 until the present day.

67. On February 27, 2024, Afzal-Khan and her spouse attended an MSU sponsored "Alumni Night" event.

---

[3] https://www.montclair.edu/about-montclair/compliance/equity-and-title-ix/reporting discrimination-or-harassment/

68. There, Afzal-Khan was approached by an MSU Faculty Dean who publicly reprimanded Afzal-Khan before members of the faculty and her spouse for unspecified posts on a campus listserv—without identifying any particular comments.

69. Upon information and belief, this MSU Faculty Dean subsequently admitted during a meeting with Afzal-Khan that he regarded her views on Israel as "antisemitic."

70. Upon information and belief, no such similar admonition was directed at any other faculty member in attendance that evening, nor at any other individual posting on the Discuss Listserv.

71. This MSU Faculty Dean's remarks specifically targeted Afzal-Khan, demonstrating viewpoint discrimination and chilling her protected speech as well as her academic freedom.

72. On March 7, 2024, a fully approved student-led fundraiser for medical supplies to Gaza was canceled by the Defendants less than 24 hours before the event, citing organizational affiliations.

73. On April 24, 2024, Rzepka subsequently discovered he could no longer post to the MSU College of Humanities and Social Sciences ("CHSS") listserv.

74. Peter Kingstone ("Kingstone"), the then MSU Dean of CHSS, confirmed that the list was now restricted and later refused to forward messages concerning Palestinian advocacy (however, several months after the fact, Dean Kingstone acknowledged that the speech restrictions had been implemented pursuant to directives "from above," specifically from Koppell's office (Exhibit K).

75. The next semester, four MSU faculty members, including Rzepka and Afzal-Khan, as well as several MSU students, held a silent campus vigil on September 5, 2024.

16

76. During this silent vigil, Rzepka and Afzal-Khan held up signs reading "We Mourn," in Hebrew and Arabic, in memory of the Palestinian and Israeli children killed in the war.

77. Within minutes of the commencement of this vigil, DelBagno and Soufleris, along with approximately 10 campus police officers, arrived to demand the vigil's relocation to the campus Amphitheater.

78. When questioned by Plaintiffs about the justification for their removal and relocation, DelBagno and Soufleris were unable to explain what actions qualified as "expressive activity."

79. Upon information and belief, DelBagno and Soufliers notably acknowledged that the Amphitheater restriction was not in the current 2021 Policy.

80. Upon information and belief, they stated, falsely, that the restriction would be added that same day to the official policy in place at that time.

81. Following this silent vigil, Rzepka and Afzal-Khan met with Sumner on (or about) September 12, 2024, whereupon Sumner falsely asserted that the Amphitheater restriction was in the 2021 Policy.

82. Upon information and belief, when corrected and asked whether Plaintiffs could proceed with a second silent vigil following the meeting, Sumner replied, "You can do whatever you want."[4]

83. Later that same day, consistent with Sumner's statement that they could "do whatever [they] want," Afzal-Khan and Rzepka, together with several MSU students, held a second

---

[4] This conversation is documented in an audio recording, which Plaintiffs can provide to this Court upon request.

silent "We Mourn" protest on campus. Very soon thereafter, Sumner and Coleman-Carter appeared at this second silent vigil to demand that the attendees disperse.

84. Upon information and belief, Sumner and Coleman-Carter claimed that the gathering was located in a reservable space on the campus quad. However, the 2021 Policy then in effect imposed no prohibition on expressive activity in such areas.

85. Sumner and Coleman-Carter informed Rzepka, Afzal-Khan, and the other faculty participants that if they failed to disperse immediately, they would be "investigated for insubordination."[5]

86. However, to date, Defendants have failed to reply to either Rzepka or Afzal-Khan's requests for additional information or updates regarding this "investigation."

87. That same month, Rzepka was elected to the University Senate, and appointed to the Administrative Affairs Council.[6]

88. Rzepka was once again targeted for his Palestine-related advocacy, this time in his capacity as a member of the MSU University Senate.

89. In his capacity as a Senator, Rzepka raised numerous, serious concerns about the implementation of the revised 2021Policy without any input from the full MSU Senate, or the MSU campus community.

90. As a result, Rzepka found himself repeatedly obstructed by the Defendants when attempting to clarify or oppose these shifting policies.

---

[5] This conversation is documented in an audio recording, which Plaintiffs can provide to this Court upon request.

[6] https://www.montclair.edu/university-senate/senate-councils/

91. Upon information and belief, Rzepka was openly and publicly insulted by the Chair of the Administrative Affairs Council and undermined in his capacity as an MSU Senator and faculty member.

