# Exhibit A

Michael P. Laffey
MESSINA LAW FIRM, P.C.
961 Holmdel Road
Holmdel, NJ 07733
(732) 332-9300
mlaffey@messinalawfirm.com

Michael R. Ross*
Tyson C. Langhofer*
ALLIANCE DEFENDING FREEDOM
CENTER FOR ACADEMIC FREEDOM
20116 Ashbrook Place, Suite 250
Ashburn, VA 20147
(480) 444-0020
mross@ADFlegal.org
tlanghofer@ADFlegal.org

*Counsel for Plaintiffs*

*\*Pro hac vice applications forthcoming.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| YOUNG AMERICANS FOR LIBERTY AT MONTCLAIR STATE UNIVERSITY, and MENA BOTROS; | Civil Case No.: |
| Plaintiffs, | |
| v. | **VERIFIED COMPLAINT** |
| The Trustees of Montclair State University—ROSE L. CALI, MARY A. COMITO, VICE-CHAIR DR. FRANCIS M. C. CUSS, CHAIR GEORGE J. HILTZIK, LAWRENCE R. INSERRA, JR., DOUGLAS L. KENNEDY, RALPH A. LAROSSA, JEAN MARC DE GRANDPRE, JOHN L. MCGOLDRICK, WILLIAM T. MULLEN, PRESTON D. PINKETT III, SECRETARY KENT SLUYTER, and STUDENT NIKITA WILLIAMS— all individually and all in their official capacities as members of the Montclair State University Board of Trustees; SUSAN A. COLE, President of Montclair State University, in her official and individual capacities; KAREN PENNINGTON, Vice President of Student Development & Campus Life of Montclair State University, in her official and individual capacities; MARGAREE COLEMAN-CARTER, Dean of Students of Montclair State University, in her | **Jury Trial Demanded** |

1

official and individual capacities; **PAUL M. CELL**, Chief of Police of Montclair State University, in his official and individual capacities; **KALUBA CHIPEPO**, Sergeant of Campus Police for Montclair State University, in his official and individual capacities; **YOLANDA ALVAREZ**, Chair of Bias Education Response Taskforce of Montclair State University, in her official and individual capacities; **HAMAL STRAYHORN**, Co-Chair of Bias Education Response Taskforce of Montclair State University, in her official and individual capacities; **THE STUDENT GOVERNMENT ASSOCIATION OF MONTCLAIR STATE UNIVERSITY INC.**,

Defendants.

## Verified Complaint

Plaintiffs Young Americans for Liberty at Montclair State University and Mena Botros, by and through counsel, and for their Complaint against Defendants, state as follows:

1. Pursuant to Local Rule 10.1, the mailing addresses of the parties are:

Young Americans for Liberty at Montclair State University
16 Suburbia Drive
Jersey City, NJ 07305

Mena Botros
16 Suburbia Drive
Jersey City, NJ 07305

Trustees of Montclair State University
Office of the President
1 Normal Avenue
Montclair, NJ 07043

Susan A. Cole
President, Montclair State University
Office of the President
1 Normal Avenue
Montclair, NJ 07043

Karen Pennington
Vice President, Student Development & Campus Life of Montclair State University
1 Normal Avenue
Montclair, NJ 07043

Margaree Coleman-Carter
Dean of Students, Montclair State University
1 Normal Avenue
Montclair, NJ 07043

Paul M. Cell
Chief of University Police, Montclair State University Police
1 Normal Avenue
Montclair, NJ 07043

Kaluba Chipepo
Sergeant of Campus Police, Montclair State University
1 Normal Avenue
Montclair, NJ 07043

Yolanda Alvarez
Chair of Bias Education Response Taskforce
1 Normal Avenue
Montclair, NJ 07043

Hamal Strayhorn
Co-Chair of Bias Education Response Taskforce
1 Normal Avenue
Montclair, NJ 07043

The Student Government Association of Montclair State University Inc.
1 Normal Avenue
Montclair, NJ 07043

## Introduction

2.    The campus of a public university is a supposed to be a "marketplace of ideas." But on September 10, 2019, Montclair State University ("MSU" or the "University") shut down three students who were peacefully expressing their ideas in a generally accessible, common outdoor area of campus. The students dressed in orange jumpsuits and held up signs voicing their support—as pretend criminals—

3

for gun-free zones. The students were expressing their views that laws creating gun-free zones benefit only criminals and endanger law-abiding citizens. A campus police officer forced them to stop their expressive activity because they had not obtained prior permission from the University to speak on campus.

3.   The University maintains that Plaintiffs must obtain permission to speak at least two weeks in advance under the University's Demonstrations & Assemblies Policy. Moreover, the University can deny a student's request for permission or indefinitely withhold it for any reason. This two-week requirement imposes an unconstitutional prior restraint on all students throughout the entire campus.

4.   The University and the Student Government Association (the "SGA") also maintain an unconstitutional set of student organization regulations which delegates to the SGA unbridled discretion to grant privileges and financial benefits from mandatory student fees based on an organization's "Class." This Class determination explicitly requires the SGA to scrutinize a student organization's viewpoint and the content of its speech, and it places virtually no limits on the SGA's ability to favor and disfavor certain viewpoints.

5.   The SGA has utilized this unbridled discretion to relegate Plaintiff YAL to the lowest possible classification which substantially limits Plaintiff's ability to obtain funding even though all of Plaintiff's members are required to pay mandatory student fees.

6.   The University also maintains a Bias Education Response Taskforce to punish so-called "bias incidents" (i.e., "conduct, speech or expression that is motivated by bias or prejudice"), a term which is defined so broadly that it encompasses protected speech on important social and political discussions in which Plaintiffs regularly engage.

7.    The First and Fourteenth Amendments require this Court to strike down these unconstitutional restrictions on speech and to enjoin the University from enforcing these restrictions against Plaintiffs.

## Jurisdiction and Venue

8.    This is a civil rights action that raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

9.    This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

10.    This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief pursuant to 28 U.S.C. §§ 2201–02; the requested injunctive relief pursuant to 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

11.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Defendants reside in this district and because all of the acts described in this Complaint occurred in this district.

## Plaintiffs

12.    Plaintiff Young Americans for Liberty at Montclair State University ("YAL") is an unincorporated expressive association made up of Montclair State University students.

13.    YAL is a non-partisan, student-led organization, and part of its mission is to be an expressive association at MSU.

14.    YAL has been a recognized student organization since 2018 and it is currently classified as a Class IV student organization by the SGA.

15.    YAL is affiliated with Young Americans for Liberty, a non-partisan organization with over 500 chapters at public and private universities throughout the country.

16.  YAL's mission is to identify, educate, train, and mobilize students to promote the principles of the natural rights of life, liberty, and property.

17.  Plaintiff Mena Botros is a sophomore at MSU and the President of YAL.

18.  Plaintiffs desire to express their message on MSU's campus through a variety of means, including flyers, signs, peaceful demonstrations, hosting tables with information, inviting speakers to campus, and talking with fellow students about the natural rights of life, liberty, and property, among other things.

19.  When engaging in these expressive activities, Plaintiffs will discuss political, religious, social, cultural, and moral issues and ideas.

## Defendants

20.  Defendants Rose L. Cali, Mary A. Comito, Dr. Francis M. C. Cuss, George J. Hiltzik, Lawrence R. Inserra, Jr., Douglas L. Kennedy, Ralph A. LaRossa, Jean Marc de Grandpre, John L. McGoldrick, William T. Mullen, Preston D. Pinkett III, Kent Sluyter, and Nikita Williams, are, and were at all times relevant to this Complaint, members of the Board of Trustees of the Montclair State University (collectively, "Trustee Defendants"), a public university organized and existing under the laws of New Jersey.

21.  Among other duties, Trustee Defendants adopt and authorize policies that govern students at MSU, including the policies challenged herein. (Ex. 1 at 1, 5–6, Art. I, Title IV.)

22.  Each Trustee Defendant is responsible for enacting, amending, and repealing the Board of Trustees' policies. (Ex. 1 at 1, 5–6, Art. I, Title IV.)

23.  Trustee Defendants are each sued in their individual and official capacities.

24.  Defendant Susan A. Cole is, and was at all times relevant to this Complaint, the President of MSU. The Board of Trustees has delegated to Defendant Cole the power to exercise discretionary authority and perform duties

6

vested in the Board of Trustees related to the operation, control, and management
of the University. (Ex. 1 at 1, Art. II.)

25.   Cole is responsible for the administration and enforcement of policies and
regulations relating to the operation of the University. Cole has the authority to
delegate this authority among subordinates.

26.   Thus, Cole is responsible for promulgating, implementing, and enforcing
the University policies, procedures, and practices that are depriving Plaintiffs and
other students of their constitutional rights and are challenged in this suit.

27.   Cole also has the authority to review, approve, or reject the decisions of
other University officials and the other non-Trustee Defendants regarding the
policies, procedures, and practices challenged in this suit.

28.   Cole authorized, approved, or implemented the policies, procedures, and
practices challenged herein. She has also failed to stop any MSU officials from
applying these policies, procedures, and practices against the Plaintiffs.

29.   Defendant Cole is sued in her individual and official capacities.

30.   Defendant Karen Pennington is, and was at all times relevant to this
Complaint, the Vice President of Student Development & Campus Life at MSU.
Pennington oversees all of Student Development & Campus Life, which includes the
Office of the Dean of Students and the Bias Education Response Taskforce.

31.   Pennington authorized, approved, or implemented the policies, procedures,
and practices relating to the Speech Permit Policy and the Bias Education Response
Taskforce policies, procedures, and practices. She has also failed to stop any MSU
officials from applying these policies, procedures, and practices against the
Plaintiffs. Pennington is sued in her individual and official capacities.

32.   Defendant Margaree Coleman-Carter is the Dean of Students at MSU. She
is in charge of the Office of the Dean of Students, which is responsible for

approving, modifying, or denying requests for students to speak on campus under the Speech Permit Policy.

33.  Coleman-Carter also reviews bias incident reports and has the power to discipline students for violating University Policies.

34.  Coleman-Carter and her subordinates in the Office of the Dean of Students enforced the Speech Permit Policy against Plaintiffs.

35.  Coleman-Carter is sued in her individual and official capacities.

36.  Defendant Paul M. Cell is the Chief of Police for Montclair State University. Defendant Cell oversees and manages the University Police of MSU.

37.  Defendant Cell is responsible for enforcing MSU's policies, including the Speech Permit Policy.

38.  Defendant Cell and his subordinates in the University Police enforced the Speech Permit Policy against Plaintiffs.

39.  Defendant Cell is also responsible for the University Police's involvement in responding to, investigating, and enforcing regulations against "bias incidents."

40.  Defendant Cell is sued in his individual and official capacities.

41.  Defendant Kaluba Chipepo is the Sergeant of Campus Police for Montclair State University Police.

42.  Defendant Chipepo enforced the Speech Permit Policy against Plaintiffs on September 10, 2019 when he ordered them to stop engaging in their expressive activity.

43.  Defendant Chipepo is sued in his individual and official capacities.

44.  Defendant Yolanda Alvarez is the Chair of MSU's Bias Education Response Taskforce. Alvarez is also the Associate Dean of Students. As the Taskforce Chair, Alvarez has the power to promulgate, implement, and enforce policies, procedures, and practices for the Bias Education Response Taskforce,

including the ones that are depriving Plaintiffs and other students of their constitutional rights and are challenged in this suit.

45. Defendant Alvarez is sued in her individual and official capacities.

46. Defendant Hamal Strayhorn is the Co-Chair of MSU's Bias Education Response Taskforce. Strayhorn is also the Director of the Office for Social Justice and Diversity. As the Taskforce Co-Chair, Strayhorn has the same authorities and powers as Ms. Alvarez, described above.

47. Defendant Strayhorn is sued in his individual and official capacities.

48. Defendant Student Government Association of Montclair State University Inc. ("SGA"), a non-profit corporation incorporated and operating in New Jersey, is the official student government association for MSU.

49. SGA is responsible for administering and overseeing the use and disbursement of mandatory Student Government Association Fees collected from each undergraduate student. (Ex. 2 at 2.)

50. SGA also sets policies and procedures governing student organizations on campus. In particular, SGA establishes requirements for a student organization to be officially recognized at MSU and sets and enforces the benefits, monetary and otherwise, to which student organizations are entitled. (Ex. 2 at 2.)

## Facts

### I. The University's unconstitutional policies restrict and suppress student speech.

51. The University maintains three unconstitutional sets of policies: (1) the Demonstrations and Assemblies Policy, (2) the student organization registration and funding regulations, and (3) the "bias incident" regulations and Bias Education Response Taskforce.

**A. The Speech Permit Policy requires all students to obtain permission two weeks in advance before speaking on campus and does not provide any objective guidelines to restrain administrative discretion.**

52. The Demonstrations and Assemblies Policy (the "Speech Permit Policy" or "Policy") regulates all expressive activity on campus, including (i) demonstrating and assembling to provide information, express views, or protest, (ii) displaying posters and distributing literature, (iii) organizing activities that present differing viewpoints, and (iv) expressing views at all organized events and activities where the opportunity for such expression is offered by the organizers. (Ex. 3 at 1.)

53. As detailed below, the Speech Permit Policy, facially and as applied, is an unconstitutional prior restraint on speech because it (i) contains no objective guidelines to restrict the University's discretion, (ii) fails to ensure timely decision making on a student's request to speak, (iii) unconstitutionally discriminates against the content or viewpoint of a student's speech, (iv) and because two weeks is an unconstitutional and unreasonable amount of time to require advance permission.

54. Students may not "demonstrate or assemble" without obtaining written permission from the Office of the Dean of Students at least two weeks in advance. (Ex. 3 at 2.)

55. But the Speech Permit Policy does not define two key terms: "demonstration" or "assembly."

56. The only exception from this two-week requirement is where a student's expression qualifies as "spontaneous" and is made "in response to emergent situations where advance planning is not possible." (Ex. 3 at 3.)

57. The Policy restricts spontaneous expression to two small outdoor locations: a) the Plaza in front of the Student Center, and b) the Amphitheater. (Ex. 3 at 3.) Any students engaging in spontaneous expression also "must report that information immediately to the Office of the Dean of Students." (Ex. 3 at 3.)

10

58.   To request permission to speak—regardless of how small an event is—a student must fill out a "Request for Demonstration, Assembly, Presentation or Forum" form, which requires the following information:

   a) the identity of the University employee, student, group or organization making the request;

   b) the date(s) and time(s) of the event;

   c) the desired location for the event;

   d) the planned objective of the event;

   e) the materials that will be used to conduct the event, including information concerning any music or sound amplification;

   f) for University groups or organizations or University sponsored groups or organizations, the number of people expected to participate in the event; and

   g) the estimated number of people the event organizers expect to attract to the event.

(Ex. 3 at 2.)

59.   After receiving this Request Form, the Office of the Dean of Students may approve, modify, or deny a request to demonstrate or assemble for any reason. The Speech Permit Policy does not require the Office of the Dean of Students to approve, modify, or deny such a request within any set timeframe.

60.   The Speech Permit Policy authorizes University officials to grant exceptions based upon "special circumstances" but fails to define "special circumstances." (Ex. 3 at 3.) Accordingly, the Office of the Dean of Students has the power to selectively enforce the Speech Permit Policy based upon the content and viewpoint of students' speech.

61.   The Speech Permit Policy thus grants Defendant Coleman-Carter and the Office of the Dean of Students unbridled discretion to grant or deny students permission to speak on campus.

62.   The Speech Permit Policy also limits demonstrations and assemblies to times between 8:00 a.m. and 10:00 p.m. (Ex. 3 at 2.)

63.  The Speech Permit Policy also prohibits "[s]igns affixed to poles or sticks." (Ex. 3 at 2.)

64.  If a student violates the Speech Permit Policy, he or she "will be subject to disciplinary action under applicable University policies, … and the Student Code of Conduct." (Ex. 3 at 3.)

65.  The University police are authorized to enforce the Speech Permit Policy and take appropriate action to curb any violations. (Ex. 3 at 3.)

**B.  The University authorizes the SGA to punish recognized student organizations who express disfavored viewpoints.**

66.  The University's student organization regulations (the "Class System") authorize the SGA to reward favored groups with a high "Class" status, while disfavoring groups like YAL with a low status which excludes them from many of the benefits enjoyed by other student organizations.

67.  The Trustee Defendants possess the authority to delegate authority to "carry[] out the purpose of the college" and, accordingly, to set the amount of and disburse tuition fees, including student activity fees. N.J. Stat. § 18A:64-13, § 18A:64-6(e), (f), (k), (o).

68.  The University charges each undergraduate student a mandatory student fee as part of tuition. This includes a portion titled "Student Government Association Fee" (the "SGA Fee"). (Ex. 4 at 1–2.)

69.  For the 2019–2020 academic year, the SGA Fee is $48.90 per student, per semester for full-time students, and $3.26 per credit hour, per semester for part-time, undergraduate students. (Ex. 4 at 1.)

70.  With approximately 17,000 undergraduate students, this amounts to approximately $1,500,000 collected through the SGA Fee and allocated to the SGA annually.

71.   Plaintiff Mena Botros is currently a sophomore by credit and has paid $280.36 in student fees since he started attending MSU. This total includes $48.90 for Fall 2017, $48.90 for Spring 2018, $35.86 for Fall 2018, $48.90 for Spring 2019, $48.90 for Fall 2019, and $48.90 for Spring 2020.

72.   The SGA works with the University Finance and Treasury Department to set an annual budget. (Ex. 5 at 1.)

73.   The University has granted the SGA discretion to utilize the SGA fees in the manner determined by the SGA. (Ex. 2 at 2, Art. II, § 4.C–D.)

74.   The University has granted the SGA plenary authority "to regulate the activities of student organizations," including the ability to "charter, rescind charters, and provide for the regulation of the Student organizations" at MSU, and to "withhold approval of student activities and functions." (Ex. 2 at 1–2.)

75.   Pursuant to this authority, the SGA has set up a literal "Class" system that grants certain student organizations special benefits, including substantial financial advantages, based on the organization's seniority and viewpoint expressed by the organization.

76.   The SGA categorizes organizations as one of four Classes. Class I organizations receive the most benefits, while Class IV organizations receive the fewest. (Ex. 6 at 46–48; Ex. 7 at 2, 8, 14, 20.) The SGA has the authority to set the amount and type of benefits at its discretion each year and to distribute those benefits to organizations as it sees fit.

77.   For example, Class I organizations currently receive (i) a yearly budget set by the SGA, (ii) the ability to ask for cash advances, (iii) up to $5,000 in emergency appropriations and $5,000 in supplemental appropriations, (iv) the ability to buy equipment, (v) the ability to have a flexible budget, (vi) the ability to keep a portion of what they fundraise through advertising, and (vii) the ability to attend conferences and conventions using SGA funds. (Ex. 6 at 47, 53, 55, 56, 59; Ex. 8 at

13

7–8; Ex. 7 at 2.) They also receive a number of non-monetary benefits, such as an
SGA legislative representative and priority for student office space. (Ex. 6 at 47; Ex.
7 at 2.)

78. For the 2019–2020 academic year, Class II organizations (i) must ask the
legislature for money, (ii) are limited to $6,000 in appropriations per year, (iii) are
limited to $3,000 in emergency and supplemental appropriations, and (iv) must
share $40,000 between all Class II organizations each year. (Ex. 6 at 59–60, 62; Ex.
8 at 8.) Subject to the discretion of the SGA, Class II organizations may also request
any unappropriated surplus funds if the $40,000 is depleted. (Ex. 6 at 59–60.) Class
II organizations can also request student office space. (Ex. 6 at 47; Ex. 7 at 8.)

79. Class III organizations are similarly limited, but are restricted to $3,000 in
appropriations per year, $2,000 in emergency and supplemental appropriations, and
must share $20,000 between all Class III organizations. (Ex. 6 at 59–60, 63; Ex. 8 at
8.) Subject to the discretion of the SGA, Class III organizations may also request
unappropriated surplus funds. (Ex. 6 at 60.) Class III organizations may not request
office space. (Ex. 6 at 47–48.)

80. Class IV organizations are even more restricted. They cannot request
funding from the SGA Legislature like other organizations and instead must
fundraise to get money. (Ex. 6 at 48; Ex. 7 at 20.) They have no ability to request
emergency and supplemental appropriations. (Ex. 8 at 8; Ex. 6 at 59.)

81. The SGA can nevertheless grant Class IV organizations some funding by
matching "dollar for dollar total cash contributions" from the organization's
members or from an organization's fundraising, but only up to $500 each year, and
only up to $5,000 for all Class IV organizations collectively. (Ex. 6 at 60, 63; Ex. 8 at
5.) Even then, the SGA has complete discretion in determining whether to approve
the request to match funds.

14

82.   Unlike Classes I–III, Class IV organizations do not "have the privilege of appropriating money from Unappropriated surplus" student funds. (Ex. 6 at 50.) That is, Class IV organizations cannot receive more than the small amount of money set aside for them ($5,000 collectively for 2019–2020) for an academic year. Again, the only way the Class System allows those funds to go to Class IV organizations is by matching outside donations dollar for dollar.

83.   For all Classes I–IV, there are no objective criteria preventing the SGA from limiting or denying requests for appropriations, office space, or any other benefit based on an organization's views or its content. (*E.g.*, Ex. 8 at 8.) This includes emergency and supplemental appropriations, as well as requests for unappropriated surplus funds.

84.   The SGA assigns an organization to a Class based on the organization's viewpoint, as well as a number of other subjective and discretionary considerations. For example, the SGA will classify an organization as Class I only if the SGA believes that organization has "an appeal that reaches the general interest of the entire campus community or … that fosters pride and mobilizes awareness of the interests of a large, distinct, and prolific subculture of the campus community, as deemed by the discretion of the chartering process." (Ex. 6 at 46; Ex. 7 at 2.)

85.   On the other hand, the SGA classifies an organization as Class III or Class IV if it "meets the needs of a very specific and unique interest of the campus community" and attracts students who "are yet to be specifically represented by a chartered organization" (Ex. 6 at 47–48; Ex. 7 at 14, 20.)

86.   An organization is considered Class IV if the SGA determines that it is an "entry level organization[]," but there are no definitions or guidelines for making this determination. (Ex. 6 at 48; Ex. 7 at 20.)

87.   Class IV organizations are required to obtain approval from SGA to re-charter their organization every year. And Class I, II, and III organizations are

15

required to obtain approval from SGA to re-charter their organization every two years. (Ex. 7 at 2, 8, 14, 20.)

88.  The SGA also heavily considers an organization's views and content when it decides whether to approve or "re-charter" student organizations.

89.  To charter, the organization must, *inter alia*, submit a draft constitution, disclose the nature and purpose of the club, and appear before the SGA's Organizational Review Committee in person to describe events it intends to hold. The organization must answer questions from the SGA such as "How does the organization differ from other organizations on campus?" and "How does this organization benefit the campus community?" (Ex. 9 at 3–7, Ex. 10 at 1.)

90.  Existing organizations must also fill out an accreditation report and describe events from the past year(s) when re-chartering. (Ex. 7 at 5, 8, 14, 20.)

91.  All student organizations must also submit a proposed budget each year. (Ex. 8 at 17–19.) To get a budget approved, all student organizations must, *inter alia*, appear before the SGA twice, first before the SGA Appropriations Committee to answer "questions concerning the budget and recommended changes." (Ex. 8 at 19.) If the Appropriations Committee approves the budget, it will recommend a vote to the entire SGA Legislature. (Ex. 8 at 19.)

92.  "At the Legislative meeting, the organization will be asked questions concerning the nature of the programming, and the related costs. **The organization must be prepared to answer questions covering all aspects of their programming and to justify all expenses.**" (Ex. 8 at 19.) The Legislature will then vote to either approve or deny the budget request. (Ex. 8 at 19.)

93.  Moreover, "[f]ailure to sufficiently answer legislators' questions may result in a lower budget." (Ex. 8 at 19.)

94.  The SGA also determines an organization's Class by seniority. A Class III organization must spend two years as Class III before it is eligible to advance to

16

Class II, and a Class II organization must similarly spend four consecutive years as Class II before it can advance to Class I. (Ex. 6 at 46–47; Ex. 7 at 2, 8.)

95. In addition to assessing an organization's viewpoint and seniority, the SGA also determines an organization's Class by maintaining a tier system within each Class to "hold organizations accountable for their performance" and to "guide them in their endeavors as they strive to advance classification within the SGA." (Ex. 7 at 3, 9, 15, 21.)

96. The SGA has no objective guidelines or criteria that require it to assess student organizations on viewpoint- and content-neutral terms.

97. The SGA has no objective guidelines or criteria enabling student organizations as a matter of right to access student funds.

98. In short, the SGA allocates student-funded money and other substantial benefits through its "Class" system by explicitly considering an organization's viewpoint, extensively assessing an organization's purpose and content during charterment and re-charterment, by implementing a seniority system, and through its discretionary and discriminatory "tier" system.

## C. The University threatens coercive re-education, investigations, discipline, and criminal investigation for students who engage in protected speech.

99. The University maintains a Bias Education Response Taskforce ("BERT") made up of various university faculty and administrators, including Captain Kieran Barrett and Lieutenant Carlos Ortiz of the University Police, and is co-headed by Defendants Alvarez and Strayhorn. (Ex. 11 at 2.)

100. According to the University, BERT exists "to provide a well-coordinated and comprehensive response to incidents of intolerance and bias with respect to race, ethnicity, gender, sexual orientation, disability, religion and national origin." (Ex. 11 at 1.)

101. The University defines a "bias incident" as "conduct, speech or expression that is motivated by bias or prejudice but doesn't involve a criminal act." (Ex. 11 at 6.)

102. On its "bias incident" webpage, the University links to an article on www.tolerance.org to define a "bias incident." (Ex. 11 at 6–8.) The article has ten examples of bias incidents, which include considering whether (i) "[t]he target(s) believe the incident was motivated by bias," (ii) the "targets and perpetrators are of a different race, religion, national origin, gender or sexual orientation," and (iii) "acts are directed against members of groups whose presence in the community or school is opposed—e.g. Mexican immigrant students in a community where nativist groups are active." (Ex. 11 at 6–7.)

103. The University encourages students who believe they were subject to a "bias motivated act/incident on campus" to report it to BERT "as promptly as possible." (Ex. 11 at 2.) The University allows students to report bias incidents through a hyperlink on the BERT webpage. (Ex. 11 at 2.)

104. The bias incident report form states that "[a]ll reports will be evaluated to determine if they should be further investigated for potential violations of University policy and/or criminal law." (Ex. 11 at 1.)