92. On October 2, 2024, a third campus vigil was held on the MSU campus, this time attended only by Afzal-Khan (amongst other MSU faculty and students).

93. In what had sadly become a predictable result of Palestine-related campus events of *any* kind, Afzal-Khan was quickly confronted by campus police, Soufleris, and Keith Barrack (Chief of Staff to President Koppell), now citing nonexistent noise violations.

94. Defendant Soufleris, along with Keith Barrack and MSU camps police, demanded that the protesters stop chanting and immediately move to a small, cordoned-off patch of grass nearby.

95. Immediately following the vigil, Soufleris trailed Afzal- Khan and an accompanying MSU faculty member across campus, harassing them and repeatedly interrupting their mutually desired conversations with students to falsely accuse them of "intimidating" those very students.

96. A mere week later, on October 9, 2024, an especially disturbing sequence of events transpired, in which both Afzal-Khan and Rzepka were verbally assaulted with racist epithets and physically intimidated by pro-Israel outside agitators, and, upon information and belief, with Defendants' consent.

97. On this date, students and faculty, including Afzal-Khan and Rzepka, conducted a planned and publicized reading of Palestinian poetry, which was disrupted, drowned out, and threatened by members of "Mothers Against College Antisemitism" (MACA)—a pro-Israel group unaffiliated with MSU.

19

98.  These counter-protesters used bullhorns and racial slurs such as "fucking terrorists" and "Hamas motherfuckers" against students and faculty (including Afzal Khan and Rzepka), and particularly against MSU Muslim students wearing the hijab.

99.  This aggression, unchecked by the Defendants, directly caused the protestors, and even passersby, to fear for their physical safety.

100. The presence of the MACA protestors on MSU's campus directly violated the 2021 Policy in place at the time, which restricted all protests by *outside* groups (though *not MSU groups*) to the Amphitheater.

101. MSU's Campus Police and Administrators present at the scene (including Soufleris) refused to intervene or take any kind of action to enforce campus policy, despite their aggressive dispersal of earlier (peaceful) pro-Palestinian demonstrations by MSU's own students and faculty.

102. Upon information and belief, when asked why they were allowing this, MSU's Campus Police and Administrators repeated a coordinated message: "State law allows it."

103. When asked again, Soufleris, upon information and belief, stated "Take it up with the President," clearly indicating that Koppell had approved MACA's verbal assault and physical intimidation of students and faculty, as a direct result of the content of their speech.[7]

---

[7] This conversation is documented in a video recording, which Plaintiffs can provide to this Court upon request.

104. In fact, the stark contrast between the Defendants' treatment of the peaceful (often silent) pro-Palestinian speech by MSU students and faculty, like the Rzepka and Afzal-Khan, and the Defendants' permissiveness of the pro-Israel expressive speech by outside organizations, is a clear and deeply troubling example of viewpoint discrimination.

105. Defendants showed utter indifference to the safety and well-being of MSU students and faculty who spoke publicly in support of Palestinian human rights.

106. Defendants knowingly placed students and faculty in harm's way by facilitating hostile environments and failing to intervene, thereby further intimidating these students and faculty into silence.

107. Upon information and belief, Defendants regularly made oppositional groups aware of planned campus events relating to Palestine—a practice they did not apply to events expressing any other viewpoint, thereby significantly increasing the risk that such events would be targeted by counter protestors such as MACA.

108. Upon information and belief, Defendants regularly informed Rebekah Adelson ("Ms. Adelson"), Director of Hillel MetroWest, of Afzal-Khan and Rzepka's planned campus events relating to Palestine.[8]

---

[8] Rebekah Adelson, Director of Hillel MetroWest (which shares many members with MACA) admitted that the Defendants kept her "well-informed" about any upcoming anti-genocide demonstrations, declaring that "Hillel has maintained a good relationship with the [MSU] administration," which "continuously provides her with updates and a heads-up on any events or incidents of concern." Debra Rubin, *Montclair Students Grapple with Weekly Anti-Israel Protests*, Jewish Link (Nov. 7, 2024). https://jewishlink.news/montclair-state-students-grapple-with-weekly-anti-israel-protests/

109. Upon information and belief, public comments and social media confirmed that Hillel MetroWest, which shares members with MACA, knew of planned campus events organized by Afzal-Khan and Rzepka.

110. Afzal-Khan and Rzepka, however, were afforded no such alerts or protections for their own campus protests.

111. This starkly unequal treatment clearly endangered students and faculty, including Afzal-Khan and Rzepka.

112. Further, Afzal-Khan was falsely singled out and named as the sole "organizer" of the Montclair State University for Palestine faculty-student group that conducted the November 7, 2024, vigil in *The Jewish Link*. (See Footnote 8).