105. The bias incident report form allows students to fill out basic information about the alleged "bias incident," to identify the persons involved, and encourages them to "be as specific as possible," to provide any available supporting documentation, and to identify the targeted "identities and/or communities." (Ex. 12 at 2–3.)

106. The form also allows a student to request to speak with someone from BERT about the incident. (Ex. 12 at 2.)

107. The University empowers Defendant Coleman-Carter, BERT, and University Police to manage, investigate, and punish students for bias incidents. (Ex. 11 at 1–3, 5.)

108. The Office of the Dean of Students receives bias incident reports. Upon receiving a bias incident report, the office will "immediately: Contact University Police and/or the Vice President of the SDCL (or designee), who will assume responsibility for managing the reported incident." (Ex. 11 at 2.)

109. The office of the Dean of Students also closely "collaborate[s] with University Police and the BERT Task Force to assess the situation and determine next steps." (Ex. 11 at 2–3.)

110. The University Police also use their coercive power to further BERT's reach on campus. The University Police state on their webpage that they are "an active member" of BERT's ongoing mission "to help eradicate instances of bias intimidation." (Ex. 11 at 5.)

111. In this same vein, the University has a number of statements and education initiatives that target disfavored speech and thus inform the scope of BERT and the definition of a "bias incident." (Ex. 11 at 9–11.)

112. The University has published a Human Relations Statement on Campus Climate for Civility and Human Dignity, which states that MSU must have a "special sensitivity to those most likely to be subjected to disrespect, abuse, and misunderstanding" and that MSU's goal is to restrict expression in a manner that MSU deems "appropriate in a multi-ethnic and multi-cultural society." (Ex. 13 at 1.)

113. The University has not published any other procedures or policies for handling bias response reports. Nor has the University published any publicly available data or logs of incident reports.

114. BERT also has authority to discipline students it investigates for "bias incidents" by issuing sanctions under the Student Code of Conduct, which provides

19

that "[v]iolations of the Code of Student Conduct that can be proven to have been motivated by illegal bias will result in the imposition of more severe sanctions." (Ex. 14 at 9.)

115. The Student Code of Conduct also prohibits protected speech by defining "discriminatory harassment, intimidation or bullying" to include "any gesture, written, verbal or physical act … whether it be a single incident or a series of incidents" that the "student directs at a specific group or individual." (Ex. 12 at 14–15.)

116. If the University determines that a student has violated this vague and overly broad definition of harassment, it can issue any discipline, from probation to expulsion. (Ex. 12 at 15.)

117. Defendant Coleman-Carter may also issue a "University No Contact Order" against any student that the University determines has violated this same provision. (Ex. 12 at 23.) There are no limits set on the duration of a No Contact Order.

118. Defendant Coleman-Carter may also issue any level of sanctions, from warnings to expulsions, for any student who violates any of the University's "written policies, regulations, and announcements." (Ex. 12 at 22.)

119. The Student Code of Conduct further specifies that "[s]tudent groups and organizations recognized by student government and/or their officers may be charged with and held responsible for violations of the Code of Student Conduct." (Ex. 12 at 22.) The University also threatens various "institutional sanctioning." (Ex. 12 at 22.)

## II. Defendants' enforcement and threats of enforcement have deprived Plaintiffs of their First Amendment rights.

## A. The University shut down Plaintiffs' speech.

120. On September 10, 2019, Mr. Botros and two other students stood outside on a large sidewalk near University Hall and Feliciano School of Business on MSU's campus to express their disagreement with laws banning law-abiding citizens from carrying guns for self-defense. (Ex. 15.)

121. The students wore orange jumpsuits and held up three signs, each of which said one of the following: "every civilian gun is a threat," "disarm law abiding citizens," and "criminals for gun free zones." (Ex. 15 at 1:21.)

122. The students collectively paid $50.85 to purchase orange jumpsuits to engage in this expressive activity, including $16.95 paid by Mr. Botros.

123. The students were not blocking access to buildings or pedestrian traffic. The students were speaking at normal levels and were not using amplified sound. The students were not interfering with any MSU activities or other planned events on campus.

124. While the students were engaged in these activities, Defendant Chipepo, a University Police Officer, approached Mr. Botros and the other students and informed them that they were violating the Speech Permit Policy because they had not obtained permission to speak from MSU officials.

125. Defendant Chipepo told the students that they must obtain permission and the office will want information on the group before they can continue. He also stated that the office will set "a day, a time, and a location in order for you to legally be here." (Ex. 15 at 0:33–0:49.)

126. When Mr. Botros asked what policy they were violating, Defendant Chipepo replied that "the school's policy" is that anyone who's going to "have a protest [must] go through the right channels." (Ex. 15 at 1:22–1:32.)

21

127. When Mr. Botros asked what would happen if they don't cease, Defendant Chipepo responded: "What you're doing now, will just be terminated …. protests cannot continue." (Ex. 15 at 1:53–2:08.)

128. Pursuant to Defendant Chipepo's orders, Mr. Botros and the other students stopped their expressive activity, left the area, and did not return.

129. Because of the Speech Permit Policy, Plaintiffs are not engaging in certain expressive activities to communicate their views on the MSU campus.

130. Because of the Speech Permit Policy, Plaintiffs are chilled in their ability to promote YAL at MSU and to discuss other important political, religious, and ideological views on campus.

**B. The University's Class System unconstitutionally restricts student association and penalizes Plaintiffs for engaging in protected speech.**

131. Plaintiffs desire to operate their student organization, Young Americans for Liberty, at the University and to use student-fees for funding for many of its events.

132. As a political organization, many of YAL's events and operations are expressive or involve protected speech.

133. Since it began operating at the University in 2018, YAL has been classified by the SGA as a Class IV organization. Because the SGA has determined that YAL is still "entry level" for the 2019–2020 school year, YAL is not eligible to request funding, to receive more than $500 in matching contributions, or to receive any supplemental or emergency funds for its events and operations.

134. The SGA's classification of YAL as a Class IV organization is a viewpoint- and content-based violation of YAL's speech.

135. The SGA has no objective guidelines or regulations that restrain its ability to make such determinations based on YAL's viewpoint and the content of YAL's speech.

136. Because the SGA has imposed a seniority system, YAL is not eligible for a budget or for its fair share of funding from the mandatory student activity fees.

137. Meanwhile, the University's website lists 13 Class I organizations, 13 Class II organizations, 35 Class III organizations, and 11 Class IV organizations, including YAL. (Ex. 16 at 1–3.)

138. There are no political organizations other than YAL in Class IV. There are several political organizations in Class III organizations, including the YesSheCanCampaign, Environmental Club, and Animal Activists. Political Class II organizations include the openly left organizations Justice for Education and Femvolution. (Ex. 16 at 2–3.)

139. YAL has been and will continue to be denied funding for its events because the student organization regulations grant the SGA unbridled discretion to allocate mandatory student fees based upon viewpoints favored by the SGA. The SGA has utilized this discretion to favor the speech of certain student organizations and to disfavor all other student speech, including Plaintiffs'.

## C. The Speech Permit Policy and BERT are preventing Plaintiffs from engaging in other core political speech.

140. Plaintiffs desire to speak on campus on a number of topics which some members of campus may oppose or consider controversial.

141. For example, Plaintiffs desire to speak out against gun control laws and criticize the deleterious impact that gun laws have on racial minorities. Specifically, Plaintiffs desire to stand on sidewalks on the University's campus, hold up signs saying that gun laws are racist, and distribute literature showing the adverse impact that gun laws have on racial minorities.

142. Plaintiffs also desire to speak against minimum wage laws by setting up a "unionized hot dog stand" and comparing its prices to a normal hot dog stand.

143. Plaintiffs also desire to host anti-war events showing the number of soldiers who have died overseas since 2017.

144. Plaintiffs also desire to promote free speech as a fundamental constitutional right by handing out pamphlets and holding up signs, even though some increasingly criticize free speech as "dangerous" and biased against certain groups.

145. Plaintiffs desire to engage in these expressive activities, as well as many others, throughout various open, generally accessible outdoor areas of campus without having to obtain permission multiple weeks in advance and without being confined to the time and location assigned to them by the Office of the Dean of Students.

146. The University's prior permission requirement and the administrative restrictions on spontaneous speech in the Speech Permit Policy prevent Plaintiffs from engaging in expressive activities in the manner of their choosing even on property that is held open to the students as a public forum.

147. Since the University enforced the Speech Permit Policy against Plaintiffs, Plaintiffs have greatly curtailed, restricted, and limited any efforts to express their political views, engage in civil discourse, or to share political literature with students and other University persons in any open, outdoor, generally accessible areas of campus.

148. Plaintiffs are also aware of the University's Bias Education Response Taskforce and its overly broad and vague definition of a "bias incident." Plaintiffs credibly fear that expressing their views on their preferred topics could result in being reported, investigated, and punished by the BERT, the Office of the Dean of Students, or other officials from Student Development and Campus Life.

149. Plaintiffs credibly fear that University Police will investigate them for criminal charges pursuant to a "bias incident" investigation. Plaintiffs also fear that

24

the University may seek to recommend Plaintiffs for "reeducation" through counselling or by mandating that they attend some of its "educational" social justice programs. Plaintiffs also credibly fear that the University will punish them and impose sanctions according to the Student Code of Conduct for violating University policies, including the unconstitutional discriminatory harassment policy and Speech Permit Policy.

150. Thus, the University's ban on "bias incidents" and associated practices chill Plaintiffs' speech. They have deterred and continue to deter Plaintiffs from speaking openly about issues of public concern. The only way for Plaintiffs to be sure that they will not be investigated or punished is to engage in self-censorship.

## Allegations of Law

151. At all times relevant to this Complaint, each and all of the acts alleged herein were attributed to the Defendants, who acted under color of a statute, regulation, custom, or usage of the State of New Jersey.

152. By forcing Mr. Botros to stop engaging in peaceful expressive activities in an outdoor, generally accessible area of campus and requiring him to obtain permission prior to engaging in speech with others on campus, the Defendants enforced an unconstitutional prior restraint on speech and therefore violated the Plaintiffs' First Amendment free speech rights.

153. By failing to adequately define key terms of the Speech Permit Policy such as "demonstration," "assembly," "emergent situations," and "special circumstances," the Defendants have maintained and enforced a set of policies and practices that are unconstitutionally overbroad and vague and therefore violated Plaintiffs' First Amendment free speech and Due Process rights when they enforced the Speech Permit Policy against Plaintiffs.

154. By imposing a Class System with onerous registration requirements upon student organizations that are funded largely by mandatory student fees, and by

failing to restrain the discretion of the SGA in administering this Class System, Defendants are violating Plaintiffs' First Amendment free speech rights.

155. By explicitly considering a student organization's viewpoint, the content of its speech, its size, and its popularity when deciding whether to re-charter that organization and what Class status it should have, Defendants are unconstitutionally discriminating against YAL based on its viewpoint and the content of its speech.

156. By requiring Plaintiffs to pay a mandatory student activity fee that is used to fund student organization speech on campus in a manner that is not viewpoint neutral, Defendants are unconstitutionally compelling Plaintiffs' speech.

157. By failing to properly define key terms in the Class System, such as "entry level," "specific and unique interest," "large and significant interest of the campus community," "general interest," "large, distinct, and prolific subculture," Defendants maintain and enforce a set of policies and practices that are unconstitutionally overbroad and vague and therefore violate Plaintiffs' First Amendment free speech and Due Process rights.

158. By maintaining a Bias Education Response Taskforce and its associated practices, Defendants maintain a set of policies and practices that unconstitutionally discriminate against students based on the viewpoint and content of a student's speech and therefore violate Plaintiffs' First Amendment free speech rights.

159. By failing to properly define a "bias incident" and associated operational terms, such as "bias" or "prejudice," Defendants maintain a set of policies and practices that are unconstitutionally overbroad and vague and therefore violate Plaintiffs' First Amendment and Due Process rights.

160. Each of the Plaintiffs are suffering harm from Defendants' Speech Permit Policy, Class System, Bias Incident regulations, and associated practices.

161. Plaintiffs have no adequate or speedy remedy at law to redress the deprivation of their constitutional rights. And unless this Court enjoins Defendants' policies and conduct, each of the Plaintiffs will continue to suffer irreparable injury.

**Count I: The Speech Permit Policy violates Plaintiffs' right to free speech.**

162. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–161 of this Complaint.

163. By enforcing the two-week permission requirement in the Speech Permit Policy against Plaintiffs on September 10, 2019, Defendants improperly denied Plaintiffs their First Amendment right to engage in free speech.

164. Defendants' Speech Permit Policy and Defendants' practice of forbidding students and student organizations from engaging in speech activities without express written consent at least two weeks in advance is an unconstitutional prior restraint, facially and as applied, in violation of the First Amendment.

165. Openly accessible common outdoor areas of campus at MSU are traditional or designated public forums for MSU students to engage in free speech and expression.

166. Accordingly, the First Amendment prohibits MSU from engaging in content or viewpoint discrimination against students who express themselves in these accessible common outdoor areas of campus. This includes providing adequate safeguards that prevent an MSU official from improperly excluding or restricting a student's speech based on the content of the message or the student's viewpoint.

167. The Speech Permit Policy is an unconstitutional prior restraint for multiple reasons. The Speech Permit Policy requires two weeks prior permission before engaging in expressive activities anywhere on campus.

168. The Speech Permit Policy does not provide any objective criteria or guidelines for Defendants to use when deciding whether to approve or reject a student's request to speak.

27

169. The Speech Permit Policy fails to ensure prompt decision-making because it contains no timeframe in which MSU administrators must rule on a student's request for permission to speak.

170. The Speech Permit Policy requires Defendants to examine the content and viewpoint of students' speech in deciding whether to approve, modify, or reject a students' request to speak. It thus allows administrators to expressly discriminate based on the viewpoint of the speaker or the content of the speech.

171. Defendants' Speech Permit Policy and associated practices are not the least restrictive means of serving the University's stated interests in allowing the University to carry on its normal business and academic activities. Nor do they serve a compelling state interest.

172. Defendants' Speech Permit Policy also fails to satisfy intermediate scrutiny because it is not narrowly tailored to serve a significant governmental interest and because it does not leave open ample alternative avenues of communication.

173. The Speech Permit Policy is also unconstitutionally overbroad, both facially and as-applied, because it restricts a substantial amount of constitutionally protected speech under key operative terms such as "demonstration," "assembly," "emergent situations," and "special circumstances."

174. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that Defendants, through the Speech Permit Policy, violated Plaintiffs' freedom of speech, facially and as-applied, and an injunction against Defendants' Speech Permit Policy and associated practices and actions. Additionally, Plaintiffs are entitled to compensatory and nominal damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## Count II: The University's Class System violates Plaintiffs' free speech rights.

175. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–161 of this Complaint.

176. The First Amendment's Freedom of Speech Clause prohibits the government from compelling citizens to express or support a message not of their own choosing.

177. The First Amendment's Free Speech Clause also prohibits public universities from collecting a mandatory student fee that is used to fund student organization speech if the student fees are not allocated in a viewpoint-neutral manner.

178. When a public university collects mandatory student fees and allows registered student organizations to apply for funds from those student fees, or when it otherwise makes those funds available to student groups, it creates a public forum for student speech and expression.

179. Similarly, when a public university allows student organizations to form and register around shared beliefs and interests, and when it allows those same organizations nonmonetary benefits such as representation in the student government or the ability to advertise, meet, and host events on campus, it creates a public forum for student speech and expression.

180. Accordingly, a public university may not allow viewpoint or content-based discrimination when it determines whether to officially recognize a student organization, when it allocates student organization funds through mandatory student fees, or when it allocates nonmonetary benefits to student organizations.

181. Montclair State University has created a public forum for student speech through its student organization Class System. Pursuant to the University's Class System for student organizations, Defendants engaged in content and viewpoint-based discrimination by favoring the expressive activities of dozens of other student

organizations that receive Class I, II, or III status and receive substantial monetary and nonmonetary benefits which Class IV organizations, including Plaintiffs' YAL chapter, do not receive.

182. The University's Class System runs afoul of Plaintiffs' clearly established First Amendment rights in a number of ways.

183. Defendants' Class System requires or allows officials to evaluate the content and viewpoint of a student organization's expression when deciding whether to recognize the organization and when deciding a student organization's Class— and therefore what access to mandatory student fees and what nonmonetary benefits it receives.

184. Defendants engaged in viewpoint and content discrimination when they classified YAL as a Class IV organization, thereby denying it certain nonmonetary benefits and the ability to request almost any portion of the mandatory student fees.

185. Defendants' Class System grants MSU officials, including SGA officials, unbridled discretion when officially recognizing or classifying a student organization.

186. The Class System does not provide any objective criteria or guidelines for Defendants to use when deciding whether to approve or reject a student organization's request for recognition or for funding.

187. These grants of unbridled discretion to MSU officials violate the First Amendment because they create a system in which student organizations are reviewed without any objective or neutral standards, thus giving student organizations no way to prove that a classification decision was based on unconstitutional considerations.

188. Because Defendants have failed to establish neutral, objective, and comprehensive standards governing the criteria above, SGA officials are allowed to

engage in content and viewpoint discrimination when classifying student organizations and determining the level of access to campus resources and student fee funding they will receive.

189. Defendants exercised that unbridled discretion when they classified Plaintiffs' YAL chapter as a Class IV organization.

190. Defendants' Class System denies student fee funds and nonmonetary benefits to certain student organizations and grants other student organizations less access to that funding based on a series of viewpoint and content-based considerations, including the size, popularity, and interest in the organization.

191. Defendants' Class System requires MSU officials to determine an organization's "Class" by using factors that are either explicitly viewpoint-based or that are effectively viewpoint-based because they grant those officials unbridled discretion.

192. Defendants engaged in viewpoint discrimination when they classified Plaintiffs' YAL chapter as a Class IV organization, thus shutting it out from almost all of the student activity fees.

193. Through the Class System, Defendants also compel Mr. Botros to pay a mandatory student activity fee that is used to fund student organization speech on campus in a manner that is not viewpoint neutral.

194. Specifically, Defendants' Class System requires Plaintiffs to fund and support speech and viewpoints with which they disagree and which they find offensive and objectionable.

195. Defendants' Class System does not satisfy strict scrutiny because it supports no compelling government interest and because it is not narrowly tailored toward any such concerns.

196. Key terms in the University's Class System are also unconstitutionally overbroad, both facially and as-applied, because they restrict a significant amount of constitutionally protected speech.

197. Defendants' hierarchical ranking based on an organization's viewpoint reaches a substantial amount of protected speech.

198. By determining Class hierarchy based upon vague, undefined terms such as "entry level," "specific and unique interest," "large and significant interest of the campus community," "general interest," "large, distinct, and prolific subculture," Defendants are maintaining a set of policies and practices that are unconstitutionally overbroad, facially and as-applied, and therefore violate each of the Plaintiffs' First Amendment free speech rights.

199. Defendants' Class System thus violates Plaintiffs' right to free speech under the First Amendment.

200. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that Defendants, through the Class System, violated Plaintiffs' First Amendment right to freedom of speech facially and as-applied, and an injunction against Defendants' Class System and associated practices and actions. Additionally, Plaintiffs are entitled to compensatory and nominal damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## Count III: The Bias Incident Regulations violate Plaintiffs' free speech rights.

201. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–161 of this Complaint.

202. Public universities cannot discriminate against students based on their viewpoint or the content of their speech.

203. The University's Bias Education Response Taskforce expressly targets speech based on the speaker's viewpoint and the content of the speaker's speech.

204. The University's definition of a "bias incident" encompasses speech that is fully protected under the First Amendment.

205. The University's policies authorize Defendants to investigate, threaten to punish, and punish students who perpetrate a "bias incident."

206. Plaintiffs fear that if they express views that some members of campus may consider offensive, they will be investigated and punished for engaging in such protected speech or, pursuant to a bias investigation, that they will be subject to criminal charges from the University Police, a University No Contact Order from Defendant Coleman-Carter, or disciplinary sanctions for discriminatory harassment or for violating other University policies.

207. Plaintiffs also fear that they will be subject to coercive "reeducation" through counselling or by mandating that they attend some of its "educational" social justice programs.

208. Plaintiffs' fears are credible and reasonable and based on past enforcement, the University's policies, statements, and the very existence and express purpose of BERT.

209. The University therefore threatens to discriminate against Plaintiffs solely because of their viewpoint and the content of their speech by employing the "bias incident" regulations and BERT against Plaintiffs.

210. Defendants' content- and viewpoint-based restrictions on "bias incidents" violate Plaintiffs' free speech rights because the restrictions do not serve a compelling state interest, nor are the University's restrictions the least restrictive means of serving any such interest.

211. The University's definition of a "bias incident" is also unconstitutionally overbroad. Plaintiffs seek to engage in protected expression in the open, outdoor

areas of campus, but MSU considers core political speech to fall within the definition of "bias incident."

212. Plaintiffs therefore reasonably fear that Defendants will punish core political speech by classifying it as a "bias incident."

213. Because of this reasonable fear, Plaintiffs have refrained from engaging in speech on campus on certain topics and have thus had their protected speech chilled by the University's definition of "bias incident."

214. Defendants' policies thus encompass, and actually target, a substantial amount of protected speech and therefore are unconstitutionally overbroad. Defendants' Bias Incident Regulations thus violate Plaintiffs' right to free speech under the First Amendment.

215. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that Defendants, through the Bias Incident Regulations, have violated and continue to violate Plaintiffs' First Amendment right to free speech, and an injunction against Defendants' Bias Incident Regulations and associated practices and actions facially and as-applied. Additionally, Plaintiffs are entitled to compensatory and nominal damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

**Count IV: The Speech Permit Policy violates Plaintiffs' Due Process rights because it is unconstitutionally vague.**

216. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–161 of this Complaint.

217. Plaintiffs seek to engage in protected expression in the open, outdoor areas of campus, but the Policy does not make clear what types of speech will trigger the Speech Permit Policy's "demonstrations and assemblies" requirements.

218. Because Plaintiffs are unsure what type of speech is regulated, they have refrained from engaging in speech on campus and have thus had their protected speech chilled by the University's definition of "demonstrations and assemblies."

219. Key operative terms such as "demonstration," "assembly," "emergent situations," and "special circumstances" in the Speech Permit Policy are unconstitutionally vague facially and as-applied because they are not defined with any precision, such that an ordinary person of reasonable intelligence cannot understand what is prohibited.

220. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that Defendants, through the Speech Permit Policy, have violated and continue to violate Plaintiffs' Due Process rights, and an injunction against Defendants' Speech Permit Policy and associated practices and actions. Additionally, Plaintiffs are entitled to compensatory and nominal damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

**Count V: The Class System violates Plaintiffs' Due Process rights because it is unconstitutionally vague.**

221. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–161 of this Complaint.

222. The Fourteenth Amendment to the United States Constitution guarantees Plaintiffs the right to due process of law and prohibits Defendants from implementing vague standards that allow for viewpoint discrimination in Defendants' handling of Plaintiffs' speech.

223. The government may not regulate speech through policies that permit arbitrary, discriminatory, or overzealous enforcement.

35

224. The government also may not regulate speech in ways that do not provide persons of common intelligence fair warning as to what speech is permitted and what speech is prohibited.

225. Defendants' Class System Policy contains multiple vague criteria.

226. Defendants have not defined key terms in the student organization regulations with any precision, such that an ordinary person of reasonable intelligence cannot understand what is prohibited.

227. By failing to properly define these key terms, terms such as "entry level," "specific and unique interest," "large and significant interest of the campus community," "general interest," and "large, distinct, and prolific subculture," Defendants are maintaining a set of policies and practices that are unconstitutionally vague, facially and as applied, and therefore violate each of the Plaintiffs' Due Process rights.

228. Defendants enforced their vague Class System Policy against Plaintiffs by classifying YAL as a Class IV organization based upon the viewpoint of their speech which prohibits them from receiving the same benefits as other student organizations.

229. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that Defendants, through the Class System, have violated and continue to violate Plaintiffs' Due Process rights, and an injunction against Defendants' Class System and associated practices and actions both facially and as-applied. Additionally, Plaintiffs are entitled to compensatory and nominal damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## Count VI: The Bias Incident Regulations violate Plaintiffs' Due Process rights because they are unconstitutionally vague.

230. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–161 of this Complaint.

231. Similarly, the University's definition of a "bias incident" is unconstitutionally vague. Plaintiffs seek to engage in protected expression in the open, outdoor areas of campus, but the Regulations do not clearly define which speech is prohibited and Plaintiffs are therefore unsure what types of speech MSU considers a "bias incident" and thus are unsure what types of speech will trigger retribution from the Bias Education Response Team, the Dean of Students, and the University Police.

232. Because Plaintiffs are unsure what type of speech is regulated, they have refrained from engaging in speech on campus and have thus had their protected speech chilled by the University's definition of "bias incident."

233. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that Defendants, through the Bias Incident Regulations, have violated and continue to violate Plaintiffs' Due Process rights, and an injunction against Defendants' Bias Incident Regulations and associated practices and actions facially and as-applied. Additionally, Plaintiffs are entitled to compensatory and nominal damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court enter judgment against Defendants and grant Plaintiffs the following relief:

A. A declaratory judgment that the Speech Permit Policy and associated practices violate Plaintiffs' rights under the First and Fourteenth Amendments both facially and as-applied;

B. A declaratory judgment that Defendants' Class System and associated

practices violate Plaintiffs' rights under the First and Fourteenth Amendments both facially and as-applied;

C. A declaratory judgment that Defendants' Bias Incident Regulations and associated practices violate Plaintiffs' rights under the First and Fourteenth Amendments both facially and as-applied;

D. A preliminary and permanent injunction prohibiting Defendants, their agents, officials, servants, employees, and any other persons acting on their behalf from enforcing the Speech Permit Policy, Class System, Bias Incident Regulations, and associated practices challenged in this Complaint;

E. Compensatory and nominal damages for the violation of Plaintiffs' First and Fourteenth Amendment rights from the Defendants sued in their individual capacities;

F. Plaintiffs' reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and

G. All other further relief to which Plaintiffs may be entitled.

Plaintiffs demand a trial by jury in this cause of action.