113. This mistaken conclusion is yet another example of the misinformation perpetuated by the Defendants' discriminatory policies on Palestine.[9]

114. Shortly thereafter, Afzal-Khan and Rzepka were again met with excessive police presence during a silent chalking and march event involving a several students and three faculty members on October 16, 2024.

115. During this event, students and the third faculty member were stopped while walking silently across the main quad, surrounded, threatened with prosecution, and pressured to provide identification and addresses.

116. Upon information and belief, MSU's Campus Police Officers claimed that these students and faculty members were "sending their academic careers down the toilet."

---

[9] https://thefridaytimes.com/13-Nov-2024/of-racism-and-the-new-mccarthyism-on-us campuses

117. At the same event, Sabriya Williams, Associate Director of the MSU Office of Student Belonging, Student Development and Campus Life, intervened to discourage a student from associating with Afzal-Khan and Rzepka, reinforcing the narrative that the students' participation was somehow dangerous or damaging to their education.[10]

118. Following directly on the heels of this demonstration came yet another deeply concerning turn of events: a "revision" to the 2021 Policy announced in an email from Koppell on October 18, 2024 (Exhibit L).

119. In this email, Koppell stated that the MSU administration had been "examining our expressive activity policy for the past several months," which ultimately resulted in a significant revision to the 2021 Policy (Exhibit M, hereinafter referred to as "Revised Policy 1").

120. Revised Policy 1 was the culmination of Defendants' escalating response to a series of peaceful protests they had already disrupted on September 5, September 12, October 2, October 9, and now, on October 16, 2024.

121. Revised Policy 1 was further evidently provoked by Defendants' own suppression of constitutionally-protected campus demonstrations, and it specifically codified the primary means of suppression that Defendants had used—in contravention of its own then-operative 2021 Policy—to suppress Plaintiffs' speech earlier that fall.

---

[10] This conversation is documented in a video recording, which Plaintiffs can provide to this Court upon request.

122. Shortly thereafter, an additional (and final) revision to Defendants' expressive speech policy was issued on October 29, 2024 (Exhibit N, hereinafter referred to as "Revised Policy 2").

123. A side-by-side comparison of the 2021 Policy and the final Revised Policy 2 is attached as Exhibit O and illustrates the substantial narrowing of expressive rights under the Revised Policy 2.

124. Revised Policy 2 not only replaced the 2021 Policy in its entirety but, in an attempt to offer greater "clarity," also imposed substantially greater restrictions on campus speech.

125. Whereas the 2021 Policy permitted speech and assembly anywhere on campus during operating hours, Revised Policy 2 limited expression to between 8:30 a.m. and 6:00 p.m., prohibited activity within 100 feet of any academic building or entrance, and eliminated all indoor expressive activity.

126. The Revised Policies further required advance reservations for any demonstration involving sound, reclassified spontaneous demonstrations as "planned" if mentioned online, and granted administrators unfettered discretion to cancel approved events "as circumstances warrant."

127. On November 5, 2024, Soufleris and Defendant MSU Campus Police forcibly ended a peaceful tabling event for Palestinian children organized by Afzal-Khan and Rzepka mere minutes after the reservation "period" for the event had ended.

128. Yet, that very same day, Defendants once more allowed the outside MACA counter protestors onto campus, this time under Revised Policy 2, which should have restricted their presence to the Amphitheater.

24

129. In a direct contradiction to Defendants' own implemented policy, the MACA counter protestors were permitted by Defendants to protest outside of the Amphitheater, well past the cones and barriers set up at the perimeter of the permitted zone and standing in a major campus walkway.[11]

130. The MACA counter protestors were therefore violating four primary requirements of the Revised Policies: they were an unaffiliated (public) group outside of the Amphitheater; they were impeding a walkway; they were well within 100 feet of a campus building; and they were protesting after 6pm.

131. Remarkably, although the MACA protests—ideologically opposite the Plaintiffs' own vigils and demonstrations—took place in the same "unauthorized" zones, Defendants allowed the MACA counter protestors to proceed without any interference yet were quick to quash Afzal-Khan and Rzepka's almost identical and entirely peaceful demonstrations.

132. Several weeks later on or about December 9, 2024, Koppell held a "Town Hall" meeting to discuss the newly updated Revised Policy 2, making multiple false representations, including that this latest revision "actually expanded opportunities for free expression" on campus; that the 2021 settlement agreement had only included "guidelines" for the establishment of expressive activity policies (rather than the implementation of the 2021 policy itself, verbatim;) and, further, that the 2021 Policy had restricted expressive activity to the Amphitheater.