Respectfully submitted on the 15th day of January, 2020,

s/ Michael Laffey
Michael P. Laffey
MESSINA LAW FIRM, P.C.
961 Holmdel Road
Holmdel, NJ 07733
(732) 332-9300
mlaffey@messinalawfirm.com

Michael R. Ross*
Tyson C. Langhofer*
ALLIANCE DEFENDING FREEDOM
CENTER FOR ACADEMIC FREEDOM
20116 Ashbrook Place, Suite 250
Ashburn, VA 20147
(480) 444-0020
mross@ADFlegal.org
tlanghofer@ADFlegal.org

*Counsel for Plaintiffs*

*\*Pro hac vice applications forthcoming.*

## Declaration under Penalty of Perjury

I, MENA BOTROS, a citizen of the United States and a resident of the State of New Jersey, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this ___15___ day of January, 2020, at ___Jersey City___, New Jersey.

## Certificate of Compliance

I, Michael P. Laffey, certify in accordance with 28 U.S.C. § 1746 and Local Civil Rule 11.2 that the matter in controversy is not the subject of any other action or proceeding before any court, any pending arbitration, or any administrative proceeding.

Dated this 15th day of January, 2020.

s/ Michael P. Laffey
Michael P. Laffey
MESSINA LAW FIRM, P.C.
961 Holmdel Road
Holmdel, NJ 07733
(732) 332-9300
mlaffey@messinalawfirm.com

*Counsel for Plaintiffs*

# Exhibit B

## I.    Policy on Expressive Activity.

This policy applies to all buildings, grounds, and other spaces owned or controlled by Montclair State University.   The term "Expressive Activity" includes:

1. Meetings and other group activities of students and student organizations;
2. Speeches, performances, demonstrations, rallies, vigils, and other events by students, student organizations, and outside groups invited by student organizations;
3. Distributions of literature, such as leafleting and pamphleting; and
4. Any other expression protected by the First Amendment to the U.S. Constitution.

## II.    Policy Statement.

Montclair State University property is primarily dedicated to academic, student life and administrative functions. But it also represents the "marketplace of ideas," and especially for students, many areas of campus represent a public forum for speech and other Expressive Activities. For students and student organizations, the outdoor areas of campus are venues for free expression, including speeches, demonstrations, and the distribution of literature.

Montclair State University shall not consider the content or viewpoint of the expression or the possible reaction to that expression in applying this policy. The University shall not impose restrictions on students, student organizations, or university employees on the basis of the content or viewpoint of their expression or the possible reaction to that expression. In the event that other persons react negatively to a student's, student organization's, or university employee's expression, the University (including University Police) shall take all necessary steps to ensure public safety while allowing the Expressive Activity to continue.

No event or Expressive Activity shall be permitted to violate or hinder the rights of others within the campus community. No event or Expressive Activity shall prevent others from pursuing their work or studies or other campus activities, nor in any way threaten or intimidate others.

Montclair State University does not assume any obligation or responsibility for the content of the materials distributed.

## III.    Rules and Regulations.

### A.    General Rules.

Subject to the additional rules set forth herein, students and student organizations shall be allowed to conduct Expressive Activities on University property as long as such activity:

1. Does not block access to campus buildings or obstruct or interfere with university-related or university-sponsored activities.
2. Does not obstruct vehicular or pedestrian traffic.
3. Does not constitute unlawful activity.
4. Does not create a clear and present threat to public safety.

5. Does not take place in a location that has been reserved by another student organization or University group.
6. Does not include physically attaching materials to University property.
7. Is conducted by a non-commercial entity.
8. Takes place during hours when the University is open.
9. Distribution of printed materials must be done in person.
10. Individuals and/or groups engaged in Expressive Activity are responsible for picking up any printed materials dropped on the ground around the areas of distribution or other litter resulting from the activity. The University may charge such individuals and/or groups a reasonable clean up fee if they fail to do so.
11. Individuals and/or groups engaging in Expressive Activity agree to pay for any damages to University property that is caused by their use of such property.
12. No use of amplification devices in outdoor locations is permitted outside of the common hour on campus, to avoid interference with classes. No amplification is permitted inside buildings at any time to avoid interference with offices, classes and programs.

This policy shall not apply to any person or organizations desiring to sell merchandise or services on campus. Any person or organization desiring to sell merchandise or services on campus should contact the Office of Campus Business Services.

**B.    Outdoor Locations.**

For outdoor campus facilities and areas, students, student organizations, and their sponsored guests may freely engage in spontaneous Expressive Activities provided that such activities are in compliance with all other provisions of this policy.

**C.    Indoor Locations.**

For indoor campus facilities and areas, students, student organizations, and their sponsored guests may freely engage in spontaneous Expressive Activities subject to the following conditions:

1. Distribution of written or printed materials, such as leafleting or pamphleting, and petitioning for signatures may only be conducted at one of the following locations:
   (a) University Hall        or        (b) Student Center
2. The Expressive Activities are in compliance with all other provisions of this policy.

**D.    Reserving Campus Facilities:**

1. If students, student organizations, or university employees desire to reserve indoor or outdoor campus facilities, they shall submit their application for reservation to the Dean of Students four business days prior to the Student reservation date. The University will respond to the reservation application within two business days

2.   External individuals or organizations may be sponsored by University students, employees or organizations, in which case the reservation must be made by the University sponsor. In the event that a non-community member's reservation conflicts with a University community member's application, the reservations will be given in the priority listed in footnote 1.

3.   Reservation requests will be processed and granted on a first-come, first- served basis, consistent with the priority listed in footnote 1. These requests may be denied for the following reasons only:

  a.   The requested venue is a facility that the university has designated as not available for Expressive Activity under this policy;

  b.   The requested venue is a facility and the request conflicts with restrictions enacted pursuant to this policy;

  c.   The venue is already reserved for another event[1];

  d.   The activity will attract a crowd larger than the venue can safely contain;

  e.   The activity is a clear and present threat to public safety, according to the university's police department, including the inability to schedule sufficient personnel/police within the necessary time frame;

  f.   The activity will occur during college examination periods or during other major campus events, such as convocations; home-coming or heavily-attended athletic competitions or performances; or

  g.   The activity is unlawful.

4.   During an event, the student, student organization, or university employee requesting the reservation is responsible for preserving and maintaining the facility it reserved. If it causes any damage to those facilities, the person(s) or organization (and its officers, if applicable) shall assume responsibility.

---

[1] In the event that multiple individuals or organizations submit conflicting reservation requests, the following order of precedence shall govern: (1) official university sponsored or contracted

activities and events; (2) recognized student organization activities and events; (3) student activities and events; and (4) all other activities and events.

# Exhibit C

MICHAEL P. LAFFEY
MESSINA LAW FIRM, P.C.
961 Holmdel Road
Holmdel, NJ 07733
(732) 332–9300
mlaffey@messinalawfirm.com

MICHAEL R. ROSS*
TYSON C. LANGHOFER*
ALLIANCE DEFENDING FREEDOM
CENTER FOR ACADEMIC FREEDOM
20116 Ashbrook Place, Suite 250
Ashburn, VA 20147
(480) 444–0020
mross@ADFlegal.org
tlanghofer@ADFlegal.org

*Counsel for Plaintiffs*

*Admitted pro hac vice.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| YOUNG AMERICANS FOR LIBERTY AT MONTCLAIR STATE UNIVERSITY, and MENA BOTROS; <br><br> Plaintiffs, <br><br> v. <br><br> The Trustees of Montclair State University— ROSE L. CALI, MARY A. COMITO, VICE-CHAIR DR. FRANCIS M. C. CUSS, CHAIR GEORGE J. HILTZIK, LAWRENCE R. INSERRA, JR., DOUGLAS L. KENNEDY, RALPH A. LAROSSA, JEAN MARC DE GRANDPRE, JOHN L. MCGOLDRICK, WILLIAM T. MULLEN, PRESTON D. PINKETT III, SECRETARY KENT SLUYTER, and STUDENT NIKITA WILLIAMS— all individually and all in their official capacities as members of the Montclair State University Board of Trustees; SUSAN A. COLE, President of Montclair State University, in her official and individual capacities; KAREN PENNINGTON, Vice President of Student Development & Campus Life of Montclair State University, in her official and individual | Civil No. 2:20-cv-00508-BRM-JAD |

capacities; MARGAREE COLEMAN-CARTER, Dean of Students of Montclair State University, in her official and individual capacities; PAUL M. CELL, Chief of Police of Montclair State University, in his official and individual capacities; KALUBA CHIPEPO, Sergeant of Campus Police for Montclair State University, in his official and individual capacities; YOLANDA ALVAREZ, Chair of Bias Education Response Taskforce of Montclair State University, in her official and individual capacities; HAMAL STRAYHORN, Co-Chair of Bias Education Response Taskforce of Montclair State University, in her official and individual capacities; THE STUDENT GOVERNMENT ASSOCIATION OF MONTCLAIR STATE UNIVERSITY INC.,

Defendants.

## JOINT STIPULATION OF DISMISSAL

NOW COME the Plaintiffs and Defendants and jointly stipulate to the dismissal of this action. In support thereof, the parties state as follows:

1.      The parties have reached a resolution in this case that resolves all claims.

2.      The parties stipulate that Counts I, III, IV, and VI of this lawsuit should be dismissed with prejudice and that Counts II and V should be dismissed without prejudice.

3.      The parties stipulate that each party will bear its own costs.

4.      This is not a class action lawsuit, no receiver has been appointed, and no federal statute that requires a court order for dismissing a case governs this lawsuit.

5.      Plaintiffs have not previously dismissed any federal or state-court suit based on or including the same claims as those presented in this case.

Respectfully submitted this day, June __, 2021.

s/ Michael Laffey
MICHAEL P. LAFFEY
MESSINA LAW FIRM, P.C.
961 Holmdel Road
Holmdel, NJ 07733
(732) 332–9300
mlaffey@messinalawfirm.com
MICHAEL R. ROSS*
TYSON C. LANGHOFER*
ALLIANCE DEFENDING FREEDOM
CENTER FOR ACADEMIC FREEDOM
20116 Ashbrook Place, Suite 250
Ashburn, VA 20147
(480) 444–0020
mross@ADFlegal.org
tlanghofer@ADFlegal.org

*Counsel for Plaintiffs*

*Admitted pro hac vice.*

s/ Michael R. Sarno
Deputy Attorney General
Office of the NJ Attorney General
25 Market Street, P.O. Box 116
Trenton, New Jersey 08625
(609) 376-2819
Michael.Sarno@law.njoag.gov

*Counsel for MSU Defendants*

s/ Maria Vallejo
MARIA P. VALLEJO
RONALD P. BOTELHO
CHASAN LAMPARELLO MALLON &
CAPPUZZO, P.C.
300 Lighting Way, Suite 200
Secaucus, NJ 07094
(201) 348-6000
MVallejo@chasanlaw.com
RBotelho@chasanlaw.com

*Counsel for Defendant The Student
Government Association of Montclair
State University, Inc.*

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release ("Agreement") is between Young Americans for Liberty at Montclair State University, and Mena Botros ("Plaintiffs"), and Rose L. Cali, Mary A. Comito, Dr. Francis M.C. Cuss, George J. Hiltzik, Lawrence R. Inserra, Jr., Douglas L. Kennedy, Ralph A. LaRossa, Jean Marc De Grandpre, John L. McGoldrick, Willliam T. Mullen, Preston D. Pinkett III, Kent Sluyter, Nikita Williams, Susan A. Cole, Karen Pennington, Margaree Coleman-Carter, Paul M. Cell, Kaluba Chipepo, Yolanda Alvarez, and Hamal Strayhorn ("University Defendants"), and The Student Government Association of Montclair State University Inc. (the "SGA"). All persons above will also be referred to as "the Parties."

A.    The Parties dispute the legality of the University Defendants' actions in enforcing its Demonstrations and Assemblies Policy on campus on September 10, 2019 with regard to Plaintiffs, the University Defendants' Bias Education Response Taskforce, and the SGA's regulations on recognizing student organizations and disbursing mandatory student fees to those organizations. Plaintiffs filed a lawsuit, *Young Americans for Liberty, et al. v. Trustees of Montclair State Univ., et al.*, in the United States District Court of the District of New Jersey, No. 2:20-cv-508-BRM-JAD (the "Litigation"), against the University Defendants and the SGA challenging the constitutionality of those actions and regulations under the First and Fourteenth Amendments to the United States Constitution.

B.    The Parties' decision to enter into this Agreement represents a compromise of disputed claims in the Litigation and creates the framework for the parties to move forward without the disruption and cost of litigation. Defendants deny all liability to the claims asserted by Plaintiffs.

C.    The Parties to this Agreement wish to resolve all claims Plaintiffs have or could allege against Defendants related to these events.

NOW THEREFORE, in consideration of the foregoing and the terms and conditions contained in this Agreement, the Parties agree as follows:

1.    Upon execution of this Agreement by all parties, Defendants agree as follows:

a.    Repeal and replace the Demonstrations and Assemblies Policy. The University Defendants will repeal the existing Demonstrations and Assemblies Policy and replace it with the Expressive Activity Policy, attached as Exhibit 1.

b.    Abolish the Bias Education Response Taskforce. The University Defendants will abolish their Bias Education Response Taskforce ("BERT") and all BERT "bias incident" regulations on reporting, investigating, and making decisions on any alleged "bias incidents."

c.    <u>Student organization recognition and funding policies</u>. The SGA will enact legislation, policies, procedures, and forms to replace the existing Class I-IV charter system and funding system with "shall recognize" and "shall fund" policies, according to the terms set forth in Exhibit 2.

d.    <u>Payment to Plaintiffs' attorneys</u>. Within sixty (60)  days of executing this Agreement and providing an executed State of New Jersey W-9 form, the University Defendants will make a payment of $28,000 and the SGA will make a payment of $14,000 by check to "Alliance Defending Freedom (IOLTA)."

2.    <u>Dismissal of the Litigation</u>. Once Defendants make the changes in Paragraphs 1.a and 1.b, and Alliance Defending Freedom receives $42,000 in accordance with Paragraph 1.d, Plaintiffs will promptly file the Joint Stipulation of Dismissal, attached as Exhibit 3.

3.    <u>Release</u>. In consideration of Defendants' actions specified in Paragraph 1 and subject to the terms of the following paragraph, Plaintiffs hereby fully release, acquit, and forever discharge Defendants, their agents, assigns, and employees, from any and all claims, liabilities, causes of action, damages, costs, attorneys' fees, expenses, and compensation whatsoever, of whatever kind or nature, in law, equity or otherwise, whether known or unknown, vested or contingent, suspected or unsuspected, that Plaintiffs may now have, have ever had, or hereafter may have (i) relating directly or indirectly to the allegations in Paragraph A of this Agreement, Plaintiff's complaint or this Litigation,  (ii) which arise from actions taken by Defendants prior to the date of this Agreement, and (iii) that arise from any challenge of the Expressive Activity Policy in Paragraph 1.a of this Agreement regarding its constitutionality or legality. This release and waiver covers all claims and demands for relief, damages, costs, expenses, and causes of action of any kind or character (whether known or unknown or foreseeable or unforeseeable) under federal and state law, as of the date of this Agreement

In consideration for Defendants' promise in paragraph 1.c. above to enact new student organization chartering and funding policies, Plaintiffs agree to dismiss without prejudice the claims challenging such policies. If the SGA fails to enact new policies consistent with the terms of Paragraph 1.c and that are acceptable to Plaintiffs, Plaintiffs reserve the right to file a lawsuit against the SGA challenging the chartering and funding policies, including seeking damages incurred as a result of the policies that were challenged in the Lawsuit.

4.    <u>Entire Agreement.</u> This Agreement contains the entire understanding of the Parties and supersedes all previous oral and written agreements; there are no other agreements, representations, or understandings not set forth herein. Plaintiffs acknowledge that neither Defendants, nor any of their agents, representatives, employees, or attorneys, have made any representations to them concerning the terms or effects of this Agreement other than those contained in it.

Further, this Agreement can be modified only by a written agreement signed by the Parties.

5.    <u>Savings Clause and Waiver</u>.  If any portion of this Agreement is found to be invalid or unenforceable for any reason, any court or other tribunal adjudicating the rights and duties of the parties under this Agreement shall alter, modify and/or strike portions of the Agreement so that it shall be enforceable to the fullest extent permitted by law.  In the event that any provision of this Agreement (or any portion thereof) is found invalid or unenforceable, the remainder of that provision and the remainder of this Agreement shall be valid, binding, and enforceable.  The waiver of a breach of any term or provision of this Agreement shall not operate or be construed to be a waiver of any other or subsequent breach of this Agreement.

6.    <u>Non-admission</u>.  This Agreement in no way shall be construed as an admission by Defendants that they acted wrongfully toward or failed to act lawfully with regard to Plaintiffs. Likewise, by entering into this Agreement, Plaintiffs neither recognize the validity of any defense Defendants may have asserted nor provide any assurance or certification that all aspects of Defendants' expressive activity regulations fully comply with the United States Constitution or other applicable law.

7.    <u>Taxes</u>.  Plaintiffs shall be solely responsible for the payment of appropriate taxes on this settlement, if any, and agree and understand that Defendants have not made any representation to them regarding the tax treatment of the sums paid pursuant to this agreement. In the event a claim for such taxes, and/or penalties and interest, is assessed by any taxing authority, Plaintiffs agree to, and do hereby hold Defendants harmless and indemnify Defendants against any and all tax liability, interest and/or penalties as due thereon from Plaintiffs.

8.    <u>Liens</u>.  Plaintiffs shall be solely responsible for the payment of any claims or liens that may be asserted against the proceeds of this settlement.  In the event a claim for such payment is asserted by anyone, including Medicare and/or Medicaid, Plaintiffs agree to make those payments and do hereby hold Defendants harmless and indemnify Defendants against any and all liability for same.

9.    <u>Counsel Fees</u>. This Agreement includes all claims for attorneys' fees and costs.

10.    <u>Non-Assignment</u>.  I acknowledge that none of the proceeds given herein have been assigned.

11.    <u>State Liens</u>. Plaintiffs acknowledge that if a debt/lien is owed to the State, its agencies or departments, such debt/lien shall be deducted from the payment prior to its disbursement to them. The holders of these liens/debts include, but are not limited to, Office of the Public Defender, the Motor Vehicle Commission, Division of Taxation, Division of Developmental Disabilities, Department of Corrections, Department of Children and Families, the Probation Division of the Administrative Office of the Courts, and the State Parole Board.

12. <u>Who Is Bound</u>. Plaintiffs and Defendants are bound by this Agreement. Anyone who succeeds to their rights and responsibilities, such as their heirs or the executor of their estates, are also bound. This Agreement is made for their benefit and all who succeed to their rights and responsibilities, such as their heirs or the executor of their estates.

13. <u>Governing Law, Jurisdiction and Venue</u>.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of New Jersey. Any proceedings related to or arising out of this Agreement shall only be commenced, prosecuted, or continued in a court of competent jurisdiction situated in the State of New Jersey.

14. <u>Voluntary Execution</u>. Plaintiffs acknowledge that they have read this Agreement, understand its terms, and have entered into it voluntarily. Plaintiffs acknowledge that they have been given a reasonable period of time within which to consider this Agreement and its waiver and release of claims. Plaintiffs further acknowledge that they have consulted with their attorney before signing this and entering into this Agreement.

15. <u>Counterparts/Signatures</u>. The Parties agree that this Agreement may be executed in counterparts, all of which shall constitute one agreement. The parties further agree that copies of signatures shall be sufficient to bind the parties to this Agreement.

**Plaintiffs:**

Date: June 15, 2021

Mena Botros, individually

Date: June 15, 2021

Mena Botros, as President of
Young Americans for Liberty
at Montclair State University

*Attorneys for Plaintiffs*

Date: June 16, 2021

Michael Ross
ALLIANCE DEFENDING FREEDOM

Date: June 16, 2021

Michael P. Laffey

4

**University Defendants**

*Board of Trustees of
Montclair State University*

Date: _____5/12/21_____

Francis M.C. Cuss
Chair

*Individual Defendants*

Date: _____4/27/21_____

Susan A. Cole
President

Date: _March 30, 2021_

Karen Pennington
Vice President of Student Development &
Campus Life

Date: _March 30, 2021_

Margaree Coleman-Carter
Associate Vice President and
Dean of Students

Date: _MAY 6, 2021_

Paul M. Cell
Chief of University Police

Date: _____5/6/21_____

Kaluba Chipepo
Sergeant of University Police

Date: _March 30, 2021_

Yolanda Alvarez
Chair of Bias Education Response Taskforce

*Attorney for University Defendants*

Date: _____6/15/21_____

Michael R. Sarno

5

Defendant the Student Government Association
of Montclair State University, Inc.

Date: _6/17/21_

Ashon M. Lanada
Executive President

Date: _6/17/21_

Karla A. Farfan-Miguel
Executive Vice President

Date: _06/17/21_

Guillermo E. Estrada
Executive Treasurer

Date: _06/17/21_

Christie A. Rosales-Herrera
Executive Secretary


*Attorneys for the Student Government Association*

Date: _6/17/21_

Maria M. Vallejo
CHASAN LAMPARELLO MALLON &
CAPPUZZO, P.C.

Date: _06/17/2021_

Ronald Botelho
CHASAN LAMPARELLO MALLON &
CAPPUZZO, P.C.

6

# Exhibit D

8/27/24, 6:56 PM
Case 2:25-cv-13793-MEF-MAH    Document 29-1    Filed 11/04/25    Page 58 of 141
Montclair State University Mail - [allusers] Respecting and Caring for Each Other During Challenging Times
PageID: 484



Adam Rzepka <rzepkaa@montclair.edu>

## [allusers] Respecting and Caring for Each Other During Challenging Times

1 message

**President Koppell** <msuadmin@montclair.edu>
Reply-To: President Koppell <msuadmin@montclair.edu>
To: allusers@lists.montclair.edu, allstudents@lists.montclair.edu

Mon, Nov 6, 2023 at 4:08 PM


A Message from **President Jonathan Koppell**

One of the differentiating features of Montclair State University is that even as it has evolved into a large, diverse, dynamic research university with nearly 30,000 students, staff and faculty, we have managed to retain a sense of shared purpose, shared identity. We are, in short, a community, not without fissures and disagreements, but so much more than a collection of individuals with an email address in common.

That sense of community is being tested now more than ever. As horrific events unfold in the Middle East, many of us are heartbroken and feel a complex stew of emotions: grief, anger, disbelief, outrage, frustration and fear. Of course, there is a dramatic variation in our understanding of what is occurring in Israel, Gaza, the West Bank and the region without even shared agreement on the facts being relayed to us in real time.

I cannot sort that out here nor will I try. My goal with this message is to remind us that **our community** should be a place that is safe and supportive, an environment where we can all express ourselves – can **be** ourselves – without feeling threatened, violated or vilified.

That is harder than ever because the disagreements that now pull us apart are linked to our identity. I know people on campus who are consumed by fear for family and friends now living in a constant state of danger. Some fear for their own safety right here on campus simply as a function of identity. The situation strains the bonds of our community.

But as I read the messages you have sent me and consider my conversations with students and faculty, I have been struck by the **commonality** of concerns expressed by individuals with diametrically opposed views of the crisis. The very consistency of these pleas leads me to urge here that we all honor two core principles of community: retain civility and respect in discourse, and commit to an ethic of safety and care.

The diversity of this university is one of its greatest strengths. It truly brings me joy to interact with students who represent a multiplicity of ethnicities, races, genders, nationalities, and religions. Of course, that includes Palestinians, Jews, Israelis, Arabs and Muslims. This presents an incredible learning opportunity for all of us. But it also makes it easy to offend, insult and diminish, both intentionally and inadvertently. Embracing the idea of community – particularly at a university as rich in diversity as our own – means pushing ourselves to avoid this outcome.

Now some would say our commitment to free expression contradicts the emphasis on sensitivity in our communications. It does not. Exercising our legal rights to free speech does not release us from a moral obligation to treat others with respect and to honor our shared humanity. I am repulsed by any antisemitic language and accusations, Islamophobic generalizations and characterizations and other racist and debasing behaviors. At Montclair State University, anti-semitism is not acceptable. Anti-Palestinianism is not acceptable. We reject hatred and should strive to empathize with all who are suffering. Let's not fall in the trap of dehumanizing through indifference those we see as adversaries.

Please keep that in mind as we continue to follow our **Expressive Activity** policy. (One specific update: recent rallies and vigils have been conducted in the Quad near the Student Center. But the volume has become disruptive to teaching and learning. Beginning the week of November 6, 2023, all such events will be located at the University's Amphitheater, to allow safe expression in an area that is accessible but lessens the impact on instruction, especially during this critical time in the semester.)

The second value we simply cannot abandon is a commitment to an ethic of safety and care – for one another and for ourselves. Many stressors are taking a toll on every one of us. I am genuinely concerned about increases in behavior that suggest deep struggles for our students, staff and faculty.

This is part of the reason to be thoughtful in our words and actions. To thrive, we must feel safe, be physically and emotionally well and enjoy a sense of belonging on our campus. Our University Police Department has increased patrols at my request, not

8/27/24, 6:56 PM    Montclair State University Mail - [allusers] Respecting and Caring for Each Other During Challenging Times

Case 2:25-cv-13793-MEF-MAH    Document 29-1    Filed 11/04/25    Page 60 of 141
PageID: 486

because there is a threat to the campus, but to provide reassurance. They are available at 973-655-4222 if you ever feel unsafe.

But I encourage our students to take advantage of our many opportunities for counseling and support, including services provided through **CAPS** (Counseling and Psychological Services), the **Student Health Center**, the **Office of Social Justice and Diversity**, the **Office of Student Belonging** and the **Dean of Students Office**. Each of those areas is uniquely equipped to assist our students with all aspects of their well being.

Counselors are available for all students, 24 hours a day. Call **Counseling and Psychological Services (CAPS)** at 973-655-5211 and select Option "2." Students may also contact the **Dean of Students Office** for assistance.

Employees can get free, confidential support from our **Employee Assistance Program** by calling 800-242-7371.

Anyone who is in crisis may call or text the nationwide **988 Suicide and Crisis Lifeline** for free, confidential support, 24/7.

Further, I encourage each of us to look out for each other. Check in with friends, colleagues and classmates. Ask people how they are doing or create a space for people to reveal their vulnerabilities.

I and other university leaders and offices are continually talking with students, faculty, staff and affiliated members of the community, both individually and in groups. We will continue to do so in an effort to be responsive.

The Montclair State University community is shaped and maintained by all of us. Let's recommit collectively to retain civility and respect in discourse and to maintain our ethic of safety and care. Together, we are stronger.