---

[11] This occurrence is documented in a video recording, which Plaintiffs can provide to this Court upon request.

133. When questioned by Town Hall attendees as to whether non-Palestine-related expressive activity "events" had also been quickly disrupted or met with significant police presence, Koppell insisted that they had.

134. Koppell, however, failed to provide even a single example of such an occurrence.

135. Upon information and belief, at no time did Defendants disrupt, disperse, or otherwise interfere with any non–Palestine-related expressive activity in the manner and to the extent that they repeatedly harassed, censored, and shut down pro-Palestinian expression, including Afzal-Khan and Rzepka's own demonstrations.

136. To Afzal-Khan and Rzepka's knowledge, Defendants have permitted at least one other non-Palestine-related event to proceed despite its clear violations of Revised Policy 2: on or about March 4, 2025, the AFT union local and a group of MSU faculty, including several senior administrators and outside participants, held a planned and advertised "Solidarity Walk," protesting "assaults on public education."

137. The group, which included participants not affiliated with MSU, gathered at the Amphitheater, and then marched across campus while chanting.

138. Remarkably, the protest was never disrupted, dispersed, or redirected to the Amphitheater as Revised Policy 2 requires for non-MSU participants; nor were there demands for the participants to remain in one location, refrain from "disruptive" noise, or remain 100 feet or more from academic buildings—all of which Revised Policy 2 also requires.

139. In glaring contrast to the March 4, 2025, "Solidarity Walk," Defendants enforced all of these restrictions against almost all the Palestine-centered campus protests throughout the

fall, even though those restrictions were only introduced in Revised Policy 2 and were indeed contrary to the letter and spirit of the then-operational 2021 Policy.

140. That following semester, Afzal-Khan and Rzepka organized and facilitated a campus discussion on feminism and Palestine on March 19, 2025.

141. Despite Afzal-Khan and Rzepka's numerous (and timely) requests to include a flyer for the event in the campus online newsletter, Defendants failed to promote this event within the previously agreed upon timeframe.

142. Upon information and belief, Soufleris blocked promotion of the event by warning the SGA that they should not permit its sponsor, MSU Students for Justice in Palestine, to publish the advertising flyer.

143. Taken together, each of the Defendants' actions to suppress the Plaintiffs' protected speech violated the 2021 Policy, to which the Defendants agreed in a binding legal settlement to ensure that student and faculty rights were no longer infringed by vague or discriminatory administrative discretion.

144. Defendants' November 2023 directive, their suppression of Afzal-Khan and Rzepka's speech during the fall of 2024, and the subsequent implementation of the Revised Policies 1 and 2, directly contradict and violate the letter and spirit of this settlement, which aimed to safeguard all expressive activity, regardless of content, from regulations and restrictions arbitrarily imposed by the Administration.

145. Defendants' misrepresentation of these revised policies as "clarifications" or "loosening" of restrictions conceals the actual tightening of expressive activity rules, renewed administrative discretion, and reintroduction of prior restraints—all in defiance of Defendants' previous guarantees per the 2021 Policy.

27

**IV. National Advocacy Organization Condemns MSU's Unconstitutional Restrictions**

146. The Foundation for Individual Rights and Expression ("FIRE"), a nationally recognized nonpartisan organization dedicated to protecting free speech and academic freedom, repeatedly warned Defendants that Revised Policy 1 and the final Revised Policy 2 violated the First Amendment.

147. In a letter dated September 26, 2024, FIRE described Defendants' creation of a single "free speech zone" at the Amphitheater as "a restrictive free speech zone violating students' First Amendment rights to peaceably express themselves," urging the Defendants' to rescind the restriction and restore the 2021 Policy (Exhibit P).

148. When Defendants failed to respond, FIRE followed with a second letter on November 7, 2024, condemning the October 29, 2024, revision as even more constitutionally infirm (Exhibit Q).

149. FIRE noted that the Revised Policy "establish[es] free-speech zones, narrow time restrictions, and pre-approval for virtually all expressive activities," all of which constitute unlawful prior restraints on speech. The organization further criticized MSU's 100-foot buffer around all buildings, 8:30 a.m.–6 p.m. speech limitation, and prohibition on anonymous postings as overbroad, unreasonable, and inconsistent with long-settled First Amendment principles.

150. Defendants replied to FIRE on November 21, 2024 (Exhibit R), citing that these restrictions were reasonable "time, place, and manner" rules."