**Jonathan GS Koppell**
President
973-655-4211
koppellj@montclair.edu



# Exhibit E



**MONTCLAIR**
**S T A T E   U N I V E R S I T Y**

**Division of Human Resources**
Director of Equity and Title IX Coordinator
Equal Employment Opportunity and Affirmative Action Officer
Office: 973-655-4234
Fax: 973-655-7210

*Personal and Confidential Communication*

<u>**Respondent Acknowledgement Letter**</u>

Adam Rzepka
Associate Professor
350 Mount Hermon Road
Blairstown, NJ 07825

*Email correspondence sent to:* rzepkaa@mail.montclair.edu

December 7, 2023

Re: State Policy – Hostile Work Environment Complaint
Montclair State University File No: 00154-2023

Dear Adam,

I am writing to advise the Office of Equity and Title IX Coordinator & the Equal Employment Opportunity and Affirmative Action Officer ("EEO/AA Officer") have received a report that you may have violated *the New Jersey State Policy Prohibiting Discrimination in the Workplace* ("the State Policy"). The University has initiated a preliminary inquiry into the allegations and imposed interim measures, see below.

As the Director of Equity and Title IX Coordinator, among other things, I oversee Montclair State University's implementation of the State Policy. The State Policy states, "forms of employment discrimination or harassment based upon the following protected categories are prohibited and will not be tolerated: race, creed, color, national origin, nationality, ancestry, age, sex/gender, pregnancy, marital status, civil union status, domestic partnership status, familial status, religion, affectional or sexual orientation, gender identity or expression, atypical hereditary cellular or blood trait, genetic information, liability for service in the Armed Forces of the United States, or disability." These are commonly referred to as protected classes.

<u>**Interim Measures**</u>

Until further notice, you are not permitted to engage in any form of communication on the Montclair State **University "Discuss" listserv OR discuss@lists.montclair.edu.** You should refer to the December 5, 2023 - No Communication Directive imposed by this office.

<u>**Intake Meeting**</u>

The intake meeting has been scheduled for <u>**December 14, 2023, at 10:00 AM**</u> via Zoom. The purpose of the intake meeting is to review the applicable policies, procedures, and the complaint. Your attendance is required and you must notify my office if you have a conflict. It is incumbent upon you to inform us of any scheduling conflicts.



## MONTCLAIR
### S T A T E   U N I V E R S I T Y

**Division of Human Resources**
Director of Equity and Title IX Coordinator
Equal Employment Opportunity and Affirmative Action Officer
Office: 973-655-4234
Fax: 973-655-7210

### Investigation/Resolution

The investigation/resolution has been assigned to me.

### Advisor

You may be accompanied by an advisor during the meeting. An advisor may be an individual of your choice, including a family member, University faculty or another employee, a supervisor, or a representative of a union in which you are a member. Should you have a work conflict, you must contact me before the meeting to reschedule. **Failure to attend scheduled appointments may result in the process moving forward without your input and disciplinary action, including suspension and termination.**

Should you choose to bring a Union representative to the meeting they will be required to acknowledge and sign the *Weingarten Representative Acknowledgment Form* and return it to me later than **December 14, 2023, at 9:00 AM. It is incumbent upon you to confirm your advisor's availability and attendance at the interview.**

### State Policy – Timeframe
The State Policy requires this office to conclude the investigation and issue a determination letter responding to the allegations raised within 120 days. If necessary, that time may be extended for an additional 60 days, of which you will be notified.

### Resources – CONCERN Employee Assistance Program

The University has partnered with Atlantic Health System to provide CONCERN Montclair State University's employee assistance program. I have included supplemental information about CONCERN. They can provide free and confidential support during this process. Please let me know if you wish to be referred to CONCERN.

### Retaliation Prohibition

The provisions of the State Policy and the Title IX Policy require all related complaints and investigations to be handledon a confidential basis, to the extent possible. In addition, there is a prohibition of retaliation against anyone who files a complaint or participates in a complaint investigation.

You will receive a copy of the *Retaliation agreement* to review, sign, and acknowledge. You are required to sign the agreement before the allegations are disclosed to you. Please review, sign, and return the agreement to me no later than **December 14, 2023.**

The provisions of the State Policy and the Title IX Policy also prohibit any form of Retaliation. The Policy states, "Retaliation against any employee who alleges that they or they were the victims of



**Division of Human Resources**
**Director of Equity and Title IX Coordinator**
**Equal Employment Opportunity and Affirmative Action Officer**
Office: 973-655-4234
Fax: 973-655-7210

discrimination or harassment, (1) provides information in the course of an investigation into
discrimination or harassment in the Workplace, (2) opposes a discriminatory practice is prohibited by this
policy. No employee bringing a complaint, providing information, or testifying in any proceeding under
this policy shall be subjected to adverse employment consequences based upon such involvement or be
the subject of retaliation".

If you have any questions, please contact me at (973) 655-4234 or at
connora@montclair.edu.

Dr. Ashante S. Connor
Director of Equity and Title IX Coordinator
Montclair State University

CC: Simplicity File

Enclosure: CONCERN Brochure
Weingarten Representative Acknowledgment Form
Retaliation Agreement

# Exhibit F



**MONTCLAIR**
STATE UNIVERSITY

**Division of Human Resources**
Director of Equity and Title IX Coordinator
Equal Employment Opportunity and Affirmative Action Officer
Office: 973-655-4234
Fax: 973-655-7210

*Personal and Confidential Communication*

*\*Corrected copy\**

<u>**Resolution of Complaint and Respondent Outcome Letter**</u>

Adam Rzepka
350 Mount Hermon Road
Blairstown, NJ 07825
*Email correspondence sent to: rzepkaa@mail.montclair.edu*

December 22, 2023

Re: State Policy – Hostile Work Environment Complaint
Montclair State University File No: 00153-2023

As the Director of Equity and Title IX Coordinator at Montclair State University, I am responsible for investigating and resolving complaints alleging discrimination or harassment based on race, creed, color, national origin, nationality, ancestry, sex/gender (including pregnancy), affectional or sexual orientation, gender identity or expression, age, marital status, civil union status, domestic partnership status, familial status, religion, atypical hereditary cellular or blood trait, genetic information, liability for service in the Armed Forces of the United States, or disability, also known as protected categories.

<u>**Resolution of the Complaint and The New Jersey Policy Prohibiting Discrimination in the Workplace (State Policy) Implications**</u>

On or around November 13, 2023, the University received complaints against you alleging inappropriate conduct that constitutes a hostile work environment under *The New Jersey State Policy Prohibiting Discrimination in the Workplace*. A hostile work environment "is created when actions and behaviors related to a protected category, as stated above defined by the State Policy unreasonably interfere with an individual's ability to work, or that create a hostile, offensive, or intimidating work environment, whether or not those actions and behaviors are directed at the individual."

On December 19, we convened a meeting to discuss your November 22, 2023 conduct which constituted a hostile work environment on the Montclair State University email discussion forum, specifically the "Discuss" listserv **- or-** discuss@lists.montclair.edu.

During our meeting, we discussed the following:

1.  Examples of behaviors that may constitute a violation of the State Policy – Hostile Work Environment provision include engaging in threatening, intimating, or hostile acts toward



**MONTCLAIR**
**S T A T E   U N I V E R S I T Y**

**Division of Human Resources**
**Director of Equity and Title IX Coordinator**
**Equal Employment Opportunity and Affirmative Action Officer**
Office: 973-655-4234
Fax: 973-655-7210

      another individual in the workplace because that individual belongs to, or is associated with any of the protected categories listed above.

2. The concept of intent versus the impact of your actions and how others perceive your actions.

3. Your persistence in engaging and challenging employees on the discussion board may be perceived as harassing or bullying behaviors based on a protected category and inappropriate for the workplace.

4. That third-party harassment was defined as unwelcome behavior involving any of the protected categories stated in the State Policy that is not directed at an individual but exists in the workplace and interferes with an individual's ability to do his/her or their job.

5. That you should refrain from discussing or disclosing an employee's work status and you should refer complaints to Human Resources for review.

6. The State Policy's zero-tolerance standard for such conduct and the University's obligation to address employee complaints.

You stated that you did not agree that your conduct constituted a hostile work environment as you were responding to employee posts and you provided an explanation for some of your conduct. You also stated that you engaged in a private exchange with an employee but you were unable to locate the email.

We reviewed the State Policy and applicable policies and procedures and you were provided with electronic copies of each document.

**Interim Measures**

On November 27, 2023, a No Communication Directive was imposed and you are not permitted to engage in any form of communication on the Montclair State University "Discuss" listserv - or-discuss@lists.montclair.edu. The No Communication Directive was rescinded on December 19, 2023.

**Mandatory Training Requirement**

Montclair State University believes in the importance of creating a safe and healthy environment for students, faculty, and staff. To further learning & development Montclair State University has partnered with Vector Solutions to provide our community with training, resources, and online support. During our meeting on November 30, we reviewed and discussed the *New Jersey State Policy Prohibiting Discrimination in the Workplace* as it specifically applies to your noted conduct. Additionally, you are required to complete the following course(s): *Preventing Harassment & Discrimination – Gateway course or Code of Conduct.*

Shortly after receiving this letter, you will receive an automated email titled, "Montclair State University has "Assigned You Training." The email will include login instructions to access these courses. If you do not receive the email, it is incumbent upon you to alert our office by contacting LuAnn Wilkins, Human Resources Compliance Assistant, at wilkinsl@montclair.edu. You should note the University will be closed from December 25, 2023, through January 1, 2024.

**Monitoring and Compliance**



**Division of Human Resources**
**Director of Equity and Title IX Coordinator**
**Equal Employment Opportunity and Affirmative Action Officer**
Office: 973-655-4234
Fax: 973-655-7210

You must complete this training course(s) no later than **Friday, January 26, 2024, at 11:59 PM.** Your course completion will be tracked for compliance and assessment purposes. You are required to email LuAnn Wilkins no later **than Friday, January 26, 2024, at 11:59 PM** to communicate your successful completion of the training courses.

Failure to meet this requirement may result in disciplinary action up to and including suspension and termination. You are reminded to conduct yourself professionally and refrain from any inappropriate interactions in the workplace moving forward.

## Resources – CONCERN Employee Assistance Program

The University has partnered with Atlantic Health System to provide CONCERN Montclair State University's employee assistance program. I have included supplemental information about CONCERN. They can provide free and confidential support during this process. Please let me know if you wish to be referred to CONCERN.

## Prohibition of Retaliation

The provisions of the State Policy request that all related complaints and investigations be handled on a confidential basis, to the extent possible. In addition, there is a prohibition of retaliation against anyone who files a complaint or participates in a complaint investigation. The Policy states, "Retaliation against any employee who alleges that (1) they were the victims of discrimination or harassment, (2) provides information in the course of an investigation into discrimination or harassment in the Workplace, or (3) opposes a discriminatory practice is prohibited by this policy. No employee bringing a complaint, providing information, or testifying in any proceeding under this policy shall be subjected to adverse employment consequences based upon such involvement or be the subject of retaliation".

Thank you for your attention to this matter, and I believe that your participation in these courses will contribute to a more inclusive and respectful workplace environment.

If you have any questions, please contact me at (973) 655-4234 or at connora@montclair.edu.

Dr. Ashante S. Connor
Director of Equity and Title IX Coordinator
Montclair State University

CC: Simplicity File
David Vernon, Vice President, Human Resources

# Exhibit G



Adam Rzepka <rzepkaa@montclair.edu>

---

## [allusers] Changes to Mass Email Lists
1 message

---

**Office of the President** <msuadmin@montclair.edu>                    Thu, Dec 21, 2023 at 11:00 AM
Reply-To: Office of the President <msuadmin@montclair.edu>
To: Faculty and Staff <allusers@lists.montclair.edu>

# OFFICE OF THE PRESIDENT

For many years, the University has automatically subscribed all new employees to four mass email lists: Campus, For Sale, Discuss and All Users. The All Users list is reserved for official announcements and can only be posted to by a small number of individuals.

The three other employee email lists are not moderated, and anything posted to them is sent automatically to everyone subscribed to the list. This approach, while perhaps well-intentioned, has generated numerous complaints from faculty and staff members over the years, including concerns about recent posts on the Discuss list. Employees are also asking to have fewer emails sent to inboxes that are already overcrowded, and they point out that the process for unsubscribing is cumbersome.

Our IT and Communications teams are building an online portal for employees that will reduce the need for mass emails as a primary internal communication tool. The portal will not open until Summer 2024, however, so **we are making some changes now to address the concerns**.

Effective today, December 21, we will no longer automatically subscribe employees to the Campus, For Sale, and Discuss lists.

To provide you with the choice to participate in Campus, For Sale or Discuss,we will unsubscribe all current members of these lists today, so from now on, if you want to participate you will need to re-subscribe. **Here are the instructions for subscribing to any or all of the lists.**

We will continue to keep everyone on the All Users list. You do **not** need to subscribe to this list.

In addition to changing subscriptions from opt-out to opt-in, we are also clarifying the purpose of each list.

- **Campus:** employees may share University events and similar information of broad general interest to faculty and staff.
- **For Sale:** employees may post items they want to sell or give away, but this list is strictly for occasional personal use. It may not be used to promote a private business.
- **Discuss:** employees may use this forum for the open exchange of views on a wide variety of topics.

Finally, to clarify what constitutes responsible use of this technology, we have updated the existing **Social Media Policy** to make it clear that it covers mass email lists and similar discussion boards created or managed by the University.

The policy prohibits comments and posts that harass, intimidate or threaten another person, promote illegal activity, violate copyright protections, privacy or confidentiality, and more. I encourage you to read this policy.

The policy is consistent with the University's legal obligations under the First Amendment, the **New Jersey State Policy Prohibiting Discrimination in the Workplace**, and the State's **Uniform Ethics Code**.

Employees must also abide by the University's policy on the **Responsible Use of Computing**, which requires all users of university computing resources to use them in a manner that complies with state and federal laws and University policies, to use only those computing resources that they are authorized to use and to use them only in the manner and to the extent authorized. The policy also prohibits the use of computing resources for personal financial gain, and spells out other expectations and restrictions.

Taken together, these policies and laws provide a framework to balance two important principles we cherish as a university: allowing free expression, and providing a working and learning environment that is free of discrimination, harassment, bullying, threats or intimidation.

In keeping with the University's long standing practice - and its commitment to free expression - we will not moderate posts to the Campus, For Sale and Discuss lists. However, we do require employees to follow our policies.

Creating and sustaining an inclusive environment in which all members of our community feel a sense of belonging means doing more than merely complying with policies. It requires all of us to be thoughtful about how we interact with each other, to listen

carefully, to respond respectfully, and to be sensitive to how our words and actions affect others.

If you believe that you or someone else has been harassed, intimidated or threatened or that you or someone else have been treated differently based on membership in a protected category, either in a posting on these email lists or in any other University setting, you may **submit a formal complaint here**. The University will look into your complaint and respond as soon as possible.

Thank you for doing your part in creating a University where everyone is welcomed, respected and given the opportunity to express their views and their identity without fear or intimidation.



**Jonathan GS Koppell, PhD**
President
973-655-4211
koppellj@montclair.edu

 



---
allusers mailing list

# Exhibit H



**MONTCLAIR**
STATE UNIVERSITY

**Division of Human Resources**
**Director of Equity and Title IX Coordinator**
**Equal Employment Opportunity and Affirmative Action Officer**
Office: 973-655-4234
Fax: 973-655-7210

*Personal and Confidential Communication*

*\*Corrected copy\**

<u>**Resolution of Complaint and Respondent Outcome Letter**</u>

Adam Rzepka
350 Mount Hermon Road
Blairstown, NJ 07825
*Email correspondence sent to: rzepkaa@mail.montclair.edu*

December 22, 2023

        Re: State Policy – Hostile Work Environment Complaint
        Montclair State University File No: 00153-2023

As the Director of Equity and Title IX Coordinator at Montclair State University, I am responsible for investigating and resolving complaints alleging discrimination or harassment based on race, creed, color, national origin, nationality, ancestry, sex/gender (including pregnancy), affectional or sexual orientation, gender identity or expression, age, marital status, civil union status, domestic partnership status, familial status, religion, atypical hereditary cellular or blood trait, genetic information, liability for service in the Armed Forces of the United States, or disability, also known as protected categories.

<u>**Resolution of the Complaint and The New Jersey Policy Prohibiting Discrimination in the**</u>
<u>**Workplace (State Policy) Implications**</u>

On or around November 13, 2023, the University received complaints against you alleging inappropriate conduct that constitutes a hostile work environment under *<u>The New Jersey State Policy Prohibiting</u>* *<u>Discrimination in the Workplace</u>*. A hostile work environment "is created when actions and behaviors related to a protected category, as stated above defined by the State Policy unreasonably interfere with an individual's ability to work, or that create a hostile, offensive, or intimidating work environment, whether or not those actions and behaviors are directed at the individual."

On December 19, we convened a meeting to discuss your November 22, 2023 conduct which constituted a hostile work environment on the Montclair State University email discussion forum, specifically the "Discuss" listserv **- or-** discuss@lists.montclair.edu.

During our meeting, we discussed the following:

  1. Examples of behaviors that may constitute a violation of the State Policy – Hostile Work
    Environment provision include engaging in threatening, intimating, or hostile acts toward



**Division of Human Resources**
**Director of Equity and Title IX Coordinator**
**Equal Employment Opportunity and Affirmative Action Officer**
Office: 973-655-4234
Fax: 973-655-7210

      another individual in the workplace because that individual belongs to, or is associated with any of the protected categories listed above.

2.    The concept of intent versus the impact of your actions and how others perceive your actions.

3.    Your persistence in engaging and challenging employees on the discussion board may be perceived as harassing or bullying behaviors based on a protected category and inappropriate for the workplace.

4.    That third-party harassment was defined as unwelcome behavior involving any of the protected categories stated in the State Policy that is not directed at an individual but exists in the workplace and interferes with an individual's ability to do his/her or their job.

5.    That you should refrain from discussing or disclosing an employee's work status and you should refer complaints to Human Resources for review.

6.    The State Policy's zero-tolerance standard for such conduct and the University's obligation to address employee complaints.

You stated that you did not agree that your conduct constituted a hostile work environment as you were responding to employee posts and you provided an explanation for some of your conduct. You also stated that you engaged in a private exchange with an employee but you were unable to locate the email.

We reviewed the State Policy and applicable policies and procedures and you were provided with electronic copies of each document.

### Interim Measures

On November 27, 2023, a No Communication Directive was imposed and you are not permitted to engage in any form of communication on the Montclair State University "Discuss" listserv - or-discuss@lists.montclair.edu. The No Communication Directive was rescinded on December 19, 2023.

### Mandatory Training Requirement

Montclair State University believes in the importance of creating a safe and healthy environment for students, faculty, and staff. To further learning & development Montclair State University has partnered with Vector Solutions to provide our community with training, resources, and online support. During our meeting on November 30, we reviewed and discussed the *New Jersey State Policy Prohibiting Discrimination in the Workplace* as it specifically applies to your noted conduct. Additionally, you are required to complete the following course(s): *Preventing Harassment & Discrimination – Gateway course or Code of Conduct.*

Shortly after receiving this letter, you will receive an automated email titled, "Montclair State University has "Assigned You Training." The email will include login instructions to access these courses. If you do not receive the email, it is incumbent upon you to alert our office by contacting LuAnn Wilkins, Human Resources Compliance Assistant, at wilkinsl@montclair.edu. You should note the University will be closed from December 25, 2023, through January 1, 2024.

### Monitoring and Compliance



## MONTCLAIR
### STATE UNIVERSITY

**Division of Human Resources**
**Director of Equity and Title IX Coordinator**
**Equal Employment Opportunity and Affirmative Action Officer**
Office: 973-655-4234
Fax: 973-655-7210

You must complete this training course(s) no later than **Friday, January 26, 2024, at 11:59 PM.** Your course completion will be tracked for compliance and assessment purposes. You are required to email LuAnn Wilkins no later **than Friday, January 26, 2024, at 11:59 PM** to communicate your successful completion of the training courses.

Failure to meet this requirement may result in disciplinary action up to and including suspension and termination. You are reminded to conduct yourself professionally and refrain from any inappropriate interactions in the workplace moving forward.

### Resources – CONCERN Employee Assistance Program

The University has partnered with Atlantic Health System to provide CONCERN Montclair State University's employee assistance program. I have included supplemental information about CONCERN. They can provide free and confidential support during this process. Please let me know if you wish to be referred to CONCERN.

### Prohibition of Retaliation

The provisions of the State Policy request that all related complaints and investigations be handled on a confidential basis, to the extent possible. In addition, there is a prohibition of retaliation against anyone who files a complaint or participates in a complaint investigation. The Policy states, "Retaliation against any employee who alleges that (1) they were the victims of discrimination or harassment, (2) provides information in the course of an investigation into discrimination or harassment in the Workplace, or (3) opposes a discriminatory practice is prohibited by this policy. No employee bringing a complaint, providing information, or testifying in any proceeding under this policy shall be subjected to adverse employment consequences based upon such involvement or be the subject of retaliation".

Thank you for your attention to this matter, and I believe that your participation in these courses will contribute to a more inclusive and respectful workplace environment.

If you have any questions, please contact me at (973) 655-4234 or at connora@montclair.edu.

Dr. Ashante S. Connor
Director of Equity and Title IX Coordinator
Montclair State University

CC: Simplicity File
David Vernon, Vice President, Human Resources

# Exhibit I



**LOCAL 1904**
**MONTCLAIR STATE UNIVERISTY**
**FEDERATION OF TEACHERS**
Affiliated with the American Federation of Teachers, AFL-CIO

**MONTCLAIR STATE UNIVERSITY**
**DICKSON HALL ROOM 104**
**MONTCLAIR, NJ 07043**
Phone: 973-655-4453
FAX: 973-655-4479
eMail: union@aftlocal1904.org
Web: www.aftlocal1904.org

3 January 2024

Keith D. Barrack, Esq.
Chief of Staff, Office of the President
Montclair State University
1 Normal Avenue, Montclair, NJ 07043
Via email: barrackk@montclair.edu

Dear Mr. Barrack:

Pursuant to Article VII.B.2. of the Collective Negotiated Agreement between the State of New Jersey and the Council of New Jersey State College Locals, AFT, AFL-CIO, AFT Local 1904 hereby brings a grievance against the University on behalf of Dr. Adam Rzepka, Associate Professor and Graduate Director in the English Department, regarding an investigation conducted by Dr. Ashante S. Connor, Director of Equity and Title IX Coordinator, into certain complaints her office received involving Dr. Rzepka, which culminated in a letter Dr. Conner sent to Dr. Rzepka dated 22 December 2023 and titled "Resolution of Complaint and Respondent Outcome Letter."

That letter states that "On or around November 13, 2023, the University received complaints against [Dr. Rzepka] alleging inappropriate conduct that constitutes a hostile work environment under *The New Jersey State Policy Prohibiting Discrimination in the Workplace*." It further alleges "November 22, 2023 conduct which constituted a hostile work environment on the Montclair State University email discussion forum, specifically the "Discuss" listserv - or- discuss@lists.montclair.edu."

On 7 December 2023 Dr. Connor imposed a "No Communication Directive," prohibiting Dr. Rzepka from "engag[ing] in any form of communication on the Montclair State University 'Discuss' listserv - or- discuss@lists.montclair.edu," preemptively taking away his right to speak in a public forum before reaching any determination of wrongdoing.

Dr. Rzepka was summoned to an interview with Dr. Connor on 19 December 2023 and was represented at that meeting by AFT Local 1904 Faculty Representative, Dr. Jonathan Howell. (I note that Dr. Rzepka disagrees with the description of that interview in Dr. Connor's letter.) At that interview, Dr. Connor rescinded the No Communication Directive and characterized her investigation as "informal." Nevertheless, Dr. Connor had reviewed Dr. Rzepka's emails, and following the interview, made a determination that something he did "constituted a hostile workplace environment." Based on that determination, in her "Resolution" letter Dr. Connor imposed the disciplinary action of a "Mandatory Training Requirement" that Dr. Rzepka

1

complete the online training course *Preventing Harassment & Discrimination – Gateway course or Code of Conduct* and communicate his successful completion of the course to LuAnn Wilkins no later than Friday, January 26, 2024, at 11:59 PM, adding that "Failure to meet this requirement may result in disciplinary action up to and including suspension and termination."

Dr. Connor's actions in this matter constitute a breach of the University's policy on Reporting Discrimination and Harassment (https://www.montclair.edu/human-resources/equity-and-title-ix/discrimination-complaint-procedures-for-employees-and-applicants-for-employment/) and the New Jersey Administrative Code 4A:7-3.2 from which that policy is derived. That policy and that part of the code provide that if a complaint of discrimination or harassment rises to the level of a formal investigation, the EEO/AA Officer will send a report of the investigation to the University President, who will make the determination as to whether or not there was discrimination or harassment and, if so, what the discipline will be, and who will send the letter communicating that determination. Dr. Connor's statement that her investigation was "informal" does not empower her to make these determinations.

Based on the above violations, the appropriate remedy is for Dr. Connor to immediately rescind the Resolution of Complaint and Respondent Outcome Letter, and for her to send the report of her investigation to President Koppell for an independent determination of the merits of the complaints made against Dr. Rzepka. Please contact me to let me know if the University agrees to the Union's remedy. In the alternative, please have your labor representative contact me to schedule a Step I hearing within twenty (20) days of receipt of this grievance.

Sincerely,

*M. Gregory*

Maughn Gregory
Vice President for Personnel

cc:    A. Rzepka
       R. Wolfson
       D. Vernon
       C. Hamilton

2

# Exhibit J



**Division of Human Resources**
Director of Equity and Title IX Coordinator
Equal Employment Opportunity and Affirmative Action Officer
Office: 973-655-4234
Fax: 973-655-7210

*Personal and Confidential Communication*

## Resolution of Complaint(s) and Respondent Closure Letter v2 [Correction]

Adam Rzepka
350 Mount Hermon Road
Blairstown, NJ 07825
*Email correspondence sent to: rzepkaa@montclair.edu*

February 22, 2024

Re: State Policy – Hostile Work Environment Complaint
Montclair State University File No: 00154-2023

As the Director of Equity and Title IX Coordinator at Montclair State University, I am responsible for investigating and resolving complaints alleging discrimination or harassment based on race, creed, color, national origin, nationality, ancestry, sex/gender (including pregnancy), affectional or sexual orientation, gender identity or expression, age, marital status, civil union status, domestic partnership status, familial status, religion, atypical hereditary cellular or blood trait, genetic information, liability for service in the Armed Forces of the United States, or disability, also known as protected categories.