151. In its December 17, 2024 follow-up to Defendants' reply letter, FIRE rejected Defendants' attempt to justify these restrictions, demonstrating that the 100-foot exclusion

28

zone effectively eliminated nearly all outdoor areas for expression, and provided a satellite-map analysis showing that virtually the entire campus fell within the prohibited zone, leaving *"little-to-no space for students to express themselves."* (Exhibit S).

152. FIRE also found Defendants' "advanced notice" and "collaboration with the public" provisions impermissibly vague and overbroad, explaining that even a social-media post about a protest could trigger the reservation requirement—an unconstitutional prior restraint on spontaneous expression.

153. FIRE concluded that Defendants' Revised Policy 2 "violates students' and faculty members' rights by imposing unconstitutional restrictions on speech and requiring pre-approval for virtually all expressive activities."

154. FIRE's findings mirror precisely what Afzal-Khan and Rzepka have personally experienced from November 2023 until today.

155. The same restrictions that FIRE identified as unconstitutional—forced relocation to the Amphitheater, advance-notice barriers, and arbitrary enforcement—were those used to silence Afzal-Khan and Rzepka's peaceful, silent protests.

156. FIRE's independent conclusion that Revised Policy 2 "leaves little-to-no space for students to express themselves" indeed validates Afzal-Khan and Rzepka's contention that the Defendants' commitment to free expression was not only illusory but rather constituted a deliberate and viewpoint-based suppression of their pro-Palestinian speech.

**INJURIES TO PLAINTIFFS**

29

157. At all times relevant to this Complaint, each and all of the acts alleged herein were attributable to the Defendants, who acted under color of a statute, regulation, custom or usage of the State of New Jersey

158. Plaintiffs Afzal-Khan and Rzepka are each directly injured by Defendants' actions alleged herein in that they were repeatedly silenced, censored, and removed from generally accessible public campus spaces in which expressive activity is presumptively protected.

159. The Defendants' arbitrary and forcible dispersal and relocation of Afzal-Khan and Rzepka' September 5, 2024, silent vigil, despite the absence of any policy requiring such relocation, both interrupted their expressive activity and sent a clear message to the MSU community that pro-Palestinian advocacy would not be tolerated in high-visibility spaces. As a direct result, Defendants' actions chilled Afzal-Khan and Rzepka's willingness and ability to participate in subsequent outdoor demonstrations for fear of further interference and discipline.

160. The Defendants' arbitrary and forcible dispersal of Afzal-Khan and Rzepka's September 12, 2024, silent vigil citing a "reservable space" rule that did not exist in the controlling 2021 Policy, along with Defendants' threatening of them and other participants with "investigation for insubordination" if they did not immediately comply, created an ongoing fear of retaliation for engaging in constitutionally protected expression.

161. The Defendants discouraged the Afzal-Khan and Rzepka from organizing additional vigils without first seeking explicit permission, imposing an unconstitutional prior restraint on speech in violation of both the 2021 settlement and their First Amendment free speech rights.

162. The Defendants' arbitrary and forcible dispersal of Afzal-Khan and Rzepka's silent vigil on October 2, 2024, falsely alleging "noise violations" and ordering them to move to a small cordoned-off patch of grass, not only significantly diminished the reach and impact of their protected speech, but was also another example of Defendants maintaining and enforcing a set of policies and practices that unconstitutionally discriminated against Afzal-Khan and Rzepka's based on the viewpoint and content of their speech, and therefore violated their First Amendment free speech rights.

163. By allowing hostile MACA outside counter-protesters to embed themselves next to Afzal-Khan and Rzepka's planned and publicized October 9, 2024, Palestinian poetry reading in the Business School quad, Defendants compelled them to share their platform with the MACA counter protestors, who shouted racial and Islamophobic slurs and used bullhorns to drown out their event.

164. This forced inclusion of unwanted speakers and outside agitators deprived Afzal-Khan and Rzepka of their First Amendment right to control their own message, caused their event to be effectively silenced, and left them and attendees in fear for their safety.

165. By forcing members of Afzal-Khan and Rzepka's group to stop engaging in their silent walk across the main quad on October 16, 2024, employing threats of prosecution, and discouraging MSU student members of the group from associating with Afzal-Khan and Rzepka, Defendants demonstrated their willingness to direct physical police enforcement against even silent, very small, manifestly harmless assemblies if those assemblies expressed public support for Palestinians, thereby deterring them from exercising their First Amendment free speech rights.