## State Policy Implication and Summary of the Complaints

On or around November 15, 2023, and later, on or around December 4, 2023, the University was notified you allegedly made false and inappropriate statements against Montclair State University employee Marc Dunec's ("Mr. Dunec") employment status because he actively engaged on the University's email discussion forum. The University's email discussion forum is also known as the "Discuss" listserv - or-discuss@lists.montclair.edu ("Discussion Board").You allegedly sent two email communications titled, (1) "Marc Dunec" and (2) "Warning Against Marc Dunec".

Then on or around November 28, 2023, the University was notified of an email Discussion Board exchange between you and Montclair State University employee Polina Chelnitsky ("Ms. Chelnitsky") in which you intimidated Ms. Chelnitsky for failing to respond to your inquiry during a discussion titled, "This is how propaganda works - Palestinian children learn to hate from a very young age."

The November 15, November 28, and December 4 incidents each implicated the hostile work environment provision under the *New Jersey State Policy Prohibiting Discrimination in the Workplace* ("State Policy").

According to the State Policy, a hostile work environment "is created when actions and behaviors related to a protected category, as stated above defined by the State Policy unreasonably interfere



**Division of Human Resources**
Director of Equity and Title IX Coordinator
Equal Employment Opportunity and Affirmative Action Officer
Office: 973-655-4234
Fax: 973-655-7210

with an individual's ability to work, or that create a hostile, offensive, or intimidating work environment, whether or not those actions and behaviors are directed at the individual."

Religion, the protected category implicated, is defined as "all aspects of religious observance, practice, and belief or nonbelief. Treating a person (an applicant or employee) unfavorably because of his or her religious beliefs. The law protects not only people who belong to traditional, organized religions, such as Buddhism, Christianity, Hinduism, Islam, and Judaism, but also others who have sincerely held religious, ethical, or moral beliefs.

Religious discrimination can also involve treating someone differently because that person is married to (or associated with) an individual of a particular religion or because of his or her connection with a religious organization or group."

## Interim Measures

On December 5, 2023, a No Communication Directive was imposed and you were told to desist any form of communication on the Discussion Board until you received further notice from the University.

The No Communication Directive was later rescinded on December 19, 2023.

## Determination and State Policy Review

On November 30, 2023, President Koppell reviewed several complaints stemming from exchanges on the Discussion Board, specifically discussions related to the October 7, 2023 - Hamas, Gaza, and Israeli conflict. While many of the complaints reviewed were protected by the First Amendment's Freedom of Speech provision and required no further action, President Koppell focused on any incidents of prohibited conduct or discussions where employees or individuals were targeted or intimidated.

Of particular concern were the discussion group forum exchanges between you and Ms. Chelnitsky and your comments about Mr. Dunec's employment status. This demonstrated conduct was determined to have violated the State Policy and its zero-tolerance standard. President Koppell was later informed of your December 4 statements against Marc Dunec and he similarly affirmed the determination that these were a violation of the State Policy and should be addressed.

Based on the nature of the Discussion Board complaints and your conduct, President Koppell determined that the appropriate action would be to employ an educational and restorative approach. Consistent with the President's delegation authority under the State Policy, he designated me as the University's Equal Employment Opportunity - Affirmative Action Officer (EEO/AA) and State Policy expert to address your conduct and implement the appropriate training in accordance with the State Policy.

## Discussion and Resolution of the Matter(s)

On December 19, 2023, we met to discuss the exchange between you and Ms. Chelnitsky, your comments against Mr. Dunec, and how your conduct constituted a hostile work environment. You were accompanied by Jonathan Howell who served as your AFT local 1904 union representative, and I, by LuAnn Wilkins, HR Compliance Assistant, for note-taking purposes. During the meeting, we specifically

# MONTCLAIR
## STATE UNIVERSITY

**Division of Human Resources**
Director of Equity and Title IX Coordinator
Equal Employment Opportunity and Affirmative Action Officer
Office: 973-655-4234
Fax: 973-655-7210

discussed your conduct and how each instance violated the hostile work environment provisions of the State Policy:

During our meeting, we reviewed and discussed the following instances:

### Ms. Chelnitsky Matter

1. On November 27, 2023, at 3:36 PM while engaging in the Discussion Board – you responded to Ms. Chelnitsky's post in part stating, "……Judging from the subject line here, you're posting this video as a justification for killing children like the children in the video. That is a war crime, by any definition, and in this particular case it is almost certainly a war crime of ethnic cleansing and very likely an act of genocide.
   If you are posting this here to advocate for the continued mass killing of children, please at least have the courage to admit it. I challenge you, as I've challenged other supporters of the assault on Gaza, to do two things that should be very simple to do…..
   No one taking your position on this listserv has been able to do those two simple things. Carol Schuler got halfway there, after weeks of work, by clearly stating #1—but she was never able to even acknowledge the reporting, which I asked her about five times."
2. On November 27, 2023, at 3:45 PM – Ms. Chelnitsky responded to you and said "Adam, I am certainly not advocating for any killing. I am sharing something that we all saw in the past and this is sickening not to talk about it."
3. On November 27, 2023, at 3:50 PM – Following Ms. Chelnitsky's 3:45 PM response, you requested a second reply and you said "…. Can you take those two steps, Polina?" The first just asks whether you support the continuation of the bombardment of Gaza under certain conditions. The second just asks you to have some recent reporting from a reputable source. I'd be interested in your response."
4. Then later on November 27, 2023, at 10:25 PM – Once again following Ms. Chelnitsky's 3:45 PM response, you requested a third reply and you said, "I'm just writing to you individually, Polina to ask if you'll be able to answer the question I've posed to you in the discussion list. Can you affirm that you support Israel's assault on Gaza, given what you see in the NYT article I linked to? I think it would be really important moment for the discussion if you have the courage to do that - or say why you can't."
5. Finally, on November 28, 2023, at 5:00 PM – Ms. Chelnitsky responded to you and in part said, "Dear Adam, ……There is a limit of abuse and name calling I can take (I should not be taking any). I felt hazarded, bullied, and treated with no respect. Never in my worst nightmare could I imagine that I have to face anti-Semitism at the USA State University. Don't think that if people on the list are not replying to your emails, that means they agree with you. Many people are leaving the discussion chat because it became a disgusting chat - they share those feelings with me and other colleagues. I will be unsubscribing as well."

Following the review of your and Ms. Chelnitsky's email exchange, we discussed how your persistence in engaging and challenging employees on the Discussion Board has been perceived as harassing or bullying behaviors based on a protected category and inappropriate for the workplace. Your response to Ms.



**Division of Human Resources**
Director of Equity and Title IX Coordinator
Equal Employment Opportunity and Affirmative Action Officer
Office: 973-655-4234
Fax: 973-655-7210

Chelnitsky documents your bullying conduct with Carol Schuler in which you state it took "weeks of work, [in] which I asked her about five times" to address the question of the reporting on the war. You stated that you did not agree that your conduct constituted a hostile work environment as you were responding to employee posts. You also stated that you engaged in a private email exchange with Ms. Chelnitsky after this public exchange; you said were unable to locate the emails and did not forward any evidence supporting your assertion. You further stated that you believed the University's approach to addressing your conduct was a violation of your First Amendment rights. We discussed that it was within the University's authority to educate you about the State Policy and to take affirmative action to correct any inappropriate conduct in the workplace, and not to censor your speech as you suggested.

### *Mr. Dunec Matter*

6. On November 15, 2023, at 3:39 PM, you sent an email communication titled, "Marc Dunec" to the Discussion Board and in part said, "Mark also appears not to have been connected to Montclair State for some years now……" You sent this communication after Mr. Dunec actively engaged in the Discussion Board.
7. Then, on December 4, 2023, at 6:02 PM, you sent another email titled, "Warning Against Marc Dunec" and in part said, "A reminder to everyone on the listserv that you should probably not reply to Mark Dunec…." You sent a second communication to the Discussion Board after Mr. Dunec actively engaged in the discussion board forum.

You stated you understood that Mr. Dunec was no longer employed by Montclair State University. During our discussion, I inquired where you learned that Mr. Dunec was not employed by the University. You said that via "LinkedIn " and your research. I informed you that your statements were not accurate about Mr. Dunec's employment status. We discussed that you should refrain from discussing or disclosing an employee's work status and you should refer complaints to Human Resources for review. You also said that you previously filed a complaint with Information Systems or Human Resources regarding Mr. Dunec's conduct, but my office was unable to verify such a complaint filed by you. You later filed a complaint against Mr. Dunec on December 19, 2023, at 10:33 PM.

### Summary of Discussion Topics:

We reviewed the above incidents and how they violated the State Policy – Hostile Work Environment provision including "engaging in threatening, intimating, or hostile acts toward another individual in the workplace because that individual belongs to, or is associated with, any of the protected categories." We also discussed the State Policy's concept of intent versus the impact of your actions and how your conduct negatively impacted both Ms. Chelnitsky and Mr. Dunec.

We also reviewed the State Policy's third-party harassment provision which is defined as "unwelcome behavior involving any of the protected categories which may be not directed at an individual but exists in the workplace and interferes with an individual's ability to do his/her or their job." We also discussed the State Policy's zero-tolerance standard for such conduct and the University's obligation to address employee complaints. The zero-tolerance standard is defined as "The right of a State Agency to take either disciplinary action, if appropriate, or other corrective action, to address any unacceptable conduct



**MONTCLAIR**
STATE UNIVERSITY

**Division of Human Resources**
Director of Equity and Title IX Coordinator
Equal Employment Opportunity and Affirmative Action Officer
Office: 973-655-4234
Fax: 973-655-7210

that violates the State Policy, regardless of whether the conduct satisfies the legal definition of discrimination or harassment." We reviewed the State Policy and applicable policies and procedures and you were provided with electronic copies of each document.

**Recommendations for Additional Education**

Montclair State University believes in the importance of creating and maintaining a safe and healthy environment for students, faculty, and staff. To further your learning & development Montclair State University has partnered with Vector Solutions to provide our community with training, resources, and online support. Therefore, we highly encourage you to consider additional learning. We will make available the following course available for you: *Preventing Harassment & Discrimination – Gateway course or Code of Conduct*. Furthermore, should you have additional questions regarding the New Jersey State Policy and its zero-tolerance standard, please do not hesitate to contact me.

Shortly after receiving this letter, you will receive an automated email titled, "Montclair State University has "Assigned You Training." The email will include login instructions to access these courses. If you do not receive the email, please contact LuAnn Wilkins, Human Resources Compliance Assistant, at wilkinsl@montclair.edu for assistance.

**Resources – CONCERN Employee Assistance Program**

The University has partnered with Atlantic Health System to provide CONCERN Montclair State University's employee assistance program. I have included supplemental information about CONCERN. They can provide free and confidential support during this process. Please let me know if you wish to be referred to CONCERN.

**Prohibition of Retaliation**

The provisions of the State Policy request that all related complaints and investigations be handled on a confidential basis, to the extent possible. In addition, there is a prohibition of retaliation against anyone who files a complaint or participates in a complaint investigation. The Policy states, "Retaliation against any employee who alleges that (1) they were the victims of discrimination or harassment, (2) provides information in the course of an investigation into discrimination or harassment in the Workplace, or (3) opposes a discriminatory practice is prohibited by this policy. No employee bringing a complaint, providing information, or testifying in any proceeding under this policy shall be subjected to adverse employment consequences based upon such involvement or be the subject of retaliation".

**Conclusion**

President Koppell upholds that this is not a matter of freedom of speech. Based on our December 19 discussion and the optional training that has been offered to you, there will be no presumption of ignorance of the State Policy and prohibitions against harassing and bullying conduct. Any future conduct that implicates the State Policy and/or applicable University policies, will be referred to



**Division of Human Resources**
**Director of Equity and Title IX Coordinator**
**Equal Employment Opportunity and Affirmative Action Officer**
Office: 973-655-4234
Fax: 973-655-7210

Employee and Labor Relations for further action.

On behalf of President Koppell, I thank you for your attention to this matter, and we believe that your
participation in these courses will contribute to a more inclusive and respectful workplace environment.

If you have any questions, please contact me at (973) 655-4234 or at  connora@montclair.edu.

Dr. Ashante S. Connor
Director of Equity and Title IX Coordinator
Montclair State University

CC: Simplicity File
Jonathan Koppell, President Montclair State University
David Vernon, Vice President, Human Resources

# Exhibit K

# MONTCLAIR
### STATE UNIVERSITY

Adam Rzepka <rzepkaa@montclair.edu>

---

## Re: [allusers] Updated Expressive Activity Policy
1 message

---

**Peter Kingstone** <kingstonep@montclair.edu>                                    Mon, Oct 21, 2024 at 4:49 PM
To: Adam Rzepka <rzepkaa@mail.montclair.edu>, ████████████████████████, ██████████
<███████████████████>

Hi Adam – adding in ██████ because she actually probably doesn't know this and █████ may have only a partial view.

The only time the college listserv was used for any kind of discussion in my time here was in my first year during covid. I believe you were on sabbatical that year and may not be aware that there was a campaign to get deans (and managers generally) to publicly commit to giving up a portion of our salary in solidarity with faculty and staff who had furlough days. I wasn't a participant in the discussion but it divided faculty and in fact unbeknownst to faculty, left some sharp feelings amongst the staff. In fact, it got quite testy at times and it left some lingering hurts. Lots of faculty wrote us to complain and many wrote me to express concerns privately. And we discovered as a result of this that the university does not wipe adjuncts from the system for some period (I don't recall how long and it makes sense because some adjuncts rotate in and out of teaching). We discovered because we got many exasperated emails from people asking us to remove them from the list including adjuncts who no longer worked for us. When we checked it, it became clear that there are hundreds of people on the list.

What it also showed me was that it was critical we have a list that exists to post college events and happenings and to disseminate information from the dean's office – what I am defining as College business – and that we needed it to be a list that people didn't want to get off of.

I didn't realize the list was still open. At some point, somebody wrote us with a one line email: "who is allowed to post on the CHSS list?" I don't even remember who and while I believe it was in the context of Israel-Hamas discussions, there was no specific posting it referred to and for the life of me I can't remember who wrote or if anything was even going on at the time. I was about to reply that it's a closed list and went to ██████ and █████ to double check and we were all surprised to discover it was an open list ... ██████ and I can't recall if we ever closed it and somebody revised it (they get rebuilt periodically I believe so maybe something happened???) or that we simply never closed it in the first instance.

So, that's the origin of the decision and it remains the case that we want this to be a list that people stay on and where we can be sure that we can disseminate critical information from the Dean's Office. On rules pertaining to speech and the management of lists, we take our instructions from above. If the Senate and the President arrive at a new policy or instruction, we'll respond accordingly.

Best

Peter

---

**From:** Adam Rzepka <rzepkaa@mail.montclair.edu>
**Date:** Monday 21 October 2024 at 12:32
**To:** Peter Kingstone <kingstonep@montclair.edu>
**Subject:** Re: [allusers] Updated Expressive Activity Policy

Thanks again, Peter! Happy to chat in person or on the phone if that's easier.

# Exhibit L



Adam Rzepka <rzepkaa@montclair.edu>

---

## [allusers] Updated Expressive Activity Policy
1 message

---

**University Communications and Marketing** <ucm@montclair.edu>    Fri, Oct 18, 2024 at 1:31 PM
Reply-To: University Communications and Marketing <ucm@montclair.edu>
To: Allusers@lists.montclair.edu



# OFFICE OF THE PRESIDENT

We all know that American universities have been confronting difficult challenges
in recent months related to free speech and the proper limits on protest that can
interfere with the primary functions of the institution. At Montclair State University,
we value free expression and recognize our community's First Amendment rights
to freedom of speech and assembly. We also have a moral and legal obligation to
ensure that equal access to all of our programs and services is not undermined
by on-campus activities. These objectives are often competing, as we have seen
on our own campus.

As a public university, we play a particularly important role in creating an
environment that is respectful of free expression – and encourages the free
exchange of ideas – but also retains the quality of a community where members
can study, learn and engage. To this end, we have been examining our
expressive activity policy for the past several months to ensure that we are
striking the right balance. I am writing today as we release a revised version of
the Expressive Activity Policy, which we intend to provide greater clarity.

Undergirding this policy is a crucial expectation: we can have robust
disagreement and make our views known without denying others the opportunity
to do the same or abandoning our commitment to civil discourse and mutual
respect. This must be the ethos of an institution that embraces diversity, liberty
and community as core values.

The University permits expressive activity but has the authority to place
reasonable limitations on its time, place, and manner to ensure that the activity
does not disrupt University operations, pose a risk to health and safety, or
interfere with the ability of all people to take part in the University's programs and

services. Under the law, the University is not permitted to impose restrictions that are based on the viewpoints expressed. As a consequence, speech that some may find offensive will be allowed on campus. That does not mean that expressive activity that includes hate speech, harassment, intimidation, incitement to violence, or other conduct that violates local, state, or federal law is permissible. It is not. Those activities will be dealt with swiftly in accordance with University policy and local, state, or federal law.

The revised policy makes clear that the rules governing expressive activities apply to all members of our campus community, as well as visitors with no current affiliation. With respect to members of the public, the Amphitheater will serve as the one location on the Montclair campus where expressive activity will be permitted. For current members of the Montclair State University  community, including enrolled students and active employees, we have established criteria and times that open additional locations for expressive activity with clear guidelines for acceptable behavior. The revision creates more opportunities for expression and therefore the increased possibility that the University Administration may need to take certain steps to ensure that the campus remains safe for all.

I want to emphasize that while a policy primarily speaks to the regulations of what is (and is not) allowed, we all have a responsibility to go beyond those legalistic words. I urge everyone to think about how our actions affect the well-being of other community members. We should continue trying to honor two core principles of community: retaining civility and respect in discourse, and committing to an ethic of safety and care. Neither of these is easy, but both are essential for each of us to enjoy the sense of belonging here at Montclair that makes free exchange of ideas and opinions possible and fruitful. We exercise our institutional prerogative to limit only outside groups to a single designated location because I believe in our ability as a community to be mindful of each other, even as we express our own thoughts and feelings. It is harder to extend that belief to people with no interest in building and maintaining this community, and view our University only as a platform to amplify their voices.

There are many conflicts in the world today that evoke deep emotions among members of our University community. We welcome people from many different backgrounds, and this diversity enriches our community, provides opportunities to ask questions and appreciate differences that make the world more interesting. When viewpoints derived from differences in experience, belief or outlook put us in diametric opposition, however, it can present a test of our shared commitments.

This is the moment we find ourselves in as a campus community and it offers an opportunity to model the world we'd like to see. I believe in our ability to find the balance between free expression and our obligation to serve the students who come here to learn and realize their potential. And even when you may not agree with how any given situation is handled, I can assure you that the pursuit of this balance is always at the forefront of our decision making.



**Jonathan GS Koppell**
President
973-655-4211
koppellj@montclair.edu



---
allusers mailing list

# Exhibit M

10/18/24, 11:38 AM

Expressive Activity – Policies And Procedures - Montclair State University



# Expressive Activity

## About This Policy

**Last Updated**

10/18/2024

**Responsible Office**

Student Development Campus Life

## I. Policy Statement

Montclair State University ("University") recognizes and upholds the right to free speech as a cornerstone of our democratic society. The University further recognizes the constitutional freedoms of speech, press, and peaceful assembly guaranteed by the United States and New Jersey constitutions. The University property is primarily dedicated to academic, student life, and administrative functions. The University has an obligation to preserve and protect the health, safety and welfare of students, faculty and staff ("Employees"), alumni, guests, members of the public, and external individuals or groups not recognized by the University (cumulative, "Public"), and its property, while simultaneously ensuring the effective operation of educational, clinical, research, business, and related functions of the University. The fulfillment of this obligation is the University's utmost priority and the lens through which this policy shall be interpreted.

Expressive Activity on the University's campus is subject to reasonable regulation with regard to time, place, and manner to prevent interference with or disruption to the educational, clinical, research, business or related functions of the University, as well as to ensure security for public health, safety, and welfare. This policy is viewpoint and content neutral and provides ample means for Expressive Activity.

The University shall not prohibit any individual or organization from engaging in Expressive Activity as long as the individual's or organization's conduct is lawful, does not materially or substantially disrupt the functioning of the University, does not place a substantial burden on the University's resources, does not constitute Disruptive Activity, and is in compliance with this policy and other University policies. Students, Employees, and the Public must respect the diverse views and opinions of others, while also expressing their own views. The University has the obligation to preserve its foremost purpose as an enclave for the pursuit of higher learning by students currently enrolled and registered in at least one credit-bearing course and by individuals actively employed by the University. Therefore, it is reasonably necessary for the University to draw a distinction between current members of the University community (students currently enrolled and registered in at least one credit-bearing course and individuals actively employed by the University) seeking to engage in Expressive Activity and members of the Public. This furthers the University's goal of creating an inclusive

Expressive Activity – Policies And Procedures - Montclair State University

atmosphere where free expression on all sides of an issue can thrive, contributing to the intellectual and cultural growth of the University community.

The University does not assume any responsibility for the content of any materials distributed or displayed during Expressive Activity. Individuals engaged in Expressive Activity pursuant to this policy speak only for themselves and do not speak for the University. Any speech permitted by this policy should not be attributed to the University. Only authorized University administrators may function as University spokespersons. The University does not endorse, support, agree, or disagree with the content of the Expressive Activity or the opinions expressed by those attending, affiliated with, or engaging in the Expressive Activity.

No policy can address every possible activity or situation that may occur on University property and therefore, the University reserves the right to address such situations as circumstances warrant.

## II. Applicability

This policy applies to all students, Employees actively employed by the University, and the Public engaged in Expressive Activity on property owned or controlled by the University. Students, Employees, and the Public who violate this policy or any other University policy may be subject to disciplinary measures, consistent with the following, as applicable: the Student Code of Conduct, employee collective bargaining agreements, faculty and employee handbooks, and federal, state, and local laws. Disciplinary measures may include but are not limited to suspension, dismissal, termination, removal from University property, arrest by University Police, and/or prosecution by the local jurisdiction.

This policy is not intended to nor should it be construed to interfere with any rights of Employees to engage in protected labor activity.

## III. Rules and Regulations Governing Expressive Activity

A. Students, Employees, and the Public are allowed to conduct Expressive Activity on University property as long as the Expressive Activity:

- Complies with this policy, the Student Code of Conduct, employee collective bargaining agreements, faculty and employee handbooks, other University policies and all applicable federal, state and local laws, including but not limited to laws prohibiting discrimination and harassment;

- Complies with all lawful orders issued by the University Police Department and/or University Official or Designee, which may include but are not limited to orders to disperse should Expressive Activity become disruptive, unlawful, unsafe, or noncompliant with federal or state laws or University policies;

- Takes place in one Designated Location, as applicable;

- Does not constitute unlawful activity or violate any federal, state or local laws;

- Does not create a credible threat to public health, safety, or property;

- Ensures the safety and well-being of individual participants and the campus community, including compliance with local, state, and federal laws and/or regulations;

- Does not take place in a location that has been previously reserved for another event or activity;

- Does not include physically attaching materials to University property;

- Is conducted by a non-commercial entity;

- Takes place between the hours of 8:30 A.M. and 6:00 P.M.;

- Does not involve digital or indirect distribution of leaflets, pamphlets, or other printed materials (e.g., pamphlets must be handed to event attendees and cannot be mass emailed to the campus community, placed under doors, or displayed around campus in a manner that violates the University's Posting Policy);

- Does not involve or lead to the creation or erection of a structure in violation of University policy;

- Does not take place an active roadway for emergency vehicles, University shuttles, and/or standard vehicle traffic;

- Does not take place on active walkway for pedestrians so as to not obstruct pedestrian traffic;

- Does not take place in an active parking lot, designated parking area, or fire lane; and

- Remains in a single area meeting the definition of Designated Location for the entirety of the Expressive Activity.

B. Silent or symbolic Expressive Activity is Expressive Activity and is subject to reasonable regulation with regard to time, place, and manner to prevent interference with or disruption to the educational, clinical, research, business or related functions of the University, as well as to allow security protections for public health, safety, and welfare. Silent or Symbolic Expressive Activity is allowed in all outdoor locations on the Montclair and Bloomfield campuses, unless the Silent or Symbolic Expressive Activity would constitute Disruptive Activity or occurs in a place that fails to comply with the requirements of Designated Locations outlined above.

Any silent or Symbolic Expressive Activity must not interfere with another individual's ability to engage in an event or Expressive Activity, obstruct an audience member's view, or prevent a speaker from conveying their message. Silent or Symbolic Expressive Activity which fails to comply with this section of the policy will be treated as other forms of Expressive Activity.

Silent or symbolic activity must be registered with the Assistant Dean of Student Engagement on the Montclair Campus or the Senior Associate Dean of Students on the Bloomfield campus no less than five (5) business days prior to occurrence. This requirement applies despite the lack of sound or the need for Designated Space reservation, and is necessary to allow for proper safety measures in light of the number of anticipated participants, the type of activity, the anticipated time and duration, proximity to other previously scheduled events, and other factors relating to the safety of the University community.

C. All posting or hanging of signs, posters, or banners, including any postings on bulletin boards, must comply with the University's Posting Policy.

D. Organic or spontaneous Expressive Activity is Expressive Activity and must comply with this policy. Organic or spontaneous Expressive Activity involving sound will be routed to a Designated Location by University Official or Designee. Failure to move such organic or spontaneous Expressive Activity involving sound to a Designated Location shall result in the Expressive Activity being deemed Disruptive Activity.

E. All students, Employees, and the Public engaged in Expressive Activity, including but not limited to individuals attending related events or passersby, must conduct themselves responsibly and peacefully.

F. Speakers at Expressive Activity have the right to speak without intimidation or interference and the audience has the right to hear and see such speakers without interference or intimidation. Dissent and debate at Expressive Activity may be appropriate but such dissent and debate may not intentionally and/or substantially interfere with others' rights to engage in Expressive Activity. The University shall take all reasonably necessary steps to ensure the safety of students, Employees, and the Public.

G. Expressive Activity shall not be permitted to violate or hinder the rights of others to access and use the campus and University facilities, such as residences, libraries, classrooms, food establishments, research labs, etc. Additionally, Expressive Activity shall not prevent others from pursuing their work, studies or other campus activities, or in any way objectively threaten or intimidate others.

H. Weapons, other objects brandished or used as weapons, and other dangerous instruments or substances may not be present or used in any Expressive Activity.

I. The use of Amplified Sound during Expressive Activity on University property is prohibited. This ensures that all campus members can engage in their studies and work without undue disruption.