166. By forcibly ending the tabling event that Afzal-Khan and Rzepka helped to organize for Palestinian children on November 5, 2024, within minutes of its reservation period ending, while permitting outside MACA counter-protestors to continue demonstrating, Defendants deprived Afzal-Khan and Rzepka of equal use of a public forum on campus, in furtherance of Defendants' viewpoint-based enforcement of speech, and inflicted both immediate and ongoing injury their rights to free expression and equal protection.

167. In addition to physical disruption of Afzak-Khan and Rzepka's expressive activity outdoors on MSU campus, Defendants intentionally dismantled the primary channels of campus communication, the "Discuss" and "Campus" listservs, used by Afzal-Khan and Rzepka to openly advocate for Palestinian human rights, and in direct response to their pro-ceasefire posts.

168. As a direct result, Defendants deprived Afzal-Khan and Rzepka of their principal means of communication with their fellow faculty members, prevented them from publicizing future Palestine-related events, and silenced their speech based on its content.

169. Defendants also weaponized disciplinary processes to punish protected expression. Rzepka in particular was subjected to a baseless hostile-environment investigation premised solely on his Palestine-related listserv posts, barred from using the "Discuss" listserv, and ordered to complete anti-harassment training despite the absence of any credible evidence and Defendants' repeated refusal even to state which groups he was supposed to have harassed.

170. As a direct result, Defendants placed a permanent note in Rzepka's MSU HR file, leaving him with a baseless disciplinary record that threatens his future employment—a clear deterrent to the full exercise of his First Amendment rights.

171. Afzal-Khan likewise suffered similar targeted harassment and reputational harm for her pro-Palestinian advocacy at the hands of the Defendants.

172. Afzal-Khan was publicly chastised by a faculty Dean during an alumni event and falsely accused of antisemitism and intimidation of her own students, all for simply being an outspoken advocate for the human rights of Palestinians.

173. Defendants' clear censorship of Afzal-Khan's views damaged her professional reputation amongst the MSU community (and beyond) and undermined her academic freedom as a scholar and professor.

174. The cumulative effect of the Defendants' actions inflicted ongoing, irreparable injury to Afzal-Khan and Rzepka's First Amendment rights.

175. Content, viewpoint, and speaker-based discrimination, unless narrowly tailored to a compelling interest, violates the First Amendment, and the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

## **FIRST CLAIM FOR RELIEF**

### **For Violations of Plaintiffs' First Amendment Rights Freedom of Speech**

#### *Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the First and Fourteenth Amendments to the United States Constitution*

176. Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

177. At all times relevant to this Complaint, each of the acts alleged herein were attributable to the Defendants, who acted under color of a statute, regulation, custom, practice or policy or usage of the State of New Jersey.

33

178. Additionally, as discussed elsewhere herein, Defendants crafted and enforced policies and practices that violated Plaintiffs First Amendment rights.

179. Defendants engaged in the acts complained of herein in order to chill Plaintiffs' in their exercise of free speech so that each Plaintiff was prevented and/or deterred from or impeded in participating in protected conduct both on the Campus and Discuss listservs, during campus demonstrations, vigils or poetry readings; and/or otherwise suffered some concrete harm(s), including but not limited to adverse actions such as disciplinary threats, a baseless "hostile-environment" investigation, police referrals because Plaintiffs spoke on Palestine.

180. Defendants imposed restrictions on protected speech and/or conduct that violated both Plaintiffs' First Amendment rights, including, but not limited to, viewpoint discrimination, "heckler's veto," and outright prior restraint, such as confining Plaintiffs to the amphitheater only, shutdown of listservs; forced silencing/relocation of vigils pertaining to Palestine and/or Gaza; and in otherwise violating Plaintiffs' rights and engaging in the acts complained of herein.

181. The Defendants' retaliatory restrictions Plaintiffs complain of herein imposed upon Plaintiffs' First Amendment rights to participate in, observe, and/or stand nearby speech, conduct, association, and/or other expressive activities protected by the First Amendment in public, and were themselves regulations on Plaintiffs' protected conduct that:

   a. Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, or precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or

   b. Were content-neutral but nonetheless lacked sufficiently narrow tailoring to serve a significant governmental interest in that the

restrictions substantially burdened more protected speech and/or conduct than was necessary to serve those interests, and/or failed to adequately provide alternatives for Plaintiffs' protected expression, including in that Plaintiffs' abilities to communicate effectively were threatened or limited; and/or

c. Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiffs' abilities to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

d. Amounted to the imposition of strict liability on Plaintiffs for engaging in protected speech and/or expression.

182. As a direct result of Defendants' acts, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; and thereby caused Plaintiffs to suffer silencing, censorship, intimidation, a chilling effect on academic discourse and freedom, emotional distress, adverse professional repercussions, reputational harm and/or otherwise damaged and injured Plaintiffs.