J. All chalking related to Expressive Activity must be done with temporary and environmentally-friendly substances or materials that can be easily erased or removed after one week. Additionally, all chalking related to Expressive Activity must be limited to the Amphitheater, sidewalks, and walkways only and is prohibited indoors and on any vertical surface or structure, including but not limited to the sides of buildings, walls, statues, poles, etc. Any costs incurred by the University for the removal of chalking or any other markings will be passed on to the student, student organization, employee, or member of the public involved in the chalking or any other markings in question or the individual or entity responsible for organizing the Expressive Activity.

# IV: Definitions

A. Amplified Sound refers to any sound enhanced by sound-amplifying equipment. Sound-amplifying equipment includes but is not limited to, any machine or device used for the amplification of the human voice, music, or any other sound, such as bullhorns, microphones, speakers, amplifiers, megaphones, etc.

B. Employee refers to any individual actively employed by the University.

C. Expressive Activity refers to any noncommercial lawful verbal, written, symbolic, audiovisual, or electronic activity or conduct, engaged in by individuals wishing to participate in free expression or to publicly express ideas, opinions, or messages to the campus community or a portion thereof. Expressive Activity excludes Disruptive Activity. Expressive Activity can take various forms, including but not limited to:

- Writing: written publications, posters, leaflets/pamphlets, or digital content and related distribution;

- Protests and Demonstrations: peaceful assemblies, marches, sit-ins, rallies, or vigils;

- Artistic Expression: oral and physical performances, visual art displays, projections, music, or theater;

- Symbolic Speech: actions that convey a specific message, such as wearing armbands, holding signs, or other non-verbal or silent forms of expression; and

- Sound: all oral, acoustic, and other sound communication, chants, clapping, speeches, stomping, and other forms of sound generated by one or more individuals.

D. Collaboration or co-sponsorship refers to any coordination (financial or otherwise) between students, Registered Student Organizations (RSOs), Employees and/or other groups recognized by the University and the Public in Expressive Activity. If the Public contributes to the Expressive Activity in any way (i.e., provides financing, materials, use of the organization or entity's name, or is in any way physically present on the Montclair or Bloomfield campuses), the Expressive Activity must take place in the Amphitheater on the Montclair campus and Back Quad on the Bloomfield campus.

E. Common Hour refers to the dedicated time slots for student engagement and campus-wide activities during which there are no scheduled classes. The Common Hour through December 24, 2024 is Wednesday, 1:30 p.m. to 5:00 p.m. on the Montclair campus and Thursday, 2:00 p.m. to 4:00 p.m. on the Bloomfield campus. Effective January 2, 2025, the Common Hour will be Monday and Wednesday, 2:00 p.m. to 3:30 p.m. on both campuses.

F. A Designated Location for students, RSOs, Employees, and other groups recognized by the University is any outdoor space on the Montclair or Bloomfield campus that complies with the following requirements:

- Is at least approximately 100 feet away from any academic building (this restriction does not apply during the Common Hour on either campus or to silent or symbolic Expressive Activity);

- Is not within approximately 100 feet of the entrance of any building, so as not to impede ingress or egress;

- Does not encompass or block any stairs, stairways, or landings immediately above or below a stairway. This includes the stairs and landings surrounding the Student Center but excludes the bricked Plaza at the bottom of the lower stairway in front of the Student Center;

- Is not already reserved for another event or activity; and

- Does not pose a true, direct threat to the health and safety of students, Employees, other members of the University community, or the Public.

Examples of Designated Locations on the Montclair and Bloomfield campuses can be found at the end of this Policy.

G. The Designated Location on the Montclair campus for the Public to engage in Expressive Activity of any kind is the Amphitheater. Any student, RSO, Employee, or other group recognized by the University collaborating or co-sponsoring an Expressive Activity with the Public will be treated as the Public and be required to utilize the Amphitheater for the Expressive Activity.The Designated Location on the Bloomfield campus for the Public to engage in Expressive Activity of any kind is the Back Quad. Any student, RSO, Employee, or other group recognized by the University collaborating or co-sponsoring an Expressive Activity with the Public will be treated as the Public and be required to utilize the Back Quad for the Expressive Activity.

This policy does not extend to locations not owned or operated by the University, such as public streets or sidewalks adjacent to the campuses. Any individual or organization engaging in Expressive Activity outside of the Montclair and Bloomfield campuses is responsible for ensuring compliance with local and state laws.

H. Disruptive Activity is conduct that violates this policy, the law, or materially or substantially interferes with the University's ability to effectively and peacefully educate students, ensure the safety of students, Employees, and the Public, conduct business operations and related functions, and/or places substantial burden on the University. Disruptive Activity includes the following:

- any incitement to imminent violence, physical or verbal threats, harassment, property damage of any sort, occupation of buildings, encampment, or general defiance of reasonable crowd control measures employed by University Police or other law enforcement;

- the scaling and/or standing atop any furniture, walls, roofs, partitions, or other surfaces, or any other conduct that creates a risk of injury to persons or property damage;

- any throwing of objects;

- any conduct that intentionally and/or substantially interferes with another person's right to engage in Expressive Activity;

- any attempt to engage in Expressive Activity in a space that is already reserved for another event or activity; and

- any use of sound that unreasonably interferes with the ability of faculty to deliver instruction or the ability of students to engage in academic activity inside of academic buildings.

I. Organic or Spontaneous Expressive Activity is Expressive Activity that does not involve any advanced organizing, advertising, or planning. This includes any advanced postings about the Expressive Activity on social media platforms.

J. Public is any individual or entity that is neither enrolled in nor presently actively employed by the University. Members of the public include alumni, guests of students or employees, outside individuals, organizations or entities, or statewide or national organizations that have chapters, subsidiaries, subsets or the like within the University community.

K. Silent or Symbolic Expressive Activity is noiseless activity that conveys a message, including but not limited to silent protest, displaying signs, wearing symbolic clothing, gesturing, standing, sitting, walking or other noiseless activity.

L. Student is any individual currently registered and enrolled in at least one credit-bearing course at the University.

M. University Official or Designee is the President of the University, Chief of Staff to the President, the Vice President of Student Development & Campus Life, the Provost, the Associate Provost, the Dean of Students, and the Chief of Police, University Police Officer, Campus Safety and Security Officer, their respective designees, or other official designee of the University.

# V: Procedures

Expressive Activity – Policies And Procedures - Montclair State University

Request Process for use of Designated Locations

A. Students, RSOs, Employees, and other groups recognized by the University are required to reserve a Designated Location for all Expressive Activity that is organized, advertised, or planned in advance. Applications for a reservation must be submitted to the Assistant Dean of Student Engagement on the Montclair Campus or the Senior Associate Dean of Students on the Bloomfield campus no less than five (5) business days prior to the requested reservation date. The University will typically respond to the reservation application within two (2) business days. Failure to adhere to this process shall result in the denial of a reservation request.

B. The Public shall submit requests to engage in Expressive Activity on the campuses of the University. These requests must be submitted as an Expressive Activity request to the Assistant Dean of Student Engagement on the Montclair campus, or Senior Associate Dean of Students on the Bloomfield campus, no less than five (5) business days prior to the requested reservation date. Failure to adhere to this process shall result in the denial of a reservation request.

C. In the event of simultaneously submitted requests, the following order of precedence shall govern: (1) official University-sponsored or contracted activities and events; (2) recognized student organization activities and events; (3) student activities and events; (4) Employee activities and events; and (5) all other activities and events. When reviewing requests, the University reserves the right and bears the responsibility to consider the appropriate time, place, and manner restrictions, as appropriate, for Expressive Activity, so as to ensure that Expressive Activity does not interfere with or disrupt the educational, research, business and related functions of the University, place substantial burden on the University, or compromise the University's ability to protect the health, safety, and welfare of its students, Employees, and the Public.

D. Expressive Activity requests may be denied for reasons including but not limited to the following:

- The requested venue is not one of the Designated Locations;

- The Designated Location requested is unavailable;

- The request conflicts with restrictions enacted pursuant to this policy;

- The venue is already reserved for another event;

- The estimated and anticipated size of crowd is larger than the requested Designated Location can safely contain;

- The activity poses a credible threat to public safety, according to the University Police Department, including the inability to schedule sufficient personnel, such as police officers, security officers and administrators within the necessary time frame;

- The activity will occur during college examination periods or during other major campus events, such as convocations/commencement, homecoming, or heavily attended athletic competitions or performances;

- The activity is unlawful or violates University policy, rules or regulations;

- The activity imposes a substantial burden on the University; and/or

- Too many events are requested on a particular day or time so as to create a substantial burden on the ability of the University to ensure the safety, health and welfare of the participants and the campus community.

E. Responsibility for Cleaning Costs, Damages, and Other Costs: The student, RSO, Employee, other organization recognized by the University, or the Public requesting the reservation, or the individual and/or entity responsible for organizing the Expressive Activity is responsible for preserving and maintaining the cleanliness and order of the Designated Location. Any damage to the Designated Location or any University property during the Expressive Activity shall be the responsibility of the person or organization (and its officers, if applicable). The University reserves the right to seek reimbursement for any damages and additional costs incurred by the University as a result of the Expressive Activity, including but not limited to additional costs for cleaning and repair services, and law enforcement and security personnel.

F. Cancellation or Termination of Expressive Activity: If, at any time subsequent to the approval of an Expressive Activity request, the University determines that any circumstance that would have resulted in the denial of a request under the terms of this policy, has

arisen, the University reserves the right, in its sole discretion, to cancel or reschedule the Expressive Activity. The University will provide notice of such a decision and the basis thereof.

G. Disruptive Activity/Termination of Expressive Activity: A University Designee will have the authority throughout the University to declare a particular Expressive Activity or behavior to be Disruptive Activity and shall, if possible, alert participants that refusal to disperse will cause them to be in violation of this policy. Thereafter, the University Designee has the discretion to call upon the University Police or Campus Security, and/or other law enforcement to contain Disruptive Activity and disperse participants in a safe manner.

# VI: Examples of Designated Locations subject to the conditions noted herein:

## Montclair Campus

- Alumni Green
- Amphitheater
- Area behind Student Center Annex
- Area surrounding Cole Hall
- Areas surrounding Blanton, Webster, and Bohn Halls
- Bricked patio at the bottom of the lower stairway between Student Center and Student Center Quad grass field
- Student Center Quad grass field
- Tennis Courts

## Bloomfield Campus

- Back Quad
- Main Quad

This policy does not apply to any person or organizations desiring to sell or promote merchandise or services on campus, as such activity is not Expressive Activity. Any person or organization desiring to sell or promote merchandise or services on campus must contact the Office of Campus Business Services.

| View Student Development Campus Life Policies | View University Policies | View All Policies |

**MONTCLAIR**
STATE UNIVERSITY

⊙ 1 Normal Ave.
Montclair, NJ 07043

| Policies and Procedures | Montclair State | Policies |
| --- | --- | --- |
| Academic | About Montclair | Copyright and Disclaimer |

# Exhibit N



# Expressive Activity

## About This Policy

**Last Updated**

10/29/2024

**Responsible Office**

**Human Resources**

**Student Development Campus Life**

# I. Policy Statement

Montclair State University ("University") recognizes and upholds the right to free speech as a cornerstone of our democratic society. The campuses of the University are primarily dedicated to academic, student life, and administrative functions. The University has an obligation to preserve and protect the health, safety and welfare of Students, faculty and staff ("Employees"), alumni, guests, members of the public, and external individuals or groups not recognized by the University (cumulative, "Public"), and its property, while simultaneously ensuring the effective operation of educational, clinical, research, business, and related functions (cumulative, "Functions") of the University. The fulfillment of this obligation is the University's utmost priority and the lens through which this Policy shall be interpreted.

Expressive Activity on the University's campuses is subject to reasonable regulation with regard to time, place, and manner to ensure the safety of all involved and the University community, as well as to prevent disruption to the Functions of the University. This Policy is viewpoint and content neutral and provides ample means for Expressive Activity. Expressive Activity by currently enrolled Students and active Employees: (1) can occur in any outdoor space that complies with the reasonable requirements herein; and (2) only requires advanced reservation if people will be gathering.

The University has the obligation to preserve its foremost purpose as an enclave for the pursuit of higher education by Students and to ensure their safety and the safety of individuals tasked with supporting that purpose. Therefore, it is reasonably necessary for the University to draw a distinction between current members of the University community seeking to engage in Expressive Activity and members of the Public.

The University does not assume any responsibility for the content of any materials distributed or displayed during Expressive Activity. Individuals engaged in Expressive Activity pursuant to this Policy speak only for themselves and do not speak for the University. The

University does not endorse, support, agree, or disagree with the content of any Expressive Activity or the opinions expressed by those attending, affiliated with, or engaging in the Expressive Activity.

No Policy can address every possible activity or situation that may occur on University property and therefore, the University reserves the right to address such situations as circumstances warrant.

## II. Applicability

This Policy applies to all currently enrolled Students, active Employees, and the Public engaged in Expressive Activity on property owned or controlled by the University. Students, Employees, and the Public who violate this Policy or any other University policy may be subject to disciplinary measures, consistent with the following, as applicable: the Student Code of Conduct, employee collective bargaining agreements, faculty and employee handbooks, and federal, state, and local laws.

This Policy is not intended to nor should it be construed to interfere with any rights of Employees to engage in protected labor activity.

## III. Rules and Regulations Governing Expressive Activity

A. Students, Employees, and the Public are allowed to conduct Expressive Activity outdoors on University property as long as the Expressive Activity:

- Complies with this Policy, the Student Code of Conduct, employee collective bargaining agreements, faculty and employee handbooks, other University policies and all applicable federal, state and local laws, including but not limited to laws prohibiting discrimination and harassment;

- Complies with all lawful orders issued by the University Police Department and/or University Officials or Designee;

- Does not create a credible threat to public health, safety, or property;

- Does not take place in a location that has been previously reserved for another event or activity;

- Does not include physically attaching materials to or erecting structures on University property in violation of University Policy;

- Takes place between the hours of 8:30 A.M. and 6:00 P.M.;

- Does not take place on an active roadway for emergency vehicles, University shuttles, and/or standard vehicle traffic;

- Does not take place on active walkway for pedestrians so as to not obstruct pedestrian traffic;

- Does not take place in an active parking lot, designated parking area, or fire lane; and

- Remains in a single Designated Location for the entirety of the Expressive Activity, as applicable.

B. All Expressive Activity by Students and Employees that is silent (noiseless) and involves a gathering of individuals shall be permitted anywhere outdoors unless the activity constitutes Disruptive Activity or occurs in a place that fails to comply with the applicable requirements for a Designated Location.Silent Expressive Activity by an individual, such as wearing a certain article of clothing or head covering, does not fall within the scope of this Policy. This Policy only applies to silent Expressive Activity that gathers individuals together.Silent Expressive Activity must not interfere with another individual's ability to engage in an event or Expressive Activity, obstruct an audience member's view, or prevent a speaker from conveying their message.

C. All posting, distribution, or hanging of signs, posters, banners, or other printed materials, including any postings on bulletin boards, must comply with the University's Posting Policy.

D. Organic or spontaneous Expressive Activity must comply with this Policy. Organic or spontaneous Expressive Activity involving sound will be routed to a Designated Location by University Official or Designee.

E. All Students, Employees, and the Public engaged in Expressive Activity, including but not limited to individuals attending related events or passersby, must conduct themselves responsibly and peacefully.

F. Speakers at Expressive Activity have the right to speak without intimidation or interference and the audience has the right to hear and see such speakers without interference or intimidation.

G. Expressive Activity shall not violate or hinder the rights of others to access and use the campuses and University facilities, such as residence halls, libraries, classrooms, food establishments, research labs, etc. Expressive Activity shall not prevent anyone from pursuing their studies, work, or other campus activities.

H. Weapons, objects used as weapons, and other dangerous instruments or substances cannot be present or used in any Expressive Activity.

I. The use of Amplified Sound during Expressive Activity on University property is prohibited.

J. All chalking must be done with temporary and environmentally-friendly substances that can be easily removed after one week. All chalking must be limited solely to the Amphitheater, sidewalks, and walkways and is prohibited indoors and on any vertical surface or structure. Any costs incurred by the University for the removal of chalking or any other markings will be passed on to the appropriate party.

# IV: Definitions

A. Amplified Sound refers to any sound enhanced by sound-amplifying equipment, which includes but is not limited to, any machine or device used for the amplification of the human voice, music, or any other sound.

B. Collaboration or co-sponsorship refers to any coordination (financial or otherwise) between Students, Registered Student Organizations (RSOs), Employees and/or other groups recognized by the University and the Public in Expressive Activity.

C. Common Hour refers to the dedicated time slots for Student engagement and campus-wide activities during which there are no scheduled classes. The Common Hour through December 24, 2024 is Wednesday, 1:30 p.m. to 5:00 p.m. on the Montclair campus and Thursday, 2:00 p.m. to 4:00 p.m. on the Bloomfield campus. Effective January 2, 2025, the Common Hour will be Monday and Wednesday, 2:00 p.m. to 3:30 p.m. on both campuses.

D. Designated Location, for currently enrolled Students, RSOs, Employees, and other groups recognized by the University, refers to any outdoor space on the Montclair or Bloomfield campus that complies with the following requirements:

- Is at least approximately 100 feet away from any academic building (this restriction does not apply during the Common Hour on either campus or to silent Expressive Activity);

- Is not within approximately 100 feet of the entrance of any building, so as not to impede ingress or egress;

- Does not encompass or block any stairs, stairways, or landings immediately above or below a stairway. This includes the stairs and landings surrounding the Student Center on the Montclair campus;

- Is not already reserved for another event or activity; and

- Does not pose a true, direct threat to the health and safety of Students, Employees, other members of the University community, or the Public.

Examples of Designated Locations on the Montclair and Bloomfield campuses can be found at the end of this Policy.

E. Designated Location, for the Public, refers only to the Amphitheater on the Montclair campus and the Back Quad on the Bloomfield campus. Any Student, RSO, Employee, or other group recognized by the University collaborating or co-sponsoring an Expressive Activity with the Public in any way will be treated as the Public and be required to utilize the Amphitheater or Back Quad.

F. Disruptive Activity refers to conduct that violates this Policy, the law, or materially or substantially interferes with the University's Functions, ability to effectively and peacefully educate Students, ensure the safety of Students, Employees, and the Public, and/or places substantial burden on the University. Disruptive Activity includes but is not limited to the following:

- any incitement to imminent violence, physical or verbal threats, harassment, property damage of any sort, occupation of buildings, encampment, or general defiance of reasonable crowd control measures employed by University Police or other law enforcement;

- failure to adhere to a directive of University Police, University Official or Designee;

- the scaling and/or standing atop any furniture, walls, roofs, partitions, or other surfaces, or any other conduct that creates a risk of injury to persons or property damage;

- any throwing of objects;

- any conduct that intentionally and/or substantially interferes with another person's right to engage in Expressive Activity;

- any attempt to engage in Expressive Activity in a space that is already reserved for another event or activity; and

- any use of sound that unreasonably interferes with the ability of faculty to deliver instruction or the ability of Students to engage in academic activity inside of academic buildings.

G. Employee refers to any faculty or staff actively employed by the University.

H. Expressive Activity refers to any noncommercial lawful verbal, written, symbolic, or audiovisual activity or conduct engaged in by individuals wishing to participate in free expression or to publicly express ideas, opinions, or messages to the campus community or a portion thereof.  Expressive Activity can be silent or involve sound. Expressive Activity excludes Disruptive Activity.

I. Public refers to any individual or entity not currently enrolled in or currently employed by the University. This includes local, state, national, or international organizations with subsidiaries or chapters at the University.

J. Sound refers to all oral, acoustic, and other sound communication, including but not limited to chants, clapping, speeches, stomping, and other forms of sound or noise generated by one or more individuals.

K. Organic or Spontaneous Expressive Activity refers to Expressive Activity that does not involve any advanced organizing, advertising, or planning. Posting about an event on social media or University listservs before an Expressive Activity occurs constitutes advanced organizing.

L. Student refers to any individual currently registered and enrolled in at least one credit-bearing course at the University.

M. University Official or Designee refers to the President of the University, Chief of Staff to the President, the Vice President of Student Development & Campus Life, the Provost, the Associate Provost, the Dean of Students, the Assistant Dean of Students, University police officers, and campus safety and security officers, their respective designees, or other official designee of the University.

# V: Procedures

A. In order to ensure that the University can dedicate sufficient resources to maintain the safety of all involved and to ensure that the desired space is available, advanced reservation of space is required for any Expressive Activity, silent or otherwise, that is planned in advance and gathers individuals together. This section, V.A, and V.B below solely apply to these types of Expressive Activity .

- Students, RSOs, Employees, and other groups recognized by the University shall submit a space reservation request to the Assistant Dean of Student Engagement on the Montclair Campus or the Senior Associate Dean of Students on the Bloomfield

Case 2:25-cv-13793-MEF-MAH    Document 29-1    Filed 11/04/25    Page 106 of 141
PageID: 532

campus no less than five (5) business days prior to the requested reservation date. The University will typically respond to the reservation application within two (2) business days. Failure to adhere to this process shall result in the denial of a reservation request.

- The Public must submit a space reservation request in order to utilize the Amphitheater (Montclair campus) or Back Quad (Bloomfield campus) for any kind of Expressive Activity. The reservation requests must be submitted to the Assistant Dean of Student Engagement on the Montclair campus, or Senior Associate Dean of Students on the Bloomfield campus, no less than five (5) business days prior to the requested reservation date. Failure to adhere to this process shall result in the denial of a reservation request.

- In the event of simultaneously submitted requests for the same Designated Location, the following order of precedence shall govern: (1) official University-sponsored or contracted activities and events; (2) recognized Student organization activities and events; (3) Student activities and events; (4) Employee activities and events; and (5) all other activities and events.

- All space reservation requests can be submitted using the following hyperlink: **https://montclair.campuslabs.com/engage/ submitter/form/start/643827**

B. Expressive Activity space reservation requests may be denied for reasons including but not be limited to the following:

- The request conflicts with this Policy;

- The estimated and anticipated size of crowd is larger than the requested Designated Location can safely contain;

- The activity poses a credible threat to public safety, as determined by the University Police Department;

- The activity will occur during college examination periods or during other major campus events, such as convocations/commencement, homecoming, or heavily attended athletic competitions or performances;

- The activity, considered alone or in the aggregate with other activities already scheduled for the same day and/or time, imposes a substantial burden on University resources, including the inability to schedule sufficient personnel, such as University police officers, campus safety and security officers, and administrators within the necessary time frame.

C. Responsibility for Cleaning Costs, Damages, and Other Costs: The Student, RSO, Employee, other organization recognized by the University, or the Public requesting the reservation, or the individual and/or entity responsible for organizing the Expressive Activity is responsible for preserving and maintaining the cleanliness and order of the Designated Location. Any damage to the Designated Location or any University property during the Expressive Activity shall be the responsibility of the person or organization (and its officers, if applicable).

D. Cancellation or Termination of Expressive Activity: If, at any time subsequent to the approval of an Expressive Activity space reservation request, the University determines that any circumstance that would have resulted in the denial of a request has arisen, the University reserves the right to cancel or reschedule the Expressive Activity. The University will provide notice of such a decision.

E. Disruptive Activity/Termination of Expressive Activity: Expressive Activity that violates this Policy shall be deemed Disruptive Activity. University Police or a University Official or Designee shall notify participants of the violation and provide guidance on how the Expressive Activity can comply with the Policy. Failure to adhere to such guidance and the continuation of the Disruptive Activity shall result in the termination of the Expressive Activity. Upon termination, all participants must disperse.

# VI: Examples of Designated Locations subject to the conditions noted herein:

## Montclair Campus

Case 2:25-cv-13793-MEF-MAH    Document 29-1    Filed 11/04/25    Page 107 of 141
PageID: 533

- Alumni Green

- Amphitheater

- Area behind Student Center Annex

- Area surrounding Cole Hall

- Areas surrounding Blanton, Webster, and Bohn Halls

- Bricked patio at the bottom of the lower stairway between Student Center and Student Center Quad grass field

- Student Center Quad grass field

- Tennis Courts

## Bloomfield Campus

- Back Quad

- Main Quad

This Policy does not extend to locations not owned or operated by the University, such as public streets or sidewalks adjacent to the campuses. Any individual or organization engaging in Expressive Activity outside of the Montclair and Bloomfield campuses is responsible for ensuring compliance with local and state laws.

This Policy does not apply to any person or organizations desiring to sell or promote merchandise or services on campus, as such activity is not Expressive Activity. Any person or organization desiring to sell or promote merchandise or services on campus must contact the Office of Campus Business Services.