183. Pursuant to 42 U.S.C.§1983, Plaintiffs are entitled to a declaration that Defendants, through their acts described herein, violated Plaintiffs' freedom of speech, and an injunction against Defendants' associated practices and actions, including the adoption and enforcement of Revised Policy 1 and Revised Policy 2. Plaintiffs are entitled to compensatory damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

**For Violations of Plaintiffs' First Amendment Rights, Retaliatory Discrimination**

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the First and Fourteenth Amendments to the United States Constitution***

35

184. Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

185. At all relevant times herein, Plaintiffs engaged in speech and expressive conduct protected by the First Amendment to the United States Constitution, including advocacy for Palestinian human rights, participation in peaceful demonstrations, and dissemination of information through campus communication channels.

186. The facts pleaded above describe the manner in which the Defendants, acting under color of law, intentionally and with discriminatory animus toward Plaintiffs' viewpoint, took adverse actions against Plaintiffs in retaliation for their protected speech, including but not limited to: unreasonable restrictions on Plaintiffs' First Amendment-protected conduct, often without fair warning; dispersing peaceful vigils and marches; terminating and restricting access to campus listservs; imposing baseless disciplinary sanctions; permitting hostile counter-protesters to overrun Plaintiffs' expressive events; and, in the absence of adequately clear standards to restrict or permit such protected speech, applying MSU expressive activity policies in a discriminatory and unequal manner; based on ad hoc determinations as to their perceived violations, often without fair warning.

187. Upon information and belief, Defendants engaged in the acts complained of herein with respect to Plaintiffs' First Amendment retaliation claims—including the related claims involving the adoption of the various revised expressive activity policies, practices, and/or customs —in response to the perceived viewpoint and/or message expressed by Plaintiffs.

188. Defendants' conduct was motivated by the content and viewpoint of the Plaintiffs' expression, namely their personal and political views on Palestine, including their public advocacy for an end to the ongoing war and the safeguarding of Palestinian

36

human rights, thereby violating Plaintiffs' rights to free speech, free association, and to be free from viewpoint-based  discrimination under the First Amendment to the United States Constitution.

189. As a direct result of Defendants' acts, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; and thereby caused Plaintiffs to be silenced, and suffer censorship, intimidation, a chilling effect on academic discourse and freedom, emotional distress, adverse professional repercussions, reputational harm and/or otherwise damaged and injured Plaintiffs.

190. Pursuant to 42 U.S.C.§1983, Plaintiffs are entitled to a declaration that Defendants, through their retaliatory and discriminatory acts described herein, violated Plaintiffs' freedom of speech, and an injunction against Defendants' associated practices and actions.  Plaintiffs are entitled to compensatory damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

### **THIRD CLAIM FOR RELIEF**

**For Violations of Plaintiffs' First Amendment Rights, Retaliation in Breach of Binding Settlement Agreement**

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the First and Fourteenth Amendments to the United States Constitution***

191. Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

192. As previously described in detail herein, MSU entered into a binding consent decree in which it was explicitly required to adopt the 2021 Policy verbatim to resolve claims that its prior policies governing expressive activity violated the First Amendment.

193. The 2021 Policy guaranteed students, faculty, and staff the right to engage in expressive activities in indoor and outdoor areas of campus without prior reservation, permit, restrictions on movement, time restrictions, or restriction to limited "free speech zones."

194. This consent decree further obligated Defendants to maintain these protections and refrain from reinstating policies or practices that infringed upon constitutionally protected speech in public campus forums.

195. As previously described in detail herein, Defendants knowingly and intentionally abandoned the 2021 Policy, reinstated unconstitutional restrictions, and imposed new, ad hoc rules, including requiring prior reservations for demonstrations or protests, limiting expressive activity involving any consultation with members of the public to the Amphitheater, and dispersing peaceful vigils, and in clear violation of a binding consent decree.

196. Defendants' abandonment of the 2021 policy, undertaken with full knowledge that their conduct violated a binding federal court order and the First Amendment, clearly constitutes both a prior restraint and retaliation against Plaintiffs' protected speech.

197. As a direct result of Defendants' acts, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; thereby caused Plaintiffs to be silenced, and suffer censorship, intimidation, a chilling effect on academic discourse and freedom, emotional distress, adverse professional repercussions, reputational harm and/or otherwise damaged and injured Plaintiffs.

198. Pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to a declaration that Defendants, through their retaliatory acts described herein, violated Plaintiffs' freedom of speech and assembly, and an injunction against Defendants' associated practices and actions in violation of the binding 2021 Policy.