**View Human Resources Policies**   **View Student Development Campus Life Policies**   **View University Policies**

**View All Policies**

**MONTCLAIR**
**STATE UNIVERSITY**

⊙ 1 Normal Ave.
   Montclair, NJ 07043

▯ 973-655-4000

▥ Campus Map

X ⓕ ⓘ ▶ ♪

| Policies and Procedures | Montclair State | Policies |
|---|---|---|
| Academic | About Montclair | Copyright and Disclaimer |
| Employee | Academics | Title IX Information |
| Finance | Admissions | Emergency/Plans |
| Student | Alumni | Notice of Non-Discrimination |
| Technology | Arts and Culture | Annual Security Report |
| University | Athletics | Middle States Accreditation |
| | Red Hawk Life | Website Privacy Notice |
| | Giving | Land Acknowledgement Statement |
| | Research | Cost of Attendance |
| | Bloomfield College Merger | |

# Exhibit O

**MSU Expressive Activity Policy—Comparison Chart**

| | Previous EA Policy<br><br>(June 2021 to October 2024) | New EA Policy<br><br>(October 2024 to present) | More restrictive 🔴<br>Neutral 🟡<br>Less restrictive 🟢 |
|---|---|---|---|
| Constitutionality | Required, verbatim, to be MSU's EA Policy in MSU's settlement of a lawsuit alleging First Amendment violations. | Replaces the EA policy required in the settlement. | 🔴 |
| Restricted hours | Anytime campus is open | 8:30am-6pm | 🔴 |
| Prohibited areas | Cannot block building access, foot traffic, or vehicle traffic. | Cannot block building access, foot traffic, or vehicle traffic; must be 100 feet away from all academic buildings, 100 feet away from any entrance; cannot be at the top or bottom of indoor or outdoor stairs. | 🔴 |
| Additional area restrictions | None | Any participants collaborating with the public "in any way" means EA is restricted to amphitheater or Back Quad. | 🔴 |

| Allowed indoors | Yes | No | ● |
|---|---|---|---|
| Movement between locations allowed | Yes | No | ● |
| Amplification | Outdoors during common hour | Not allowed | ● |
| Reservation | Not required | Required with 5 days' notice if any individuals create any sound. | ● |
| Reservation submission time | 4 days in advance | 5 days in advance | ● |
| Time limit for university to respond to reservation request | 2 days | No limit | ● |
| Planned versus spontaneous EA | No additional requirements for planned | Spontaneous EA becomes "planned" if it is posted on social media or a university listserv and then requires a reservation. | ● |

| Silent versus audible EA | No additional requirements for audible | Spontaneous EA that becomes audible in any way must be relocated to a Designated Location | 🔴 |
|---|---|---|---|
| Individual versus more than one person | No additional requirements for multiple people | If EA involves more than one person, multiple restrictions apply. | 🔴 |
| Collaboration with members of the public | No additional requirements for collaboration | Any collaboration "in any way," including chapter membership in a larger organization, restricts EA to Amphitheater | 🔴 |
| Outside (non-MSU) groups | Must be sponsored by a campus student organization. | Sponsorship not needed, but EA is restricted to Amphitheater | 🟡 |
| Provisions for university designees to override the policy. | None | The University reserves the right to address such situations as circumstances warrant. Reservations can be canceled by the university at any time subsequent to approval. | 🔴 |
| Appeals process for alleged violations | None included | None included | 🟡 |

3

Exhibit P

**FIRE**
Foundation for Individual
Rights and Expression

September 26, 2024

Jonathan G.S. Koppell
Office of the President
Montclair State University
1 Normal Avenue
Montclair, New Jersey 07043

*Sent via U.S. Mail and Electronic Mail (koppellj@montclair.edu)*

Dear President Koppell:

FIRE, a nonpartisan nonprofit dedicated to defending freedom of speech,[1] is concerned by Montclair State University's restrictions on students demonstrating in outdoor spaces. The university has limited outdoor demonstrations to one small area of campus, creating a restrictive "free speech zone" and violating students' First Amendment rights to peaceably express themselves. We call on Montclair to reverse this policy and allow community members to freely express themselves outdoors subject to reasonable "time, place, and manner" restrictions permitted under the First Amendment.[2]

## I.  __Background Facts__

Montclair's 2021 Expressive Activity policy explains that "students, student organizations, and their sponsored guests may freely engage in spontaneous Expressive Activities [in outdoor campus facilities and areas] provided that such activities are in compliance with all other provisions of this policy."[3]

This policy was replaced by your November 6, 2023, communication limiting outdoor expression to one area of campus. You stated that, because "the volume [of protests] has become disruptive to teaching and learning," all "rallies and vigils" must be relocated to the Amphitheater "to allow safe expression in an area that is accessible but lessens the

---

[1] For 25 years, the Foundation for Individual Rights and Expression (FIRE) has defended freedom of expression, conscience, and religion, and other individual rights on America's university campuses. You can learn more about our expanded mission and activities at thefire.org.

[2] *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

[3] *Expressive Activity*, Outdoor Locations, MONTCLAIR STATE UNIV. (updated July 21, 2021), https://www.montclair.edu/policies/all-policies/expressive-activity/ [https://perma.cc/NX6L-7GPY]. The following is our understanding of the pertinent facts. We appreciate that you may have additional information to offer and invite you to share it with us.

impact on instruction, especially during this critical time in the semester."[4] Despite justifying this restriction by citing the "volume" of protests during a specific period of time in the fall 2023 semester, the restriction continues to be in effect almost a year later. As a result, the 2023 guidance has effectively superseded the 2021 policy.

Since November 2023, administrators have instructed students and faculty members demonstrating outside of the Amphitheater to relocate to this space. ████████████ In another instance, on September 5, 2024, Professor Adam Rzepka and three of his faculty colleagues held a silent protest in the main quad. Such a protest could not have caused a disturbance, yet multiple university officials told the demonstrators that they needed to move to the Amphitheater if they wished to continue protesting.[6]

On September 12, Professor Rzepka attended a meeting with Associate Provost Kenneth Sumner, Assistant Vice President Mary Colon, University Senate President Shannon Bellum, Professor Fawzia Afzal-Khan, and Professor Alan Chorun regarding the school's Expressive Activity policy.[7] When asked by Professor Rzepka during that meeting whether he, his colleagues, and students could protest outside the Amphitheater, Associate Provost Sumner replied, "you can do whatever you want."[8]

Sumner's assurance to Rzepka would quickly prove untrue. Following the meeting, Professor Rzepka, two faculty colleagues, and one student engaged in another silent protest outside of the Amphitheater.[9] After they protested for a few minutes on the main quad, Associate Provost Sumner, Assistant Vice President Colon, and Associate Vice President and Dean of Students Margaree Coleman-Carter told the demonstrators that they would have to relocate to the Amphitheater or disperse.[10] The administrators claimed that the demonstrators had not reserved the space and were therefore not allowed to protest there, even though neither the 2021 Expressive Activity policy nor your 2023 communication requires reservations for outdoor demonstrations.

On September 17, Rzepka, three faculty colleagues, and four students repeated their silent protest activity on the quad.[11] Rzepka reserved the space in advance for this protest. This

---

[4] *Respecting and Caring for Each Other During Challenging Times*, MONTCLAIR STATE UNIV. (Nov. 6, 2023), https://www.montclair.edu/president/2023/11/06/respecting-and-caring-for-each-other-during-challenging-times/.

[5] Email from Adam Rzepka to Ross Marchand (Sept. 11, 2024, 1:50 PM) (on file with author).

[6] *Id.*

[7] Email from Adam Rzepka to Ross Marchand (Sept. 12, 2024, 3:32 PM) (on file with author).

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] Email from Adam Rzepka to Ross Marchand (Sept. 17, 2024, 5:46 PM) (on file with author).

time, administrators gathered at the protest site but did not speak to the demonstrators or attempt to break up the protest.[12]

## II.    Montclair's Establishment of a Free Speech Zone Violates Students' Free Speech Rights

As a public university bound by the First Amendment,[13] Montclair may establish "reasonable time, place, and manner" restrictions on expressive activity,[14] but its rules must be content- and viewpoint-neutral, narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication.[15]

Montclair's policy is not narrowly tailored to the university's stated interest in noise reduction, as it bans speech regardless of its noise level. Furthermore, restricting all speech, regardless of noise level, to one small area of campus is not a reasonable restriction and fails to leave open alternative avenues for expression, with the rest of the open outdoor areas of campus remaining closed to all expression.[16]

Courts have repeatedly held that similar restrictions on student expression cannot withstand constitutional scrutiny. A federal district court in Ohio enjoined the University of Cincinnati from limiting all "demonstrations, picketing, or rallies" to a small "free speech area."[17] Likewise, a federal district court in California invalidated Los Angeles Pierce College's free speech zone because it did not further the college's interests in avoiding disruption and maintaining the attractiveness of campus "without unnecessarily impeding students' First Amendment rights."[18]

Montclair's free speech zone similarly fails to pass constitutional muster. While you cited easing the noise-related burdens on instructors during a critical time of the semester as a rationale for setting up this free speech zone,[19] the university could have set noise limits for demonstrations or required pre-approval for demonstrations exceeding a threshold number of students. Such provisions could have helped further the university's goal of making sure that protests were not too loud or distracting during a stressful time of the year, while stopping far short of relegating all expression to one free speech zone on campus.

---

[12] *Id.*

[13] *Healy v. James*, 408 U.S. 169, 180 (1972).

[14] *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

[15] *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

[16] *Respecting and Caring for Each Other During Challenging Times*, *supra* note 4.

[17] *University of Cincinnati Chapter of Young Americans for Liberty v. Williams*, 2012 U.S. Dist. LEXIS 80967, at *29–30 (S.D. Ohio June 12, 2012).

[18] *Shaw v. Burke*, 2018 U.S. Dist. LEXIS 7584, at *26 (C.D. Cal. Jan. 17, 2018).

[19] *Respecting and Caring for Each Other During Challenging Times*, *supra* note 4.

### III.    Montclair's Inconsistent Application of a Free Speech Zone Fails to Give Students Reasonable Notice of Prohibited Activities

Any university-imposed restrictions on student speech must give students reasonable notice and a fair opportunity to know what is prohibited.[20] Montclair's constantly shifting speech restrictions and uneven enforcement of its 2021 Expressive Activity policy fail to provide this reasonable notice.

Your directive confusingly stated that Montclair "continue[s] to follow our [2021] Expressive Activity policy,"—the policy that allows for spontaneous protests in all outdoor areas of campus—only to parenthetically state immediately thereafter that events such as rallies and vigils will be relocated to the Amphitheater.[21] This irreconcilable conflict of logic means that recipients of this communication had no way to know what Montclair's policy actually was, despite the fact that the 2021 Expressive Activity policy remains on the books.[22]

Montclair faculty and students are also left to wonder whether they need a reservation to demonstrate in outdoor areas of campus outside of the Amphitheater. After telling Rzepka that he could do whatever he wanted, administrators immediately used Rzepka's lack of reservation to break up the September 12 protest. Yet they declined to break up the September 17 protest after Rzepka reserved quad space[23]—a reservation that is not required by either the 2021 Expressive Activity policy[24] or your directive.[25] While the administrators' conduct toward Rzepka and his fellow demonstrators implies that reserving space in advance is now a requirement for protesting outside the Amphitheater, this appears to have been deliberately left unstated by written policy.

A conflicting array of directives, policies, and enforcement provides insufficient notice of university rules that Montclair has every reason to know will chill speech and result in self-censorship. Indeed, such an outcome is *so* inevitable that a desire to silence constitutionally protected speech is the only possible motivation behind Monclair's behavior.

### IV.    Conclusion

Montclair's establishment and inconsistent enforcement of a free speech zone is a stark illustration of a "reckless or callous indifference to the federally protected rights of others,"[26] Accordingly, we remind you that a public college administrator who violates

---

[20] *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

[21] *Id.*

[22] *Expressive Activity*, *supra* note 3.

[23] Email from Adam Rzepka to Ross Marchand (Sept. 12, 2024, 3:32 PM); Email from Adam Rzepka to Ross Marchand (Sept. 17, 2024, 5:46 PM) (on file with author).

[24] *Id.*

[25] *Respecting and Caring for Each Other During Challenging Times*, *supra* note 4.

[26] *Smith v. Wade*, 461 U.S. 30, 56 (1983).

clearly established law will not retain qualified immunity and can be held personally responsible for monetary damages for violating First Amendment rights.[27]

Montclair must make clear that the 2021 Expressive Activity policy currently published on its website is still binding, that reservations are not required for every single instance of free expression, and that the Amphitheater is not the sole venue for free expression. FIRE would be pleased to assist Montclair in training its administrators to implement the 2021 Expressive Activity policy, which protects students' and faculty's First Amendment rights.

Sincerely,

Ross Marchand
Program Officer, Policy Reform and Campus Rights Advocacy

Cc:    Kenneth Sumner, Associate Provost for Academic Personnel, Graduate School
       Mary Colon, Assistant Vice President for Academic Personnel Services
       Shannon Bellum, University Senate President
       Margaree Coleman-Carter, Associate Vice President and Dean of Students

---

[27] *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Gerlich v. Leath*, 861 F.3d 697, 709 (8th Cir. 2017) (upholding denial of qualified immunity to defendants—public university administrators—because plaintiffs' First Amendment right was clearly established).

Exhibit Q



**FIRE**
Foundation for Individual
Rights and Expression

November 7, 2024

Jonathan G.S. Koppell
Office of the President
Montclair State University
1 Normal Avenue
Montclair, New Jersey 07043

<u>*Sent via U.S. Mail and Electronic Mail (koppellj@montclair.edu)*</u>

Dear President Koppell:

FIRE[1] is disappointed not to have received a response to our enclosed September 26 letter detailing concerns with Montclair's limitation of student and faculty expressive activity to the Amphitheater. We write again with concern about the latest version of the university's Expressive Activity Policy, which infringes on students' and faculty members' First Amendment rights by establishing free speech zones, narrow time restrictions, and pre-approval for virtually all expressive activities. Additionally, the Policy's reaffirmation of the 2020 "Posting Policy and Regulation" hampers students' and faculty members' free speech rights to post materials anonymously and without approval.

FIRE urges Montclair to reinstate its 2021 Expressive Activity Policy, which fully protected the campus community's First Amendment rights, and to revise its Posting Policy to allow for anonymous posting and postings without administrative approval.

### I.    <u>The Expressive Activity Policy Limits Expressive Freedoms</u>

On October 29, Montclair issued the latest version of its Expressive Activity Policy. The updated Policy allows for expressive conduct on university property so long as the conduct takes place between 8:30 A.M. and 6:00 P.M. and remains in a designated location.[2] The designated location for students, RSOs, employees, and university-recognized groups is "any outdoor space on the Montclair or Bloomfield campus that ... [i]s at least approximately 100 feet away from any academic building" and "not within approximately 100 feet of the

---

[1] As you will recall from previous correspondence, the Foundation for Individual Rights and Expression is a nonpartisan nonprofit dedicated to defending freedom of speech. You can learn more about our mission and activities at thefire.org.

[2] *Expressive Activity*, Rules and Regulations Governing Expressive Activities, MONTCLAIR STATE UNIV. (updated Oct. 29, 2024), https://www.montclair.edu/policies/all-policies/expressive-activity/ [https://perma.cc/3TJA-8FS4].

entrance of any building[.]"[3] The designated location for the public is "the Amphitheater on the Montclair campus and the Back Quad on the Bloomfield campus."[4] If a student, RSO, employee, or recognized group collaborates or co-sponsors with the public in any way, they will be required to use the Amphitheater.[5]

The Expressive Activity Policy also requires "advanced reservation of space ... for any Expressive Activity, silent or otherwise, that is planned in advance and gathers individuals together." This is paired with a requirement that reservations be made "no less than five (5) business days prior to the requested reservation date," a requirement applying to students, RSOs, employees, university-recognized groups, and the public.[6] However, the Policy also states, "Silent Expressive Activity by an individual [and not a group], such as wearing a certain article of clothing or head covering, does not fall within the scope of this Policy."[7]

Montclair's Posting Policy requires that "posting of printed literature, posters, placards, flyers, and banners on campus (except in the residence halls) must be stamped and approved by the Center for Student Involvement" and that posting "in the residence hall must be approved by the appropriate Residence Hall Director."[8] The Policy also notes that the "name of the sponsoring department, group, or organization must be printed legibly on all materials."[9]

## II.    Montclair's Expressive Activity and Posting Policies Violate its First Amendment Obligations

FIRE appreciates that Montclair has a compelling interest in "preserv[ing] and protect[ing] the health, safety and welfare" of community members and members of the public.[10] However, these priorities cannot come at the expense of student and faculty First Amendment rights. It has long been settled law that the First Amendment binds public universities,[11] like Montclair, such that its actions and decisions—including the

---

[3] *Id.* at Definitions.

[4] *Id. (*Public refers to any individual or entity not currently enrolled in or currently employed by the University. This includes local, state, national, or international organizations with subsidiaries or chapters at the University.).

[5] *Id.*

[6] *Id.* at Procedures.

[7] *Id.* at Rules and Regulations Governing Expressive Activity.

[8] *Posting Policy and Regulation*, MONTCLAIR STATE UNIV.(updated Jan. 3, 2020), https://www.montclair.edu/policies/all-policies/posting-policy-and-regulation/ [https://perma.cc/2RJW-6KJW].

[9] *Id.*

[10] *Expressive Activity*, *supra* note 2 at Policy Statement.

[11] *Healy v. James*, 408 U.S. 169, 180 (1972) ("[T]he precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, 'the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'") (internal citation omitted).

maintenance of policies implicating student expression[12]—must not restrict student expressive freedoms.

Montclair may establish "reasonable time, place, and manner" restrictions on expressive activity,[13] but its rules must be content- and viewpoint-neutral, narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication.[14]

Montclair's "time" and "place" restrictions are neither reasonable nor narrowly tailored to serve a significant governmental interest. Montclair also impermissibly imposes prior restraints on organizing events on campus and posting materials on campus without citing anything resembling a sufficiently significant government rationale. Finally, Montclair's posting policy impermissibly forbids protected anonymous speech.

### A. Montclair's "Designated Location" rules that create a de facto "free speech zone" are not valid time, place, and manner restrictions, as they are neither reasonable nor narrowly tailored

On its face, the prohibitions against expressive activities within 100 feet of any building entrance and within 100 feet of any academic building ban most outdoor expressive activity. Virtually all green spaces on Montclair's main campus, including the Student Center Quad, Science Quad, Alumni Green, and the Chapin Hall Quad, are surrounded by buildings, and are within "approximately 100 feet of the entrance of any building."[15] Through this overly restrictive scheme, Montclair is creating an exceedingly small allowable "zone" of places where community members are allowed to express themselves. The "100 feet" requirement leaves only small sections of the Alumni Green and Student Center Quad available for expressive activity.

Courts have repeatedly held that policies confining student expression to small areas around campus cannot withstand Constitutional scrutiny. For example, the University of Cincinnati was prohibited from limiting all "demonstrations, picketing, or rallies" to a small "free speech area."[16] Likewise, Los Angeles Pierce College's free speech zone was invalidated because it did not further the college's interests in avoiding disruption and maintaining the attractiveness of campus "without unnecessarily impeding students' First Amendment rights."[17]

While Montclair has an interest in "ensur[ing] the safety of all involved and the University community" and "prevent[ing] disruption to the Functions of the University,"[18] the

---

[12] *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177 (6th Cir. 1995).

[13] *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

[14] *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

[15] *Campus Map*, MONTCLAIR STATE UNIV., https://www.montclair.edu/campus-map/ [https://perma.cc/D5PE-DLPN].

[16] *Univ. of Cincinnati Chapter of Young Ams. for Liberty v. Williams*, 2012 U.S. Dist. LEXIS 80967, at *29–30 (S.D. Ohio June 12, 2012).

[17] *Shaw v. Burke*, 2018 U.S. Dist. LEXIS 7584, at *26 (C.D. Cal. Jan. 17, 2018).

[18] *Expressive Activity, supra* note 2 at Policy Statement.

university does not offer a reason why preventing interruptions or disruptions requires cordoning off virtually the entire campus to expressive activities.

Moreover, the policy is not narrowly tailored. If the university wishes to safeguard access to campus buildings, it may simply use language from its 2021 Expressive Activity Policy forbidding protestors from "block[ing] access to campus buildings."[19] Rutgers has a similar policy that uses more tailored language: "[i]ndividuals may not block or prevent others from entering and exiting university buildings."[20] If students show they are unable to enter or exit buildings, Montclair could intervene and disperse demonstrators who were blocking doors. Unlike the current policy, this would be sufficiently tailored to protect demonstrators' free speech rights while ensuring normal campus operations are not disrupted.

The university could also follow a more tailored approach for its policy provision barring expressive activity within 100 feet of any *academic* building. If the university seeks to prevent protests from disrupting classroom activities, it could limit its prohibition to activities above a designated noise level occurring immediately adjacent to academic buildings. Unlike the current, sweeping policy language, this approach would be sufficiently tailored to serve the significant governmental interest of ensuring an environment conducive to learning and instruction.

Montclair's regulation that outdoor expressive activities of the public can only occur at the Amphitheater is also problematic in that the university's definition of "the Public" extends to students who "collaborate" on or "co-sponsor" an event in any way with external individuals or organizations who are also considered "the Public."[21] According to this broad language, a student who asks a parent for help designing an event flyer or practices a speech in front of a friend would be considered "the Public" and confined to the Amphitheater. Even students who distribute flyers advertising an off-campus food bank volunteering event as part of a "collaboration" with that food bank would be considered "the Public."

Coupled with the "100 feet" restrictions, this all-encompassing definition of "the Public" reinforces the idea that virtually all expression on campus will be confined to a small area. The university fails to give a rationale as to why this definition must be so broad, instead of being limited to external individuals not affiliated with the university. Similarly, Montclair fails to explain why its "100 feet" rules are necessary to prevent disruptions to campus or academic life. Absent any rationale related to a significant governmental interest, Montclair's onerous place-based restrictions cannot pass constitutional muster.

### B.  Montclair's time restriction on expressive activity is neither reasonable nor narrowly tailored

---

[19] *Expressive Activity*, MONTCLAIR STATE UNIV. (updated July 21, 2021), https://www.montclair.edu/policies/all-policies/expressive-activity/ [https://perma.cc/NX6L-7GPY].

[20] *Rutgers University Guidelines for Free Expression on Campus*, Operating Procedures for All Demonstrations, RUTGERS UNIV., https://free-expression.rutgers.edu/sites/default/files/2024-08/Rutgers-University-Free-Expression-Guidelines.pdf [https://perma.cc/3JRK-PPEU].

[21] *Expressive Activity, supra* note 2 at Definitions.

Montclair's Expressive Activity Policy requirement that demonstrations "take ... place between the hours of 8:30 A.M. and 6:00 P.M" is similarly unreasonable and not narrowly tailored.[22] While the university has stated an interest in avoiding disruption to campus life, most classes have presumably concluded by 6:00 P.M. The restriction also presumably applies on the weekend, when there are few to no classes. As a result of these restrictive limits on expression, students or faculty looking to demonstrate or have a political conversation outdoors in the evening hours will be prevented from doing so.

There are easy ways to maintain narrowly tailored time restrictions of expressive activities while balancing Montclair's interest in minimizing campus disruptions. For example, the University of Virginia's recently updated rules on demonstrations only prohibit outdoor events on Grounds between 2:00 a.m. and 6:00 a.m.[23]

There's little reason to believe that confining expressive activity to business hours will "prevent interference with or disruption to the educational, clinical, research, business or related functions of the University"[24] in a way that more narrowly tailored restrictions will not.

### C. Montclair's event pre-approval and posting policies impose prior restraints

Montclair's requirement of five business days' advanced notice "for any Expressive Activity, silent or otherwise, that is planned in advance and gathers individuals together"[25] is an unconstitutional "prior restraint," defined as government action which prohibits expression absent administrative permission.[26] In the words of the Supreme Court, prior restraints are "the most serious and least tolerable infringement" of free speech.[27] Courts have long held that prior restraints are permissible only in the most severe circumstances, such as in the event of a demonstrated threat to national security.[28] Specifically, courts have made clear that broad restrictions on spontaneous expression—like requiring students to obtain permits for outdoor protests—violate the First Amendment due to "the significant burden that [advance notice and permitting requirements] place on free speech."[29]

---

[22] *Id.*

[23] *Duties Toward Speakers and Use of University Facilities or Property*, Policy Statement General Access to Outdoor University Property, Access by Affiliated Persons, Univ. of Va. (revised Aug. 26, 2024), https://uvapolicy.virginia.edu/policy/PRM-017.

[24] *Expressive Activity*, *supra* note 2.

[25] Because the university considers any event-related social media or listserv post to constitute advanced planning and organizing, a large majority of impromptu demonstrations pertaining to current events are also likely subject to the pre-approval requirement. *See Expressive Activity*, *supra* note 2 at Definitions.

[26] *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 556 (1976).

[27] *Id.* at 559.

[28] *See N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971); *Near v. Minnesota*, 283 U.S. 697 (1931).

[29] *Berger v. City of Seattle*, 569 F.3d 1029, 1037 (9th Cir. 2009) (advance notice and permitting requirements are presumptively invalid) (citing *Watchtower Bible,* 536 U.S. at 166); *see also Roberts v. Haragan*, 346 F. Supp.2d 853, 870 (N.D. Tex. 2004) (invalidating two-day advance notice requirement for students to speak in designated campus areas as "sweep[ing] too broadly in imposing a burden on a substantial amount of expression that does not interfere with any significant interests of the University").

Montclair has failed to meet its "heavy burden"[30] of providing a reason why students must obtain pre-approval for virtually all events, without exception for small demonstrations, silent protests, or most activities responding to unfolding current events. Students and faculty members may wish to express themselves spontaneously to respond to the latest unfolding current events, only to be preempted without reason by this sweeping pre-approval provision. This prior restraint therefore cannot survive Constitutional scrutiny.

The university's 2020 "Posting Policy and Regulation requiring all "printed literature, posters, placards, flyers, and banners" to "be stamped and approved by the Center for Student Involvement"[31] is a further prior restraint on student and faculty expression. Under this policy provision, students seeking to freely express themselves through postings—whether for political purposes, supportive platitudes, or birthday wishes—are unable to do so absent university permission. There is no conceivable rationale, let alone a compelling one, for this broad-based preemption of speech. It is impermissible for Montclair to subject its students to prior review of all posted expression.

### D. Montclair's posting policy impermissibly forbids anonymous speech

Montclair's requirement that "[t]he name of the sponsoring department, group, or organization must be printed legibly on all materials"[32] contravenes the First Amendment's protection of anonymous speech.[33]

The Supreme Court has explained that a speaker is "free to decide whether ... to disclose his or her true identity. The decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible."[34] Anonymous communication "is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent."[35] Thus, Montclair's blanket ban on anonymous postings cannot stand.

### III.    <u>Conclusion</u>

Montclair's "Expressive Activity Policy" and "Posting Policy and Regulation" are stark illustrations of what the Supreme Court has labeled a "reckless or callous indifference to the federally protected rights of others."[36]

---

[30] *N.Y. Times Co.*, 403 U.S. at 714.

[31] *Posting Policy and Regulation*, *supra* note 8.

[32] *Id.*

[33] *See, e.g.*, *Watchtower Bible & Tract Soc. of N.Y. v. Vill. of Stratton*, 536 U.S. 150, 166–67 (2002) (striking down ordinance that, among other things, required canvassers to identify themselves to mayor's office); *Justice for All v. Faulkner*, 410 F.3d 760, 764–65 (5th Cir. 2005) (striking down college policy requiring leaflets distributed on campus to identify their authors).

[34] *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341-42 (1995).

[35] *Id.* at 357; *see also Talley v. California*, 362 U.S. 60, 64 (1960); *Lamont v. Postmaster Gen.*, 381 U.S. 301, 307 (1965); *Tattered Cover v. City of Thornton*, 44 P.3d 1044, 1051 (Colo. 2002).

[36] *Smith v. Wade*, 461 U.S. 30, 56 (1983).

Montclair should rescind the 2024 Expressive Activity Policy and return to its 2021 version,[37] which fully protected the expressive rights of students and faculty members. It should also revise its 2020 Posting Policy to comply with First Amendment requirements.