## FOURTH CLAIM FOR RELIEF

**For Violations of Plaintiffs' First Amendment Rights, Compelled Speech and Alteration of Message in Violation of *Hurley v. Irish American Gay, Lesbian & Bisexual Group of Boston*.**

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the First and Fourteenth Amendments to the United States Constitution***

199. Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

200. In *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995), the Supreme Court held that the First Amendment protects the right of speakers and organizers to control the content of their own message, and that the government may not compel them to include unwanted, conflicting speech within their expressive event.

201. As previously described in detail herein, Plaintiffs, along with students and other MSU Faculty, organized a peaceful Palestinian poetry reading on October 9, 2024.

202. MACA counter protesters, who had no affiliation with MSU, were permitted by Defendants to enter the campus and use bullhorns to scream racist and Islamophobic slurs, epithets and insults against Plaintiffs, students and faculty, including Muslim students wearing the hijab, calling them "terrorists" and "Hamas motherfuckers," and intentionally drown out the Plaintiffs' poetry reading.

39

203. Defendants, acting under color of law, knowingly permitted the MACA members to physically and audibly occupy the same expressive space as Plaintiffs, refused to maintain any meaningful separation between the groups and declined to intervene or disperse the outside MACA counter protestors.

204. Defendants, by permitting these hostile MACA counter-protesters to embed themselves next to, and drown out, Plaintiffs' peaceful expressive event, compelled Plaintiffs to share their expressive platform with an intentionally antagonistic and contradictory message which endorsed a war rather than peace.

205. Defendants' forced inclusion fundamentally altered the content, tone, and impact Plaintiffs' poetry reading, thereby distorting and undermining Plaintiffs' intended expression.

206. Defendants' failure to separate the hostile MACA counter-protesters from Plaintiffs' subdued Palestinian poetry reading, and their decision to permit the MACA counter protesters to overrun and overshadow Plaintiffs' expressive forum, constituted compelled speech and a distortion of Plaintiffs' intended message in violation of the First Amendment.

207. As a direct result of Defendants' acts, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; and thereby caused Plaintiffs to be silenced, and suffer censorship, intimidation, a chilling effect on academic discourse and freedom, emotional distress, adverse professional repercussions, reputational harm and/or otherwise damaged and injured Plaintiffs.

208. Pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to a declaration that Defendants, through their discriminatory acts described herein, violated Plaintiffs' freedom of speech,

and an injunction against Defendants' associated practices and actions towards their

failure to separate hostile counter-protesters from Plaintiffs' events.

## **PRAYER FOR RELIEF**

**WHEREFORE**, in light of the foregoing, Plaintiffs FAWZIA AFZAL- KHAN and

ADAM RZEPKA respectfully request the following relief against the Defendants a

declaration, pursuant to 28 U.S.C. § 2201:

i.      Defendants' November 6, 2023, directive, Revised Policy 1 (October 18, 2024), and Revised Policy 2 (October 29, 2024) are unconstitutional on their face and as applied;

ii.     Defendants' actions described in this Complaint violated Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution; and

iii.    Defendants' past and ongoing retaliation against Plaintiffs constitutes impermissible viewpoint discrimination in violation of the First and Fourteenth Amendments.

(b) Preliminary and Permanent Injunctive Relief:

i.  Enjoin the Defendants, their officers, agents, employees, and all persons acting in concert with them from enforcing policies and practices challenged herein or otherwise retaliating against Plaintiffs for protected speech.

 ii. Order the Defendants to reinstate the 2021 Expressive Policy as previously mandated;

(c) An award of damages, including but not limited to damages for the violation of the

Plaintiffs First Amendment rights.

(d) Attorneys' Fees and Costs pursuant to 42 U.S.C. § 1988, and any other applicable

provision of law, including expert-witness fees and litigation expenses.

(e) Pre-Judgment and Post-Judgment Interest as allowed by law.

(f) Such other and further relief, including equitable relief, as the Court deems just and proper.

41

Dated: November 3, 2025

*s/ Maryam S. Fatouh*
Maryam S. Fatouh, Esq.
111 Town Square Place
Suite 1238
Jersey City, NJ


*s/ Theodore Bohn*

Theodore Bohn, Esq.
90 Montgomery Street
Bloomfield, NJ 07003
P: (631) 512-2412
E: Ted1091@gmail.com


*s/ Jonathan Wallace*
Jonathan Wallace, Esq.
P.O. Box 728
Amagansett, NY 11930
P: (917) 359-6234
E: Jonathan.Wallace80@gmail.com
*\* Admitted pro hac vice*


*Attorneys for Plaintiffs*