FIRE would be pleased to assist Montclair in revising its policies free of charge—in accordance with our charitable mission. We respectfully request a substantive response to this letter no later than close of business on November 18, 2024.

Sincerely,

Ross Marchand
Program Officer, Policy Reform and Campus Rights Advocacy

Encl.

---

[37] *Expressive Activity, supra* note 19.



September 26, 2024

Jonathan G.S. Koppell
Office of the President
Montclair State University
1 Normal Avenue
Montclair, New Jersey 07043

*Sent via U.S. Mail and Electronic Mail (koppellj@montclair.edu)*

Dear President Koppell:

FIRE, a nonpartisan nonprofit dedicated to defending freedom of speech,[1] is concerned by Montclair State University's restrictions on students demonstrating in outdoor spaces. The university has limited outdoor demonstrations to one small area of campus, creating a restrictive "free speech zone" and violating students' First Amendment rights to peaceably express themselves. We call on Montclair to reverse this policy and allow community members to freely express themselves outdoors subject to reasonable "time, place, and manner" restrictions permitted under the First Amendment.[2]

## I.  **Background Facts**

Montclair's 2021 Expressive Activity policy explains that "students, student organizations, and their sponsored guests may freely engage in spontaneous Expressive Activities [in outdoor campus facilities and areas] provided that such activities are in compliance with all other provisions of this policy."[3]

This policy was replaced by your November 6, 2023, communication limiting outdoor expression to one area of campus. You stated that, because "the volume [of protests] has become disruptive to teaching and learning," all "rallies and vigils" must be relocated to the Amphitheater "to allow safe expression in an area that is accessible but lessens the

---

[1] For 25 years, the Foundation for Individual Rights and Expression (FIRE) has defended freedom of expression, conscience, and religion, and other individual rights on America's university campuses. You can learn more about our expanded mission and activities at thefire.org.

[2] *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

[3] *Expressive Activity*, Outdoor Locations, MONTCLAIR STATE UNIV. (updated July 21, 2021), https://www.montclair.edu/policies/all-policies/expressive-activity/ [https://perma.cc/NX6L-7GPY]. The following is our understanding of the pertinent facts. We appreciate that you may have additional information to offer and invite you to share it with us.

impact on instruction, especially during this critical time in the semester."[4] Despite justifying this restriction by citing the "volume" of protests during a specific period of time in the fall 2023 semester, the restriction continues to be in effect almost a year later. As a result, the 2023 guidance has effectively superseded the 2021 policy.

Since November 2023, administrators have instructed students and faculty members demonstrating outside of the Amphitheater to relocate to this space. For example, last winter, administrators verbally reprimanded students and faculty members affiliated with Students for Justice in Palestine after the group members silently marched across campus.[5] In another instance, on September 5, 2024, Professor Adam Rzepka and three of his faculty colleagues held a silent protest in the main quad. Such a protest could not have caused a disturbance, yet multiple university officials told the demonstrators that they needed to move to the Amphitheater if they wished to continue protesting.[6]

On September 12, Professor Rzepka attended a meeting with Associate Provost Kenneth Sumner, Assistant Vice President Mary Colon, University Senate President Shannon Bellum, Professor Fawzia Afzal-Khan, and Professor Alan Chorun regarding the school's Expressive Activity policy.[7] When asked by Professor Rzepka during that meeting whether he, his colleagues, and students could protest outside the Amphitheater, Associate Provost Sumner replied, "you can do whatever you want."[8]

Sumner's assurance to Rzepka would quickly prove untrue. Following the meeting, Professor Rzepka, two faculty colleagues, and one student engaged in another silent protest outside of the Amphitheater.[9] After they protested for a few minutes on the main quad, Associate Provost Sumner, Assistant Vice President Colon, and Associate Vice President and Dean of Students Margaree Coleman-Carter told the demonstrators that they would have to relocate to the Amphitheater or disperse.[10] The administrators claimed that the demonstrators had not reserved the space and were therefore not allowed to protest there, even though neither the 2021 Expressive Activity policy nor your 2023 communication requires reservations for outdoor demonstrations.

On September 17, Rzepka, three faculty colleagues, and four students repeated their silent protest activity on the quad.[11] Rzepka reserved the space in advance for this protest. This

---

[4] *Respecting and Caring for Each Other During Challenging Times*, MONTCLAIR STATE UNIV. (Nov. 6, 2023), https://www.montclair.edu/president/2023/11/06/respecting-and-caring-for-each-other-during-challenging-times/.

[5] Email from Adam Rzepka to Ross Marchand (Sept. 11, 2024, 1:50 PM) (on file with author).

[6] *Id.*

[7] Email from Adam Rzepka to Ross Marchand (Sept. 12, 2024, 3:32 PM) (on file with author).

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] Email from Adam Rzepka to Ross Marchand (Sept. 17, 2024, 5:46 PM) (on file with author).

time, administrators gathered at the protest site but did not speak to the demonstrators or attempt to break up the protest.[12]

## II.    Montclair's Establishment of a Free Speech Zone Violates Students' Free Speech Rights

As a public university bound by the First Amendment,[13] Montclair may establish "reasonable time, place, and manner" restrictions on expressive activity,[14] but its rules must be content- and viewpoint-neutral, narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication.[15]

Montclair's policy is not narrowly tailored to the university's stated interest in noise reduction, as it bans speech regardless of its noise level. Furthermore, restricting all speech, regardless of noise level, to one small area of campus is not a reasonable restriction and fails to leave open alternative avenues for expression, with the rest of the open outdoor areas of campus remaining closed to all expression.[16]

Courts have repeatedly held that similar restrictions on student expression cannot withstand constitutional scrutiny. A federal district court in Ohio enjoined the University of Cincinnati from limiting all "demonstrations, picketing, or rallies" to a small "free speech area."[17] Likewise, a federal district court in California invalidated Los Angeles Pierce College's free speech zone because it did not further the college's interests in avoiding disruption and maintaining the attractiveness of campus "without unnecessarily impeding students' First Amendment rights."[18]

Montclair's free speech zone similarly fails to pass constitutional muster. While you cited easing the noise-related burdens on instructors during a critical time of the semester as a rationale for setting up this free speech zone,[19] the university could have set noise limits for demonstrations or required pre-approval for demonstrations exceeding a threshold number of students. Such provisions could have helped further the university's goal of making sure that protests were not too loud or distracting during a stressful time of the year, while stopping far short of relegating all expression to one free speech zone on campus.

---

[12] *Id.*

[13] *Healy v. James*, 408 U.S. 169, 180 (1972).

[14] *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

[15] *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

[16] *Respecting and Caring for Each Other During Challenging Times*, *supra* note 4.

[17] *University of Cincinnati Chapter of Young Americans for Liberty v. Williams*, 2012 U.S. Dist. LEXIS 80967, at *29–30 (S.D. Ohio June 12, 2012).

[18] *Shaw v. Burke*, 2018 U.S. Dist. LEXIS 7584, at *26 (C.D. Cal. Jan. 17, 2018).

[19] *Respecting and Caring for Each Other During Challenging Times*, *supra* note 4.

### III. Montclair's Inconsistent Application of a Free Speech Zone Fails to Give Students Reasonable Notice of Prohibited Activities

Any university-imposed restrictions on student speech must give students reasonable notice and a fair opportunity to know what is prohibited.[20] Montclair's constantly shifting speech restrictions and uneven enforcement of its 2021 Expressive Activity policy fail to provide this reasonable notice.

Your directive confusingly stated that Montclair "continue[s] to follow our [2021] Expressive Activity policy,"—the policy that allows for spontaneous protests in all outdoor areas of campus—only to parenthetically state immediately thereafter that events such as rallies and vigils will be relocated to the Amphitheater.[21] This irreconcilable conflict of logic means that recipients of this communication had no way to know what Montclair's policy actually was, despite the fact that the 2021 Expressive Activity policy remains on the books.[22]

Montclair faculty and students are also left to wonder whether they need a reservation to demonstrate in outdoor areas of campus outside of the Amphitheater. After telling Rzepka that he could do whatever he wanted, administrators immediately used Rzepka's lack of reservation to break up the September 12 protest. Yet they declined to break up the September 17 protest after Rzepka reserved quad space[23]—a reservation that is not required by either the 2021 Expressive Activity policy[24] or your directive.[25] While the administrators' conduct toward Rzepka and his fellow demonstrators implies that reserving space in advance is now a requirement for protesting outside the Amphitheater, this appears to have been deliberately left unstated by written policy.

A conflicting array of directives, policies, and enforcement provides insufficient notice of university rules that Montclair has every reason to know will chill speech and result in self-censorship. Indeed, such an outcome is *so* inevitable that a desire to silence constitutionally protected speech is the only possible motivation behind Monclair's behavior.

### IV. Conclusion

Montclair's establishment and inconsistent enforcement of a free speech zone is a stark illustration of a "reckless or callous indifference to the federally protected rights of others,"[26] Accordingly, we remind you that a public college administrator who violates

---

[20] *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

[21] *Id.*

[22] *Expressive Activity*, *supra* note 3.

[23] Email from Adam Rzepka to Ross Marchand (Sept. 12, 2024, 3:32 PM); Email from Adam Rzepka to Ross Marchand (Sept. 17, 2024, 5:46 PM) (on file with author).

[24] *Id.*

[25] *Respecting and Caring for Each Other During Challenging Times*, *supra* note 4.

[26] *Smith v. Wade*, 461 U.S. 30, 56 (1983).

clearly established law will not retain qualified immunity and can be held personally responsible for monetary damages for violating First Amendment rights.[27]

Montclair must make clear that the 2021 Expressive Activity policy currently published on its website is still binding, that reservations are not required for every single instance of free expression, and that the Amphitheater is not the sole venue for free expression. FIRE would be pleased to assist Montclair in training its administrators to implement the 2021 Expressive Activity policy, which protects students' and faculty's First Amendment rights.

Sincerely,

Ross Marchand
Program Officer, Policy Reform and Campus Rights Advocacy

Cc:    Kenneth Sumner, Associate Provost for Academic Personnel, Graduate School
       Mary Colon, Assistant Vice President for Academic Personnel Services
       Shannon Bellum, University Senate President
       Margaree Coleman-Carter, Associate Vice President and Dean of Students

---

[27] *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Gerlich v. Leath*, 861 F.3d 697, 709 (8th Cir. 2017) (upholding denial of qualified immunity to defendants—public university administrators—because plaintiffs' First Amendment right was clearly established).

# Exhibit R

**University Counsel**
973-655-5225
Fax: 973-655-7719



November 21, 2024

Ross Marchand
Program Officer, Policy Reform
Foundation for Individual Rights and Expression (FIRE)
700 Pennsylvania Avenue, Southeast, Suite 340
Washington, DC 20003

Dear Mr. Marchand:

I am University Counsel of Montclair State University ("University").  Please accept my apology for not responding to your September 26, 2024 letter, as I mentioned in my voicemail, the University was in the process of updating its Expressive Activity Policy.  However, as we discussed (via email), I am writing in response to your November 7, 2024, in which you incorrectly assert that the University's updated Expressive Activity Policy ("Policy"), which was published by the University on October 29, 2024, "infringes on students' and faculty members' First Amendment rights."

The University recognizes and upholds, as it must, the right to free speech under both the First Amendment and the New Jersey State Constitution. However, as you acknowledge in your letter, the University "has a compelling interest in 'preserv[ing] and protect[ing] the health, safety and welfare' of community members and members of the public." To that end, the University's Policy contains certain limitations on expressive activity on campus. Those limitations, however, are consistent with the First Amendment and the State Constitution, in that they amount to reasonable time, place, and manner restrictions, which are content neutral, narrowly tailored to serve significant government interests, and leave open ample alternative channels for communication. Startzell v. City of Philadelphia, Pennsylvania, 533 F.3d 183, 197 (3d Cir. 2008).

You state that the Policy's requirement that expressive activity not take place within 100 feet of any building entrance or within 100 feet of any academic building "ban[s] most outdoor expressive activity" and "leaves only small sections of the Alumni Green and Student Center Quad available for expressive activity." This is simply incorrect. There are ample alternative locations for expressive activity located outside of the 100-foot buffer zone surrounding building entrances and/or academic buildings. Moreover, this location restriction is content neutral, and narrowly tailored to serve the University's undeniably significant interests in keeping noise near academic buildings at a reasonable level and providing for the safe and comfortable ingress and egress of all buildings on campus. Indeed, the University campuses are primarily dedicated to academic,

student life, and administrative functions, and the University has an obligation to ensure the effective operation of those functions.

Your letter suggests that the University replace its building entrance buffer zone with, what you characterize as, "more tailored language," that would merely prohibit individuals from blocking or preventing others from entering and exiting University buildings. You also suggest that the University replace its buffer zone surrounding academic buildings with a prohibition against activities above a designated noise level occurring immediately adjacent to academic buildings. FIRE's preferences, however, for its purportedly less intrusive time, place, and manner restrictions, as opposed to the restrictions contained in the current Policy, do not render the Policy's restrictions unconstitutional. In fact, the Supreme Court has stated that "restrictions on the time, place, or manner of protected speech are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.'" Ward v. Rock Against Racism, 491 U.S. 781, 797 (1989) (citation omitted). There is no need to determine if the restrictions are the least intrusive, but rather whether the regulation "'promotes a substantial government interest that would be achieved less effectively absent the regulation.'" Id. at 799 (citation omitted). The buffer zone requirements in the Policy clearly satisfy this standard.

You also raise concerns regarding the Policy's mandate that expressive activity of the "Public" must occur at the Amphitheater on campus. The basis for your concern is the Policy's provision that "[a]ny Student, RSO, Employee, or other group recognized by the University collaborating or co-sponsoring an Expressive Activity with the Public in any way will be treated as the Public and be required to utilize the Amphitheater or Back Quad." You argue that this provision, together with the Policy's definition of "Public," which includes, in part, "any individual or entity not currently enrolled in or currently employed by the University," would render a student who asks a parent for help designing a flyer, or who practices a speech in front of a friend, "the Public," resulting in that student being confined to the Amphitheater. You also state that students distributing flyers advertising an off-campus event at a food bank would be considered "the Public" and restricted to the Amphitheater. Your conclusions regarding the facts described are wrong. Not to mention, these are not the types of situations that are meant to be captured by the Policy's provisions. In an effort to clarify????

Indeed, "[c]ollaboration or co-sponsorship" is defined in the Policy as "any coordination (financial or otherwise) between Students, Registered Student Organizations (RSOs), Employees and/or other groups recognized by the University and the Public in Expressive Activity." This definition, together with the other provisions in the Policy concerning collaboration or co-sponsorship with the Public, are meant to address the on-campus participation in expressive activity by any individual or entity not currently enrolled in or currently employed by the University, and/or the funding of on-campus expressive activity by any individual or entity not currently enrolled in or currently employed by the University. Under such circumstances, the expressive activity must take place at the Amphitheater or Back Quad. In an effort to clarify this issue, the University will consider addressing this topic on the "Questions and Answers About the Expressive Activity Policy" page of its website.

With respect to your concerns regarding the time limitations on expressive activity set forth in the Policy, such limitations constitute a reasonable time, place, and manner restriction. They are not only content neutral, but also narrowly tailored to the University's significant government interest in ensuring the effective operation of the University's educational, clinical, research, business, student life, and related functions. They also leave open ample opportunity for expressive activity. Indeed, even if you were correct in your presumption that most classes are held on weekdays and are concluded by 6:00 pm, the academic and campus life activities continue through the evening and nighttime hours during the week, and on the weekend. For example, students on campus are studying, doing homework, reading, and researching. Faculty members are holding office hours, preparing their courses, and grading papers. Limiting the time during which expressive activity is permitted on campus to 9.5 hours a day provides ample opportunity for communication on campus, while preserving the University's primary dedication to its effective operation as an academic institution. It also advances the University's significant interest in preserving and protecting the health, safety and welfare of students, employees, and the public, as it allows for proper staffing of University security and allocation of University resources during expressive activity hours. Again, the University is not constitutionally mandated to implement FIRE's preference for an extension of the hours during which expressive activity is permitted on campus simply because doing so may be less restrictive on speech. The University's time limitations constitute a reasonable time, place, and manner restriction and are, thus, constitutionally sound.

Furthermore, your argument that the Policy's reservation requirement constitutes a prior restraint on spontaneous expression appears to be based on a misreading of the Policy's provisions. Specifically, the reservation requirement applies only to expressive activity that is planned in advance and gathers individuals together. It does not apply to spontaneous expressive activity, which, by definition, is not planned in advance.

Finally, with regard to the University's Posting Policy and Regulation, the University is currently in the process of updating that policy and, upon completion and implementation of same, I would be happy to forward a copy to you.

Please do not hesitate to contact me if you have any questions.


Sincerely,


*Althea Broomfield-Michel*

Althea Broomfield-Michel
University Counsel

# Exhibit S

**FIRE**
Foundation for Individual
Rights and Expression

December 17, 2024

Althea Broomfield-Michel
University Counsel
Montclair State University
Susan A. Cole Hall 231C
1 Normal Avenue
Montclair, New Jersey 07043

*Sent via U.S. Mail and Electronic Mail (broomfieldma@montclair.edu)*

Dear Ms. Broomfield-Michel:

FIRE appreciates your response to our November 7 letter expressing concern that the university's Expressive Activity Policy and Posting Policy violate students' and faculty members' free speech rights. In addition, we are pleased that Montclair has committed to revising its Posting Policy.

However, your response misconstrues several of our arguments and mischaracterizes First Amendment case law. Consistent with our previous letter, FIRE urges Montclair to revise the latest (October 29) version of its Expressive Activity Policy to safeguard the free speech rights of students and faculty members.

I.    **Despite Its Claims, Montclair's "Designated Location" Rules Proscribe Virtually All Outdoor Expressive Activities**

In your response to FIRE's letter, you claim it is "incorrect" that "the Policy's requirement that expressive activity not take place within 100 feet of any building entrance or within 100 feet of any academic building 'ban[s] most outdoor expressive activity.'" You assert "[t]here are ample alternative locations for expressive activity located outside of the 100-foot buffer zone surrounding building entrances and/or academic buildings," but fail to identify locations on campus that would satisfy this criterion. The policy does contain a list of "Designated Locations" available for student and faculty expression, but these locations are explicitly said to be "subject to the conditions" contained elsewhere in the policy—including the "100 feet" rule.[1]

---

[1] *Expressive Activity*, Rules and Regulations Governing Expressive Activities, Montclair State Univ. (updated Oct. 29, 2024), https://www.montclair.edu/policies/all-policies/expressive-activity/ [https://perma.cc/3TJA-8FS4].

As seen in the map data in Appendix A, the policy leaves preciously little outdoor space on campus for expressive activities.[2] Further "Designated Locations" include the "Area behind Student Center Annex," "Area surrounding Cole Hall," and "Areas surrounding Blanton, Webster, and Bohn Halls."[3] These location descriptions likewise run afoul of the "100 feet" policy.[4] Students and faculty members reading the policy cannot possibly understand how they are to comply with this contradictory language.

In response to FIRE suggesting that Montclair replace its "100 feet" rule with more tailored language prohibiting individuals from blocking or preventing others from entering and exiting University buildings, you state: "FIRE's preferences ... do not render the Policy's restrictions unconstitutional. ... There is no need to determine if the restrictions are the least intrusive [way of advancing a substantial government interest]." You cite the following line from the 1989 Supreme Court case *Ward v. Rock Against Racism*: "restrictions on the time, place, or manner of protected speech are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.'"[5]

However, you ignore the fact that, just two pages later in the very same decision, the Court states that its narrow tailoring standard "**does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests**."[6] The present prohibition on expression within 100 feet of any building unquestionably burdens substantially more speech than is necessary to achieve Montclair's stated aim of safeguarding the "ingress or egress" of buildings. As we noted in our November 7 letter, expressive activities conducted 100 feet away from a building—a third of the length of a football field, or two feet further than the Cristo Redentor statue in Rio de Janeiro (see Appendix B) is tall—do not affect ingress or egress. This is especially true of small or silent demonstrations. FIRE's suggested revisions in our November 7 letter would help Montclair avoid "burden[ing] substantially more speech than is necessary" to facilitate ingress and egress of campus buildings.

## II.    Montclair Fails to Adequately Address its Broad Definition of "the Public"

In our letter, we expressed concern with Montclair's broad definition of the term "the Public," which extends even to students who "collaborate" on or "co-sponsor" an event in any way with external individuals or organizations who are also considered "the Public."[7] As we noted, this broad wording would extend to a student who asks a parent for help designing a flyer or practices a speech in front of a non-student friend. This sweeping definition is especially problematic given that expression by "the Public" is confined to the Amphitheater.[8]

---

[2] The referenced Google Maps searches are on file with author and shown for reference in Appendix A of the letter.

[3] *Expressive Activity*, *supra* note 1 at Designated Locations.

[4] *Expressive Activity*, *supra* note 1 at Definitions.

[5] 491 U.S. 781 at 797.

[6] *Id.* at 799 (emphasis added).

[7] *Expressive Activity*, *supra* note 1 at Definitions.

[8] *Expressive Activity*, *supra* note 1 at Definitions.

You allege that FIRE's "conclusions regarding the facts described are wrong," without explanation. You claim "these are not the types of situations that are meant to be captured by the Policy's provisions." If that is true, Montclair should have no problem altering the policy language to accurately capture its intended meaning.

Your citation of Montclair's definition of "[c]ollaboration or co-sponsorship"—which entails "any coordination (financial or otherwise) between Students, Registered Student Organizations (RSOs), Employees and/or other groups recognized by the University and the Public in Expressive Activity"[9]—only demonstrates FIRE's concern. By the policy's plain language, *any* degree or type of coordination between students and external individuals or organizations is grounds for confining expressive activity to the Amphitheater. As FIRE noted in its November 7 letter, Montclair could resolve this issue by clarifying that collaborating or coordinating with outside parties does not make students or faculty members "the Public," provided that campus community members retain primary control over events.

### III.    Montclair Fails to Establish That Time Limitations on Expression are Reasonable or Narrowly Tailored

Writing on November 7, FIRE criticized Montclair's 8:30 A.M. to 6:00 P.M. time window for expressive activity as neither reasonable nor narrowly tailored. Noting that "expressive activity is permitted on campus ... 9.5 hours a day," you contend "the University is not constitutionally mandated to implement FIRE's preference for an extension of the hours during which expressive activity is permitted on campus simply because doing so may be less restrictive on speech."

However, as discussed previously, the Supreme Court has held, "a time, place, or manner regulation may [not] burden substantially more speech than is necessary to further the government's legitimate interests."[10] While you cite an interest in "ensuring the effective operation of the University's educational, clinical, research, business, student life, and related functions," you fail to articulate how preventing even small or silent protests in the early evening or morning advances that interest. As FIRE noted in its November 7 letter, Montclair could resolve this issue by prohibiting non-silent expressive activities immediately adjacent to academic and residential buildings during class and evening hours, respectively.

### IV.    Montclair Misunderstands the Implications of its Advanced Notice Requirement

You plainly deny FIRE's claim that the Expressive Activity Policy's reservation requirement constitutes a prior restraint on spontaneous expression. You write, "the reservation requirement applies only to expressive activity that is planned in advance and gathers individuals together. It does not apply to spontaneous expressive activity, which, by definition, is not planned in advance."

---

[9] *Expressive Activity*, *supra* note 1 at Definitions.

[10] *Ward*, 491 U.S. 781 at 799.

But Montclair's expansive definition of advanced planning renders this distinction inconsequential. As FIRE noted in our November 7 letter, "Because the university considers [in its Expressive Activity Policy][11] any event-related social media or listserv post to constitute advanced planning and organizing, a large majority of impromptu demonstrations pertaining to current events are also likely subject to the pre-approval requirement." Even a single social media post alerting community members to an otherwise unplanned demonstration five minutes later technically triggers the university's advanced notice requirement.

Courts have made clear that broad restrictions on spontaneous expression—like requiring students to obtain permits for outdoor protests—violate the First Amendment due to "the significant burden that [advance notice and permitting requirements] place on free speech."[12] Montclair's broad "planning" language and sweeping pre-approval requirement cannot survive constitutional scrutiny and must be revised.

V.    **Conclusion**

Montclair's 2024 Expressive Activity Policy, as currently promulgated, violates students' and faculty members' rights by imposing unconstitutional restrictions on speech and requiring pre-approval for virtually all expressive activities. It is not as though these problems are unavoidable. For example, Rutgers uses the following, tailored policy language to ensure its students can enter and exit campus buildings: "Individuals may not block or prevent others from entering and exiting university buildings."[13] Yet Montclair has repeatedly rejected careful, constitutionally-sound policy language and failed to substantively address FIRE's concerns.

Again, FIRE would be pleased to assist Montclair in revising its policies to address both its legitimate concerns and its constitutional responsibilities, as we have assisted many other institutions, free of charge in accordance with our charitable mission. We respectfully request a substantive response to this letter no later than close of business on January 10, 2024.

Sincerely,

Ross Marchand
Program Officer, Policy Reform and Campus Rights Advocacy

---

[11] *Expressive Activity*, *supra* note 1 at Definitions.

[12] *Berger v. City of Seattle*, 569 F.3d 1029, 1037 (9th Cir. 2009) (advance notice and permitting requirements are presumptively invalid) (citing *Watchtower Bible & Tract Soc'y of NY, Inc. v. Vill. of Stratton,* 536 U.S. 150, 166); *see also Roberts v. Haragan*, 346 F. Supp.2d 853, 870 (N.D. Tex. 2004) (invalidating two-day advance notice requirement for students to speak in designated campus areas as "sweep[ing] too broadly in imposing a burden on a substantial amount of expression that does not interfere with any significant interests of the University").

[13] *Rutgers University Guidelines for Free Expression on Campus*, Operating Procedures for All Demonstrations, RUTGERS UNIV., https://free-expression.rutgers.edu/sites/default/files/2024-08/Rutgers-University-Free-Expression-Guidelines.pdf [https://perma.cc/3JRK-PPEU].

**APPENDIX A**

The red squares in the satellite image below of Montclair's campus demonstrate the approximate range of the policy-mandated 100-foot buffer zone around buildings. As can be seen by this image, the rule leaves little-to-no space for students to express themselves on campus.



**APPENDIX B**

*Cristo Redentor*, Rio de Janeiro, Brazil. Tourists pictured allow a size comparison. The height of the statue (sans pedestal) is 98 feet—two feet shorter than the exclusion zone required by Montclair's "100 feet" rule.[14]



*Image Source: Wikimedia Commons.*

---

[14] Calculations on file with author.